**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RAMONA MATOS RODRIGUEZ,
TATIANA CARBALLO GOMEZ,
FIDEL CRUZ HERNANDEZ,
RUSSELA MARGARITA RIVERO SARABIA,
*et al.*,

                    *Plaintiffs*,


        v.

PAN AMERICAN HEALTH ORGANIZATION,
JOAQUIN MOLINA,
ALBERTO KLEIMAN,
INDIVIDUAL DOES No. 1-10,
*et al.*,

                    *Defendants*.

**20-CV-928-JEB**

JURY TRIAL DEMANDED

## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

INTRODUCTION ................................................................................................................... 2

JURISDICTION .................................................................................................................... 6

FACTUAL ALLEGATIONS ................................................................................................ 10

    PAHO Directed, Controlled, and Profited from the Mais Medicos Program ........................... 10

    Recruitment of Cuban Medical Personnel Under Threats, Coercion, and Fear ....................... 14

    Cuba's Practice of Human Trafficking to Generate Foreign Currency Is Well-Documented .. 17

    PAHO's Knowing Participation in the Forced Labor and Human Trafficking Enterprise ....... 21

    Defendants Molina and Kleiman, and Other PAHO Officials, Conspired with Officials from Brazil and Cuba to Create and Implement the Illegal Mais Medicos Enterprise ..................... 23

    PAHO's Actions Are Internationally Wrongful Acts For Which There is No Immunity ........ 32

    Experiences of Individual Plaintiffs ......................................................................................... 42

        *Dr. Ramona Matos Rodriguez* ............................................................................................ 42

        *Dr. Tatiana Carballo Gomez* ............................................................................................... 49

        *Drs. Russela Margarita Rivero Sarabia  &  Fidel Cruz Hernandez* ..................................... 53

CLASS ACTION ALLEGATIONS ....................................................................................... 57

COUNT I:   VIOLATION OF 18 U.S.C. § 1589 & § 1590
TRAFFICKING VICTIMS PROTECTION ACT ......................................................................... 61

COUNT II:  VIOLATION OF 18 U.S.C. § 1962
RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ..................... 65

## **INTRODUCTION**

1.     Defendant, Pan American Health Organization ("PAHO"), has collected over $75 million since 2013 by enabling, managing, and enforcing illegal human trafficking of Cuban medical professionals in Brazil.  Defendants Kleiman and Molina are current PAHO officials who conspired with other Individual Doe Defendants, including other PAHO officials, and governmental ministers from Cuba and Brazil, to create the program adopted and ratified by PAHO to enable, manage, and enforce illegal human trafficking of Cuban medical professionals in Brazil. Plaintiffs are Cuban physicians who were victims of human trafficking by PAHO and who were

paid only a fraction—10% or less—of the fees the Brazilian Government paid PAHO for their services, while PAHO paid at least 85% to the Cuban government, and retained a brokerage fee of 5% for itself. PAHO, by participating in human trafficking between Cuba and Brazil, is responsible for compensating Plaintiffs for the full amount paid by Brazil for their services, and for other damages.

2.      In 2018, and for several years leading up to 2018, Cuba generated at least $8 billion every year from "medical missions" in which the government "exports" doctors and other health care workers to foreign countries. Foreign labor missions comprise the largest single element— over 50%—of the Cuban national budget.[1]   However, Cuba's generation of these astronomical sums is achieved through practices universally condemned and outlawed under international law proscribing exploitation of forced labor and human trafficking. Cuba's medical mission program:

- "recruits" participants under threat of harsh social, economic, political, personal, reputational, and legal repercussions;

- separates the workers from their families;

- refuses to inform them where they will be sent and what work they will perform;

- restricts their freedom of movement;

- pays the workers a fraction of the total sums paid by the host country for their work;

- and, in many cases, withholds a portion of their wages until they return to Cuba.

In Brazil, the Cuban medical professionals were overseen by Cuban security and intelligence personnel employed by PAHO.

3.      The employment of Cuban doctors in Brazil was organized, administered, and enforced by the Governments of Cuba and Brazil and the Pan American Health Organization.

---

[1] For the 2011-2015 time period, tourism generated approximately $2.8 billion annually to Cuba's treasury.

PAHO officials, including the individual Defendants, were and are aware that the enterprise violated international laws against forced labor and human trafficking.  PAHO entered into agreements with a private entity called the Sociedad Mercantil Comercializadora de Servicios Medicos Cubanos S.A. ("CSMC"), to carry out trafficking of Cuban medical personnel in Brazil.

4.      PAHO knowingly provided, obtained, and profited from the forced labor and trafficking of more than 10,000 Cuban doctors and medical and health care professionals in Brazil between 2013 and 2018.[2]  An estimated 3,500 of the Cuban doctors, most of whom were granted humanitarian parole by the U.S. Department of Homeland Security, now reside in the United States, with the largest number—some 1,500—in South Florida.

5.      Plaintiffs Ramona Matos Rodriguez, Tatiana Carballo Gomez, Fidel Cruz Hernandez, and Russela Margarita Rivero Sarabia are native-born Cuban physicians who worked in Brazil in the Mais Medicos Program between 2013 and 2017.   Plaintiffs were selected by the Cuban government to participate in a "patriotic" medical mission to Brazil, and understood that refusing the assignment would have subjected them to harsh political, social, professional, personal, and legal recriminations, including direct and implied threats of physical force or imprisonment against themselves and their relatives.   Plaintiffs were not provided with any information about the areas of Brazil to which they would be sent, nor what medical services they would be expected to provide.  They were not allowed to negotiate the terms of their employment agreements, but given a form agreement to sign the day before they were sent to Brazil.  Plaintiffs'

---

[2] Throughout this Complaint, the phrase "Cuban doctors" and "Cuban medical professionals," and/or "Cuban doctors and medical personnel" and "Plaintiffs" are used interchangeably, and encompass the Cuban trafficking victims who are the putative class members in this case. Similarly, the phrases "PAHO," "Defendants," "PAHO and the individual Defendants," are used interchangeably to encompass the entity and individuals against whom this action is brought, unless specifically stated otherwise.

contracts were countersigned by the same private corporation, the Sociedad Mercantil Cubana Comercializadora de Servicios Medicos Cubanos, S.A. ("CSMC"), which entered into a contract with PAHO to administer and enforce the Cuban government's terms of employment of Plaintiffs. In addition to receiving training in Portuguese, Plaintiffs were trained to indoctrinate the people they would serve in Brazil with pro-Cuban political propaganda.  In Brazil, Plaintiffs and the other Cuban doctors were continuously surveilled by Cuban intelligence service members employed by PAHO.

6.     Nothing in PAHO's Constitution authorizes it to become a broker—for a fee—of medical services between a private entity and Brazil (or any other country), much less to profit from a scheme to exploit trafficked Cuban workers under conditions that violate international human rights laws and U.S. law.  PAHO's actions in violation of its Constitution, as well as U.S. law, international law, and UN mandates, treaties, agreements, and protocols, render its actions ultra vires, and disqualify PAHO from any and all immunities or other protections it might claim apply under its Constitution and U.N. agreements and protocols.  In addition, under binding international agreements, PAHO, an international organization that engaged in internationally wrongful acts, is obligated to compensate Plaintiffs and all similarly situated Cuban doctors for the difference in sums paid to Plaintiffs and the other Cuban doctors, on the one hand, and the full amounts Brazil paid PAHO for their services, on the other, and other damages as well.  Under these agreements, PAHO has waived all immunities and is subject to this Court's jurisdiction for the purpose of enabling Plaintiffs to obtain compensation for PAHO's profiting from forced labor. Similarly, the individual Defendants' intentional and illegal actions disqualify them from any possible immunity arguments.

7.      Plaintiffs have filed this lawsuit as a class action on behalf of themselves and others similarly situated under the U.S. Trafficking Victims Protection Act, 18 U.S.C. § 1859, et seq., the Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962, et. seq., and other applicable international laws, to recover the remaining portion of the compensation Brazil paid PAHO for their services, and for other damages, including treble damages under RICO. Plaintiffs specifically reserve the right to add additional named individual Plaintiffs and defendants as warranted.


## **JURISDICTION**

8.      Plaintiff Ramona Matos Rodriquez is a resident of Miami, Florida.    Plaintiff Tatiana Carballo Gomez is a resident of Kentucky.  Plaintiffs Fidel Cruz Hernandez, and Russela Margarita Rivero Sarabia are residents of Texas.

9.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1330, §1331, 28 U.S.C. §1605, 28 U.S.C. §1595, and 18 U.S.C. §1964.  The Court has personal jurisdiction over Defendant PAHO pursuant to Fed. R. Civ. P. 4(k)(1)(A) and (D), and under 18 U.S.C. §1965(d) and 28 U.S.C. §1330(b).  First, Defendants PAHO, Molina, Kleiman, and Does 1-10 are subject to personal jurisdiction under 18 U.S.C. §1965(d), because they conducted an enterprise through a pattern of racketeering activity (forced labor and human trafficking as defined under 18 U.S.C. §1589 and §1590), and are subject to service in any judicial district in which they are found, and to personal jurisdiction in this Court based on their aggregate contacts with the United States.  PAHO is headquartered in Washington, D.C., and processed over $1.5 billion from Brazil through its Washington, D.C. bank accounts, and conducts research, service and

development activities in South Florida.[3]  Defendants Molina and Kleiman, who are both PAHO employees or officials, reside permanently or part-time in Washington, D.C., and knowingly engaged in and benefited financially from a criminal enterprise to traffic Plaintiffs and other Cuban doctors in Brazil, and possibly to violate the U.S. Embargo with Cuba.[4]  Second, PAHO is subject to personal jurisdiction under 28 U.S.C. §1330(b) because this Court has jurisdiction over Plaintiffs' claims under the Foreign Sovereign Immunities Act (FSIA) waiver, commercial activities, and international takings exceptions, 28 U.S.C. §1605(a)(1)-(3); 22 U.S.C. §288a; *Jam v. International Fin. Corp*., 139 S. Ct. 7592 (2019).

10.     Venue is proper in this Court under 28 U.S.C. § 1391(f).

11.     Defendant PAHO is affiliated with the World Health Organization (WHO), the Organization of American States (OAS), and the United Nations (UN).  According to its website, "PAHO wears two institutional hats: it is the specialized health agency of the Inter-American System and also serves as Regional Office for the Americas of the World Health Organization (WHO), the specialized health agency of the United Nations."  PAHO is a "public international organization entitled to enjoy the privileges, exemptions, and immunities conferred by the International Organizations Immunities Act of 1945"[5] ("IOIA," codified at 22 U.S.C. § 288).  Such organizations enjoy "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."[6]

---

[3] *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997).

[4] On information and belief, there is reason to believe PAHO violated the Cuban Embargo, i.e. U.S. Cuban Assets Control Regulations, 31, C.F.R. Part 515, because it appears PAHO processed transactions through the U.S. or U.S. financial institutions to Cuba without obtaining proper authorization.

[5] Executive Order 10864, 1960 WL 66346 (Pres.).

[6] 22 U.S.C. §288(b).

12.     Foreign governments and international organizations can lose their immunity under exceptions set forth in 28 U.S.C. § 1605:

**§1605.   General exceptions to the jurisdictional immunity of a foreign state:**

(a)  A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state, or upon an act performed in the United States in connection with a commercial activity of the foreign country elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state, . . . .

13.     PAHO is subject to this Court's jurisdiction under the waiver, commercial activities, and property-taken-in-violation-of-international-law exceptions to the FSIA, 28 U.S.C. § 1602-1605.[7]

14.     This Court has jurisdiction over this case under 28 U.S.C. §1605(a)(1) because PAHO has waived any immunities under applicable United Nations rules and protocols and other international agreements.  PAHO's actions in violation of its Constitution and binding international agreements render its actions ultra vires, and disqualify PAHO from any UN-sourced or other immunity. Further, UN rules and protocols and other binding sources of international law,

---

[7] *See Jam v. International Fin. Corp.*, 139 S. Ct. 7592 (2019) (resolving circuit split and holding that under the IOIA, international organizations are subject to the same immunity exceptions as foreign governments under the Foreign Sovereign Immunities Act.).

including Protocol P029 and the Articles on the Responsibility of International Organizations, affirmatively and expressly waive immunity for PAHO by mandating that PAHO must compensate Plaintiffs and other Cuban medical professionals for international wrongful acts, i.e. acts in violation of international law. The Draft Articles (DARIO) also require the United States to enforce the obligations thereunder, including ensuring jurisdiction in U.S. courts for the enforcement of PAHO's obligations under international law and U.S. law.

15.     This Court has jurisdiction over this case under 28 U.S.C. § 1605(a)(2) because PAHO's participation in the Cuba-Brazil-CSMC Mais Medicos Program falls under the commercial activity exception to foreign sovereign immunity. PAHO's participation in creating the Mais Medicos program, and in making policy, management, and enforcement decisions, and in receiving and depositing hundreds of millions of dollars in U.S. bank accounts every year since 2013, constitute (a) commercial activity carried on in the United States; (b) acts performed in the United States in connection with a commercial activity outside of the U.S.; and (c) acts outside the territory of the United States in connection with PAHO's commercial activity elsewhere that causes a direct effect in the U.S., i.e. receiving and depositing over $1.5 billion and retaining in excess of $75 million for itself in Washington, D.C. bank accounts, of illegally obtained money from Brazil.

16.     This Court has jurisdiction over this case under 28 U.S.C. § 1605(a)(3) because PAHO's and the other Defendants' participation in trafficking of Plaintiffs' labor constitutes the taking of Plaintiffs' property, i.e. their labor and wages, in violation of international law, and was conducted in connection with PAHO's commercial activity in the United States, its receiving and depositing over $1.5 billion in fees from Brazil, and its retaining in excess of $75 million for itself in Washington, D.C. bank accounts.

## FACTUAL ALLEGATIONS

**PAHO Directed, Controlled, and Profited from the Mais Medicos Program**

17.     Headquartered in Washington, D.C., Defendant PAHO's "fundamental purposes" are "to promote and coordinate efforts of the countries of the Western Hemisphere to combat disease, lengthen life, and promote the physical and mental health of the people."[8]  The PAHO Constitution limits the organization's income to "annual contributions from Member Governments" (such as the United States) and extraordinary contributions for general expenses and specific purposes from Member Governments in addition to their annual quota contributions. PAHO may also accept and administer donations and bequests to the organization provided that any conditions attached to such donations or bequests are consistent with the purposes and policies of the organization.[9]  PAHO also receives funds directly from the United Nations.[10]

18.     Contrary to its constitutional authority, PAHO became the creator, manager, and enforcer of the enterprise through which Cuba shipped medical professionals to Brazil under conditions constituting human trafficking under international law and U.S. law.   PAHO is a signatory to an agreement between Brazil and a private corporation, the Sociedad Mercantil Comercializadora de Servicios Medicos Cubanos SA ("CSMC") to enforce the obligations of Cuban doctors to the CSMC and to Brazil under an instrument titled "Technical Cooperation Agreement Between the Ministry of Public Health of the Republic of Cuba and the Pan American Health Organization/World Health Organization for Expanded Access by the Brazilian Population to Primary Health Care." The implementing agreements, which include several amendments, called for Brazil to make payment to PAHO's Citibank account in Washington, D.C. Pursuant to

---

[8] PAHO Constitution, Art. 1.
[9] PAHO Constitution, Art. 24, 25.
[10] The United States Treasury provides over 50% of PAHO's budget as a member nation.  The U.S. also provides substantial additional amounts of PAHO funding through its UN dues.

these agreements, PAHO collected hundreds of millions of dollars every year from Brazil and it

remitted 85% to Cuba, paid 10% or less to the doctors, and kept 5% for itself.  Since 2013, PAHO

collected and retained more than $75 million in fees, and remitted more than $1.3 billion to Cuba

which it received from Brazil for the forced labor and trafficking of Plaintiffs and other Cuban

doctors.   In contrast, doctors from Brazil and other countries who provided the same services in

the same locations received 100% of the amounts paid by the Brazilian Government.

19.     PAHO and the other Defendants were aware PAHO was acting in violation of its

own Constitution, Brazilian law, and international law.  For example:

a)  PAHO executed a commercial contract with a private corporation, the
    CSMC, and engaged in a commercial business outside its authority under
    PAHO's own constitution, WHO rules, and international law.

b)  When the official Brazilian Court of Audit raised questions about the
    legality of PAHO's payments to Cuba, PAHO refused to provide the
    auditors any documentation supporting its payments to Cuba or to CSMC,
    and PAHO has refused to provide that documentation to this day.

c)  PAHO has consistently, to this day, denied that it entered into any
    agreement to compensate Cuba for the services of the Cuban medical
    professionals in Brazil.  These denials are false.  In June of 2012, PAHO
    entered into an agreement with the Government of Cuba that calls for
    PAHO "**[t]o facilitate international cooperation, which is compensated**
    and at the same time, based on solidarity, the South-South cooperation, **and
    the triangulation in health care cooperation and the moving of
    resources.**"[11] That is, PAHO agreed to "triangulate" health care services
    between Cuba and another entity, for compensation.  The other entity was
    Brazil.  When the U.S. State Department and the OAS asked PAHO's
    leadership about this document, PAHO denied its existence.[12]

---

[11] The agreement is titled "Nota Estrategica, Cooperation Tecnica Entre La OMS/OPS Y La
Republica de Cuba 2012-2015 (extendida al 2017)" (Translation:  "Strategic Note – Technical
Cooperation Between the WHO/PAHO and the Republic of Cuba 2012-2015 (extended to
2017)).

[12] PAHO also refused to provide the Strategic Note to the Brazilian Court of Audit, despite the
Court's direct request for all documents supporting the transfer of money from PAHO to Cuba.

     d) The Brazilian Court of Audit found that Brazil's pay discrimination between the Cuban doctors such as Plaintiffs and the non-Cuban Mais Medicos participants violated (i) Article 5 of the Brazilian Constitution, and (ii) the WHO Global Code of Practice for International Recruitment of Health Professionals.[13]

     e) When Cuban medical professionals filed discrimination actions in Brazilian courts—because they were being paid less than non-Cuban doctors for the same work in Brazil— and those courts held that the arrangement violated the Isonomy (Equality) principle of Article 5 of the Brazilian Constitution and other Brazilian laws,  PAHO representatives pressured the Brazilian Attorney General to intervene and shut down, or divert, the court cases brought by Cuban doctors.  This threat was delivered by a senior PAHO official to Brazil's Minister of Health in Washington, D.C.

     f) PAHO's official independent external auditor, the Tribunal De Cuentas De España, recommended that PAHO establish a financial reserve to account for possible financial liabilities from the Mais Médicos Program.

20. Meeting notes demonstrate that PAHO and the other Defendants were aware PAHO was acting in violation of its own Constitution, Brazilian law, and international law.  On February 9 and 10, 2017, Defendant Molina convened a "Tripartite Meeting" with officials from Cuba, Brazil, and PAHO at the Agency Offices of the Pan American Health Organization in Havana, Cuba.  Molina "transmitted the message of PAHO Director Dr. Clarissa F. Etienne, who was aware of the working agenda of this Tripartite Meeting and who reaffirmed the commitment to the Mais Médicos Program."

21. Cuba's Vice Minister of Health, Dr. Marcia Cobas, raised Cuba's concerns about the Cuban doctors' lawsuits in Brazil.  These lawsuits claimed the doctors were being denied their rights under the Brazilian Constitution to equal treatment as foreign workers.  She admitted that

---

[13] Article 4.4 of the World Health Organization (WHO) Global Code of Practice on the International Recruitment of Health Personnel, clearly binding on PAHO, provides:  "Migrant health personnel should be hired, promoted and remunerated based on objective criteria, such as levels of qualification, years of experience and degrees of professional responsibility on the basis of equality of treatment with the domestically trained health workforce."

such claims had never been made before in any of the other countries using Cuban doctors, and

that the enforcement of such rules would undermine Cuba's medical missions program. According

to the meeting Minutes:

> Vice Minister Marcia Cobas stated that the lawsuits are a delicate issue; it is the
> first time this problem has arisen in more than 50 years of medical cooperation
> overseas and it constitutes a risk to the continuity of the program because of the
> legal guarantees that the States must offer when complying with the international
> treaties to which they are parties, which will constitute a negative precedent for the
> Brazilian Government.  The doctors working in the cooperation program are Cuban
> citizens and they sign a three-year contract.  At the end of the mission, they are
> supposed to reassume their work in the Cuban Health System.

> [Vice Minister Marcia Cobas further stated that] the Cuban doctors are covered by
> Cuban labor and administrative law, which is why this issue cannot be settled
> through Brazilian legal mechanisms.  In addition, once a doctor abandons the
> program, he or she is removed from the Cuban National Health System.  Based on
> the international agreements signed among the Parties, the doctors cannot be hired
> individually by Brazilian institutions.  We feel that the Brazilian Government must
> file a high impact lawsuit to encourage a guarantee of the international obligations
> it assumed under these agreements, since Cuba will not agree to comply with any
> such court orders, because they are a violation of national sovereignty.  The lawsuits
> filed by the Cuban doctors in Brazil are not legitimate and they can lead to the
> dismantling of the program.

22.     The Cubans, the Brazilians, and the PAHO officials in attendance all agreed that it

was up to PAHO to eliminate the doctors' legal challenges demanding equality of treatment.

PAHO's legal counsel, Ms. Heidi Jimenez, attending the meeting in person, expressly undertook

to take whatever steps were necessary to block the Cuban doctors from seeking equality of

treatment in the Brazilian courts, and agreed to treat Cuba's and Brazil's "sovereign agreements"

as superseding PAHO/WHO rules, Brazilian law, and international law.  According to the Minutes:

> Dr. Wellington Mendes, the representative of the Brazilian Ministry of Health,
> stated that the Executive Branch is in total agreement with compliance with the
> Mais Medicos Program agreements, to such an extent that this was the first item on
> the agenda, and they are committed to finding a solution to this situation, but he
> explained that the three Branches in Brazil (Executive, Judicial, and Legislative)
> are independent one of the other.  So, MINSA [Brazilian Ministry of Public Health]

has asked for an answer from MINSAP [Cuban Ministry of Public Health] and PAHO, because otherwise, it would be obligated by force of the law to comply with the lawsuits, which is what the Brazilian government does not want to do, since it would create a very dangerous precedent for the continuity of the Program.

PAHO/Washington's legal counsel Dr. Heidi Jimenez, reported on PAHO's responsibility to all of the Member States and their sovereignty. PAHO has worked jointly with Cuba and Brazil on the continuity of the agreements and in defense of the Program.
    . . . .
The Vice Minister [of the Cuban Health Ministry, Marcia Cobas] confirmed that the response to the legal proceedings in Brazil would have to come through PAHO.

Dr. Wellington Mendes asked PAHO to officially submit a response to support the defenses of the Brazilian Ministry of Health insofar as the Judicial Branch was concerned, considering the serious risk that these lawsuits could pose in personal penalties by way of the restriction of the freedom of the program's executives at the Brazilian Ministry of Health.

Dr. Heidi Jimenez then promised, on behalf of PAHO, to prepare a response [and] present it to the Brazilian Ministry of Foreign Affairs in order to enforce the international obligations of all of the Parties.[14]

### Recruitment of Cuban Medical Personnel Under Threats, Coercion, and Fear

23.     Plaintiffs and other Cuban doctors and medical personnel were recruited for the Mais Medicos program under political pressure, threats to their economic well-being, threats against their family members, and other forms of intimidation.

24.     Plaintiffs and other Cuban doctors and medical personnel understand that in Cuba's totalitarian society, their refusal to join any "revolutionary mission abroad" is considered by authorities as a lack of revolutionary commitment that automatically marks the person as politically "unreliable and dangerous." From that point on, the individual understands he or she would face continuous reprisals. The Cuban state controls economic and educational institutions,

---

[14] Minutes of Brazil-Cuba-PAHO/OMS Tripartite Meeting, February 9 and 10, 2017, at 1-3.

so refusing the "voluntary" mission results in demotions, denials of promotions, refusals to hire, and denial of the required authorization to work as self-employed.  Cuban law includes a provision on "idoneidad"—i.e.,whether the applicant holds correct political views—and this law allows employers to deny jobs if the applicant, in the employer's view, does not meet revolutionary i.e. political integration – and "correct" – ideological standards.   Risks from the government include direct and implied threats of physical force or imprisonment against themselves and their relatives.

25.     Plaintiffs, and other Cuban doctors and medical professionals who were selected to participate in international medical missions such as the Mais Medicos program, do not sign a free-market business contract based on consent.

26.     When Cuban doctors "agree" to join the revolutionary medical mission, they are not informed of the country they will be sent to, the length of absence from Cuba, or the "incentives," i.e. salary and other forms of compensation they might receive upon return to Cuba. The Cuban government also strictly limits the medical professionals' ability to bring members of their family to accompany them in the foreign country.

27.     Plaintiffs, and other Cuban doctors in the Mais Medicos program, were subjected to many other restrictions that violate international labor laws.  These include:

a) Rather than allow the medical professionals to use their Cuban passports, the Cuban government created a special travel document limited to travel between Cuba and Brazil.

b) Plaintiffs and their colleagues were informed that any movements within the country must be approved by a "minder" or "assessor" or "advisor," who is planted among the working Cuban doctors by the Cuban government. Invariably, this minder was not a doctor, a paramedic, or other medical professional, but a Cuban intelligence official; in recent years, they worked for PAHO.

c) Plaintiffs and other Cuban doctors were instructed to collect political intelligence and to campaign among the local population in favor of the Brazilian political parties supported by Cuba.[15]

d) Plaintiffs and other Cuban doctors were expected to regroup as military units if ordered to do so, for example, to defend a foreign government favorable to Cuba in the event of a coup or political crisis. In Cuba it is mandatory, in order to obtain a medical degree, to pass an intense military training program that would enable the future doctors to play a dual role as a physician and soldier in their missions abroad.

e) Plaintiffs and other Cuban doctors in Brazil were not informed that their salaries are a small fraction of what Brazil paid PAHO for their services, and that non-Cuban doctors who perform the same work are paid the full amount by Brazil. Nor were Plaintiffs informed that 85% of the sums paid by Brazil for their services is paid to the Cuban government.

f) Plaintiffs and other Cuban doctors in Brazil were not informed in advance that a portion of their compensation would be withheld and deposited into a bank account in Cuba. Nor were they informed that under Cuban law, if they "abandon" the mission, they would be precluded from recovering those sums deposited in the Cuban bank accounts. Under regulations issued by the Ministry of Public Health in Cuba (MINSAP) those who "abandoned" a mission and are interested in visiting Cuba have to wait eight years to do so. This eight-year period mirrors the period of time under Cuban law after which a bank account is deemed dormant and forfeited. Therefore, under the Mais Medicos program, administered by PAHO, it is (and was) impossible for Cuban doctors whose wages were paid into Cuban bank accounts, and who came to the U.S. under the Cuban Medical Professional Parole Program, to collect those sums.

---

[15] Cuba's use of its "medical missions" for political and intelligence-gathering purposes is well-documented. *See, e.g.,* Nicholas Casey "'*It Is Unspeakable': Maduro Used Cuban Doctors to Coerce Venezuela Voters*," THE NEW YORK TIMES, March 17, 2019, available at https://www.nytimes.com/2019/03/17/world/americas/venezuela-cuban-doctors.html (According to one Cuban doctor, "his Cuban and Venezuelan superiors told him to use the oxygen as a political weapon … to be doled out closer to the election, part of a national strategy to compel patients to vote for the government." Cuban doctors "were told to go door-to-door in impoverished neighborhoods, offering medicine and warning residents that they would be cut off from medical services if they did not vote for Mr. Maduro or his candidates.");
*see also* "*Cubanos en Bolivia quemaron títulos falsos*" LA PRENSA DEL TACHIRA, January 10, 2020 (reporting that Bolivian Minister of Communications Roxana Lizárraga announced that "many members of the medical brigade that arrived from Cuba were not doctors" but were working in "indoctrination and also intelligence." A raid by the Bolivian national police discovered half-burned false medical degrees in the dwellings of the Cuban team, which had been paid more than $147 million for its services.).

g) Defendants Molina, Kleiman, Does No. 1-10, and other PAHO officials were and are aware that the Plaintiffs and other Cuban doctors were subjected to the foregoing violations of their rights under the U.S. Trafficking Victims Protection Act, Brazilian law, international law, and PAHO and WHO rules.

**Cuba's Practice of Human Trafficking to Generate Foreign Currency Is Well-Documented**

28.    Information about Cuba's totalitarian government, its repressive central controls and suppression of individual liberties, and its practice of exporting Cuban laborers in foreign missions in violation of international law, has been a matter of public record for many years.   The U.S. State Department consistently reports that Cuba is a totalitarian government and brutal violator of human rights.    For example, the State Department's 2016 Executive Summary explains:

Cuba is an authoritarian state led by Raul Castro, who is president of the Council of State and Council of Ministers, Communist Party (CP) first secretary, and commander in chief of security forces. The constitution recognizes the CP as the only legal party and the leading force of society and of the state. The government conducted the April 2015 municipal elections with relative administrative efficiency, but they were neither free nor fair; a CP candidacy commission prescreened all candidates and the government treated non-CP candidates differently.

The national leadership, including members of the military, maintained effective control over the security forces.

The principal human rights abuses included the abridgement of the ability of citizens to choose their government; the use of government threats, physical assault, intimidation, and violent government-organized counter protests against peaceful dissent; and harassment and detentions to prevent free expression and peaceful assembly.

The following additional abuses continued: harsh prison conditions; arbitrary, short-term, politically motivated detentions and arrests; selective prosecution; denial of fair trial; and travel restrictions. Authorities interfered with privacy by engaging in significant monitoring and censoring of private communications. The government did not respect freedoms of speech and press, restricted internet access, maintained a

> monopoly on media outlets, circumscribed academic freedom, and maintained some restrictions on the ability of unregistered religious groups to gather. The government refused to recognize independent human rights groups or permit them to function legally. In addition, the government continued to prevent workers from forming independent unions and otherwise exercising their labor rights.
>
> Government officials, at the direction of their superiors, committed most human rights abuses. Impunity for the perpetrators remained widespread.[16]

The State Department's 2016 Report on Cuba's human rights record is attached to this Complaint as Exhibit 1, and incorporated herein.

29.    Plaintiffs and other Cuban doctors have no freedom of choice in deciding whether to participate in a medical mission.  They are justified in their fear that they and their family members will suffer personal and professional recriminations if they do not participate in the mission, and if they fail to abide by the Cuban government's rules while working in the mission. These rules are enforced by surveillance and discipline (e.g. threats of deportation), to control the doctors' freedom of movement and freedom of thought in Brazil (or any foreign country).

30.    The U.S. State Department Office to Monitor and Combat Trafficking in Persons has documented that Cuba's medical missions abroad constitute forced labor. In 2017, for example, the Office stated:

> The Government of Cuba does not fully meet the minimum standards for the elimination of trafficking; however, it is making significant efforts to do so. . . .  [In 2017] the government did not demonstrate increasing [anti-trafficking] efforts compared to the previous reporting period.  The penal code does not criminalize all forms of human trafficking.  **The government did not prohibit forced labor, report efforts to prevent forced labor domestically, or recognize forced labor as a possible issue affecting its nationals in medical missions abroad**. [17]

---

[16] U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2016*, https://www.state.gov/documents/organization/265790.pdf

[17] Emphasis added. The Report's reference to "significant efforts" to eliminate trafficking pertains specifically to curbing sex trafficking, not Cuba's foreign medical or other labor export programs, which Cuba has taken no steps to curtail.

The State Department's 2017 report added:

> The government is the primary employer in the Cuban economy, including in foreign medical missions that employ more than 84,000 workers in more than 67 countries, including Bolivia, Brazil, Colombia, and Venezuela. These medical missions constitute a significant source of Cuban government income.
>
> Some participants in foreign medical missions as well as other sources allege that Cuban officials force or coerce participation in the program; the government has stated the postings are voluntary, and some participants also have stated the postings are voluntary and well paid compared to jobs within Cuba. The Cuban government acknowledges that it withholds passports of overseas medical personnel in Venezuela due to security concerns; the government provided ID cards to such personnel in place of passports. There are also claims about substandard working and living conditions in some countries.
>
> In the past, there have been claims that Cuban authorities coerced participants to remain in the program, including by allegedly withholding their passports, restricting their movement, using "minders" to monitor participants outside of work, or threatening to revoke their medical licenses or retaliate against their family members in Cuba if participants leave the program. [18]

31.     In 2019, the State Department Trafficking In Persons (TIPS) Report was even more explicit in describing Cuba's medical missions as human trafficking, and the Department downgraded Cuba's human-trafficking compliance status to Level 3, the least-compliant level:

> According to statements from government officials, the government employed between 34,000-50,000 healthcare professionals in more than 60 countries in Africa, the Americas, Asia, the Middle East, and Portugal in foreign medical missions through contracts with foreign governments and, in some countries, with international organizations serving as intermediaries.

---

[18] *2017 Trafficking in Persons Report*, page 4. The State Department's note that "some participant[s]" say the posting is "voluntary" ignores that Articles 3(a) and (b) of the Palermo Protocols establish that where threats of force, coercion, fraud, deception, and the abuse of power are employed, as Plaintiffs here allege, "the consent of a victim of trafficking in persons to the intended exploitation shall be irrelevant."   The same applies for 2019. *See* footnote 19.

In November 2018, Cuba ended the five-year-old "Mais Medicos" medical mission program in Brazil, which was facilitated by a UN-affiliated organization, following demands from Brazil's then president-elect to improve the treatment and employment conditions of Cuban healthcare professionals after allegations of coercion, non-payment of wages, withholding of passports, and restrictions on their movement.

In November 2018, Cuban healthcare workers filed a class action in the U.S. District Court Southern District of Florida under the Trafficking Victims Protection and the Racketeering Influenced and Corrupt Organization Acts alleging the Cuban government profited from the export of healthcare professionals; the case remains pending. In Brazil, the Cuban government collected revenue for each professional's services and paid the worker a fraction of the revenue depositing a large percentage of the worker's wages in an account in Cuba only accessible upon completion of the mission and return to Cuba. The Cuban government collected approximately 7.2 billion pesos ($7.2 billion) in annual revenue from the export of services, including foreign medical missions in 2017.

Some participants in foreign medical missions as well as other sources allege Cuban officials force or coerce participation in the program; the government has stated the postings are voluntary, and some participants also have stated the postings are voluntary and well-paid compared to jobs within Cuba. Observers report the government does not inform participants of the terms of their contracts, making them more vulnerable to forced labor. The Cuban government acknowledges that it withholds passports of overseas medical personnel in Venezuela; the government provided identification cards to such personnel.

Some Cuban medical personnel claim they work long hours without rest and face substandard working and living conditions in some countries, including a lack of hygienic conditions and privacy. Observers note Cuban authorities coerced some participants to remain in the program, including by withholding their passports, restricting their movement, using "minders" to conduct surveillance of participants outside of work, threatening to revoke their medical licenses, retaliate against their family members in Cuba if participants leave the program, or impose criminal penalties, exile, and family separation if participants do not return to Cuba as directed by government supervisors.[19]

32.    On September 30, 2019, the U.S. State Department imposed visa restrictions under the Immigration and Nationality Act Section 212(a)(3)(C) on Cuban officials "responsible for

---

[19] *State Department 2019 Trafficking in Persons Report for Cuba*, at 162-164.

certain exploitative and coercive labor practices as part of Cuba's overseas medical missions program."[20] In support of these restrictions, the Department found that "[p]rofiting from the work of the Cuban doctors has been the decades-long practice of the Castros." It further found that the practices in the medical missions "include requiring long work hours without rest, meager wages, unsafe housing, and restricted movement." Finally, it found that "[t]he regime has also withheld passports[,] surveilled some doctors outside of work[, and] . . . compelled some Cuban doctors to use medical care as a political tool by providing care in exchange for pledges of loyalty."

**PAHO's Knowing Participation in the Forced Labor and Human Trafficking Enterprise**

33.     PAHO knowingly participated in and financially benefited from the Mais Medicos enterprise despite its integral reliance on Cuba's well-known human trafficking and forced labor practices in Brazil, and despite the venture's violation of Brazilian and WHO rules requiring equal treatment of physicians doing the same work, and despite being warned about its potential liability to compensate the Cuban doctors for treating them unequally.

34.     On August 23, 2013, the Brazilian Government Court of Audit (similar to the U.S. GAO), the Supremo Tribunal Das Contas ("Tribunal"), raised questions with the Ministry of Health about the government's payments to PAHO. The Ministry of Health acknowledged the payments to PAHO and that the retention of a large fraction of the salaries earned by the Cuban medical personnel, and PAHO's payment of hundreds of millions of dollars to the Cuban government, was never reported officially.

35.     The Tribunal also found that the unequal compensation to the Cuban doctors relative to those from Brazil and other countries violated the Brazilian Constitution's Article 5,

---

[20] Press Statement: Visa Actions Against Cuban Officials Exploiting Cuban Doctors, U.S. STATE DEPARTMENT (Sept. 30, 2019).

"isonomy" or "equality" principle, and the WHO Global Code of Practice for International Recruitment of Health Professionals.  It also found that PAHO and the Brazilian government failed to provide adequate documentation to ascertain whether PAHO's payments to Cuba were legal. The Tribunal raised the same issues in 2014, 2015, 2016, and 2017, and has not to this day been provided an explanation of PAHO's payments to Cuba or CSMC.

36.     In 2016, the Report of PAHO's independent external auditor, the Tribunal De Cuentas De España, recognized (consistent with 2015 and 2014 and 2013 audits) that PAHO's involvement in Mais Medicos raised concerns about how funds were obtained, budgeted, and spent. The Report recommended that PAHO establish a financial reserve to account for possible exposure for the pay disparities suffered by the Cuban doctors financial liabilities from the Mais Medicos Program:

> We noticed that at least 50 Cuban doctors had filed lawsuits related to the Mais Medicos project.  The claim of the lawsuits was to get a contract extension in their contracts and to achieve equal working conditions to other doctors within the same project.  Those lawsuits would imply a potential risk if those medical workers won their lawsuits and got a court ruling stating that they must receive equal working conditions to other doctors participating in the program.    This hypothetical event could provoke a massive number of lawsuits of the same nature, which would be a serious issue for the functioning of the Mais Medicos project.

The Report recommended that PAHO "avoid using general grants or budget lines to fund activities which are specifically within the scope of Mais Medicos project." The Report also recommended that PAHO "continue closely monitoring relevant decisions of the Brazilian courts about Cuban doctors' claims.  At the same time, PAHO should elaborate a contingency plan in case of favorable sentences for plaintiffs.  We also recommend continuing monitoring closely relevant decisions of the Brazilian Federal Supreme Court and keep the contingency plan updated."[21]

---

[21] Report of the External Auditor, Tribunal De Cuentas De España, 2017, page 92.

**Defendants Molina and Kleiman, and Other PAHO Officials, Conspired with Officials from Brazil and Cuba, and Among Themselves, to Create and Implement the Illegal Mais Medicos Enterprise, Which PAHO Adopted and Ratified**

37.     The Mais Medicos enterprise is the result of an elaborate, intentional, and carefully calculated scheme between and among the representatives of governments of Brazil and Cuba, PAHO, Defendants Kleiman, Molina, the individual Doe defendants, and others, to circumvent Brazilian budget, labor, and immigration laws; the Brazilian Constitution; U.S. criminal laws and international laws against forced labor and human trafficking; the U.S. embargo against financial transactions with Cuba; and PAHO's Constitution and by-laws.

38.     For many years, Cuba targeted Brazil as an opportunity to profit from medical exports.  Diplomatic cables from the Brazilian Embassy in Cuba document that throughout 2012, Cuban and Brazilian government officials, negotiated and locked down the details of the illegal enterprise through which PAHO and the other defendants provided, supplied, and benefited from the trafficking of Plaintiffs and other Cuban Doctors in Brazil. The initial mechanism for violating these laws was to introduce PAHO as an "intermediary" to receive funds from Brazil and transfer the majority of the money to Cuba; this was followed by the creation of a fraudulent "academic" research program to cover up the fact that Brazil was in fact importing Cuban medical professionals, paying Cuba and PAHO fees for the doctors' labor, and, along with PAHO, enforcing Cuba's illegal system of forced labor.

39.     2012 cables released by the Brazilian Embassy and published by the Brazilian media in November 2018 document the steps taken to establish the illegal framework for the enterprise.[22]   The participating officials acknowledged that the program would be controversial

---

[22] The contents of several cables were reported in Brazil in November 2018 by the newspaper *Folha de S.Paulo* and confirmed by *TVGlobo*.  The telegrams, kept confidential for five years, show that the negotiations were confidential to avoid reactions of the Brazilian medical class and Congress.

and would conflict with Brazil's labor laws, immigration laws, and professional medical standards. They understood that Brazilian law required congressional approval when federal funds would be paid to the Cuban government but, working in concert with Defendants Kleiman, Molina, and other highly-placed PAHO officials, created an enterprise centered around PAHO serving as an "intermediary" to conceal the commercial transactions under which Brazil would pay Cuba for the doctors' services, under Cuba's standard terms and conditions, i.e. exploiting medical professionals in a forced labor regime to generate cash for the Cuban government. The officials calculated that the "total annual value of the services" could reach $475 million.

40.     On April 23, 2012, the Brazilian Charge d'Affaires of the Brazilian Embassy in Cuba, Alexandre Ghisleni, reported to his superiors that he had been approached by Tomas Reinoso, Business Vice President of Cuban Medical Services ("SMC"), about the Cuban experience in the export of medical services. According to the cable, SMC's function was "coordinating commercialization of medical services in Cuba and in the outside. The Cuban company maintains export contracts with Algeria, China, Jamaica, Portugal, Qatar, Suriname, as well as Venezuela."

41.     On May 24, 2012, Brazil's Charge d'Affaires reported that he met with Cuba's Deputy Minister of Public Health, Marcia Cobas, at a Brazil-Cuba Economic Development Organization meeting. Ms. Cobas discussed her visit to Brazil the previous November to address the proposed sending of six thousand specialists in internal medicine, and said that preparatory measures for this mission were already under way within the Government of Cuba. There is no available documentation in May 2012 that the Brazilian government had approved Cuba's sending 6,000 medical personnel within six months.

42.     On June 22, 2012, the Brazilian Embassy in Havana reported that Brazilian Ministry of Health official Alexandro Dias ordered the embassy to cooperate with the Ministry of Health to advance its negotiations with "Cuba's health institutions to bring 6,000 Cuban doctors" to work in remote areas of Brazil.   The cable stated that the Brazilian Ministry of Health would send mission of 17 people, including Special Advisor for International Affairs in the Ministry of Health, Defendant Alberto Kleiman,  as well as State Secretaries of Health and mayors, to Havana to explain the motives and objectives of the project.  It also stated the project would have been started in a "reserved" manner, "in view of the concern about the impact of the entry of doctors in the Brazilian medical community."

43.     On July 2, 2012, Brazil's Ambassador to Cuba, Jose Eduardo M. Feliciano, sent a cable to the government describing meetings on June 27-29 with representatives of the governments of Brazil and Cuba.   The parties discussed, without resolution. a range of compensation, between $4,000 and $8,000 per doctor, though they agreed that only $1,000 would be paid to the doctors.  The "Brazilian side" also suggested that each visiting doctor would be "supervised in person and at a distance by Brazilian doctors linked to public universities." The Cuban side "showed extreme discomfort" with any possibility that the doctors would be supervised, and possibly rejected, and proposed that Brazil's role would be limited to "familiarizing the doctors with language, procedural practices, and administrative procedures." The Brazilians, in turn, insisted on some form of "follow up" "with a view to the broad debate that hiring professional foreigners must generate in the country."

44.     On July 3, 2012, Ambassador Feliciano sent another cable with further information about the June 27-29 meetings. The participants discussed the draft text of an agreement presented by the Cuban Government of the Contract for the Provision of Medical Services between the

Ministry of Public Health of Cuba and the Ministry of Health of Brazil.  The Cuban side reported

that, on its part, the company SMC ("Distributor of Cuban Medical Services, S.A.), linked to the

Ministry of Public Health, would be designated to sign the contract.  It presented a "model

contract" used in other countries, which provided that Cuban law would govern disputes.

45.     Ambassador Feliciano opined in his July 3 cable that Cuba's insistence on

advantageous provisions such as the application of Cuban law showed the proposal was a

commercial endeavor and lacked the protections for Brazil that would result from an

intergovernmental agreement:

> The above dispute settlement issue raises doubts, including whether such an
> agreement should take the contract of purchase of medical services, of
> commercial character, or an intergovernmental agreement should be signed,
> with greater security and commitment.

He added that an intergovernmental agreement "may have to be submitted to Congress, where, of

course, it would generate controversy, in any event, about the public repercussions of hiring

doctors to work in Brazil" and noted that certain provisions of the draft "deal with immigration

issues and leave to work, which involve other ministries and agencies of the Brazilian government

independent of the MS to whom it will be necessary to sign the contract."

46.     On November 23, 2012, "on the eve of" another meeting, the Brazilian and Cuban

ministers discussed "the negotiation process for the contracting by Brazil of Cuban medical

services."  The cable describing that meeting covers discussions about the number of doctors that

would be coming, and states that the Cuban Vice Minister of Health, Marcia Cobas, and Alberto

Kleiman, representing Brazil's Ministry of Health, would "continue negotiations on the

contracting of services as part of the preparation of the visit which the minister of State Health

Alexandre Padilha will make" to Havana between Dec. 2 and 4, 2012.

47.     The meetings in Havana between December 2 and 4 were reported in a cable dated December 7, 2012 by Brazil's Charge d'Affaires, Alexandre Ghisleni.  The December 7 cable exposed critical elements of the Defendants' conspiracy to violate Brazilian and U.S. laws and PAHO's Constitution and by-laws.  Brazilian officials understood the most sensitive issue was the "legal framework" for Brazil to contract for medical services, due to the absence of a bilateral agreement authorizing payments to the government of Cuba, which would require approval by the Brazilian Congress.  Nonetheless, rather than insisting on the legally appropriate approval for a program for payments by Brazil's Federal Treasury to Cuba, i.e. Congressional approval, Brazil's representatives "presented the proposal to use the Pan American Health Organization as an intermediary, characterizing the contracting of services as cooperation in the medical field."

48.     The Brazilian Embassy cables candidly admit that PAHO's role was necessary to find a way for Brazil to compensate Cuba without the approval of the Brazilian Congress:

> The second issue was even more sensitive:  what would be the legal framework governing an agreement for such services.  Considering the absence of any bilateral agreement, approved by the Brazilian Congress, allowing the transfer of Brazilian Government funds to Cuba in the medical field, the Brazilian party has submitted for consideration **a proposal to use the Pan American Health Organization (PAHO) as an intermediary, by presenting the hiring of such services as a cooperation in the medical field**.[23]

49.     The parties' candid admission that the "cooperation" rationale was a pretext for being a conduit of money to Cuba is consistent with the fact that six months earlier, in June of 2012, PAHO had already entered into a bilateral agreement with the Cuban government to guarantee it would transfer resources from third parties  as a way to compensate Cuba for the utilization of its medical professionals, i.e. to "triangulate" health care cooperation which is

---

[23] December 7, 2012 Cable from Brazilian Embassy in Havana to Ministry of Foreign Affairs, page 2, ¶3 (emphasis added).

"compensated," through the "movement of resources,"  as mentioned in paragraph 19(c) of this Complaint.  Confirming that PAHO's role as an intermediary had been secured previously, PAHO representatives were already on-site in Havana and Brasilia at the time of the December 2-4 meetings to discuss the "technical details" of the Mais Medicos program with Cuban and Brazilian officials.  The December 7, 2012 cable also states:

> In the afternoon of December 03, members of the two delegations and PAHO representatives held a technical meeting in Brasilia and Havana. PAHO representatives were excited with this project, which, if approved under the current conditions discussed, would be the largest volume ever for PAHO . . . in terms of money and deployment of personnel.  They also said it was not clear which technical requirements would be necessary to make it work, but **they assured that PAHO is fully committed to perform any adjustments needed**.[24]

50.     Cuba's Minister of Public Health, Roberto Morales, raised concerns that the involvement of PAHO, "an organization based in Washington," would "generate the risk of applying embargo rules to project operations."   Brazil's Minister of Public Health Alexandre Padilha responded that the role of PAHO's headquarters might be limited to "the approval of the project," and that the transfer of resources be carried out "directly between PAHO's offices in Brasilia and Havana.  However, Ghisleni reported to his principals that he spoke separately after the meeting with Joaquin Molina, PAHO's representative in Brazil, and Molina made it clear that any transfer of funds between local offices would be done through Washington, and that PAHO's office bank account in Brasilia is at Citibank."[25]

51.     According to Ghisleni's cable, Molina suggested that PAHO's Secretary could and would approve the role of PAHO as an "intermediary" in a program to transfer hundreds of

---

[24] *Id*., at pages 2-3, ¶4 (emphasis added).

[25] December 7, 2012 Cable from Brazilian Embassy in Havana to Ministry of Foreign Affairs, page 3, ¶5

millions of dollars to the Government of Cuba: "Molina told me that [the] PAHO Secretary has the authority to approve this kind of cooperation project. Therefore, the new Director-General would not need any endorsement or support from any collective body of the State Members to do it." As shown below, PAHO's participation in the Mais Medicos program occurred just as Molina said it would, including agreements between PAHO and the Brazilian Ministry of Health requiring the Ministry to make its payments to PAHO's Citibank account in Washington, D.C., with the vast majority of the funds to be paid to Cuba.

52.     Defendants continued to exercise substantial influence over the culmination of the negotiations. On July 13, 2013, Defendant Kleiman, still serving as an advisor to the Brazilian Minister of Health, met with Molina's assistant, Maria Alice Barbosa Fortunato (representing PAHO), and with two other advisors to the Minister of Health (Rafael Bonassa and Jean Uema), In recordings published by the Brazilian media, Ms. Fortunato states:

> If we allow the expression 'Cuban government' to be inserted in our document and our document becomes public, anybody and I mean any person, is going to understand that we are dodging and evading to do this as a bilateral agreement and this would explode.
> …
> We can pretend that the program is open to doctors coming from other countries and include them in the initial TA -- the agreement -- to allow doctors from Mercosur and Unasur, that'd represent roughly two million and that would shift the focus from Cuba allowing us to use the countries of Mercosur and Unasur.[26]

In addition, Ms. Fortunato explained that Cuban intelligence operatives would be embedded with the real doctors, and camouflaged as such:

> Let's say this: if there are nine thousand doctors and we will need 50 "consultants;" I'll include 9050 Doctors in my TA because otherwise they won't be allowed and that's what I want to defend.

---

[26] Audio of the meeting was published by the Brazilian television news program *Jornal de Band*. Mercosur and Unasur are South American intergovernmental organizations, the reference is akin to saying "Schengen Area" or "NAFTA" to refer to the countries party to those agreements.

53.     The Mais Medicos program was the result of detailed planning and execution of a criminal conspiracy to evade Brazilian law, U.S. law, international law, and PAHO organizational structures and rules. As Defendants Kleiman and Molina, and Molina's aide Fortunato told Brazil's representatives,  the program was a favorite of Brazil Presidents Lula and Rouseff,  the  Program's true character would have to be withheld from the Brazilian Congress, PAHO's Secretariat was committed to the program regardless of the evasions of the laws the Brazilian and Cuban ministers and the PAHO representatives had negotiated.[27]   As a result of these "negotiations," Kleiman, Molina, other PAHO representatives, with Brazilian and Cuban officials, decided that PAHO would be the "intermediary" for a so-called "academic" program, which was really the importation of Cuban doctors, in violation of Brazilian law, U.S. and international laws against human trafficking, the U.S. embargo, PAHO's Constitution and by- laws, and that also exceeded all of PAHO's and the UN's legitimate authority.

54.     Further, everything Molina, Kleiman, and Fortunato said would happen at these 2012 and 2013 meetings actually came to pass.  PAHO adopted and ratified all of the illegal elements of the conspiracy advanced by Molina, Kleiman, Fortunato, and others, and they became elements of the contracts that PAHO entered into (frequently amended) with Brazil's Health Ministry, and the CSMC to carry out illegal trafficking of Cuban medical personnel in Brazil, including provisions for payments through PAHO's Citibank account in Washington, D.C.

---

[27] Both Kleiman and Molina benefitted personally from the program, financially, and in obtaining higher positions of power.  Kleiman was a consultant to the Brazilian Minister of Health in 2012, but later became the PAHO Director of External Relations, Partnerships, and Resource Mobilization in Washington, D.C.  Molina was a mid-level Cuban official for PAHO at the time of the negotiations, and was then promoted around the time of the December 2012 meeting to become the PAHO Director General for all of Brazil.

55.     After the secret meetings in 2012 and 2013, the Mais Medicos program came to fruition in a series of steps designed to conceal the enterprise's multiple violations of Brazilian and international law.  First, President Rousseff signed an executive order (Medida Provisoria 621 or "Provisional Measure") on July 8, 2013, establishing the Mais Medicos Program under the guise of an academic research program.  Ostensibly, foreign medical professionals would obtain advanced medical education in exchange for providing health care to Brazilian citizens in underserved regions.  The enterprise was elaborately structured to appear to pay academic stipends (comparable to a medical school residency in the United States), conspicuously "defined" not to involve the payment of wages for employment.[28]  Under the Executive Agreement, PAHO was identified as the entity responsible for managing and enforcing the Cuban doctors' involvement in the "academic" program.

56.     In sum, Defendants Molina, Kleiman, the unnamed individual Does, and PAHO, engaged in a criminal conspiracy to violate Brazil's budgetary, immigration, and professional regulation laws; the United States Trafficking Victims Protection Act; the U.S. Embargo of Cuba; the provisions of international law outlawing forced labor and human trafficking; and PAHO's constitution and by-laws.  As such, all of the Defendants' actions were, perforce, outside of the scope of the United Nations' mandate and authority, outside of the scope of the United Nations Specialized Agency for Public Health, the World Health Organization's mandate and authority, outside the scope of PAHO's mandate and authority, and outside the scope of the individual defendants' authority as PAHO officials, hence they are not entitled to claim any immunity from this lawsuit based on the United Nations Charter, the Convention on Privileges and Immunities of

---

[28] Lei 12. 871/2013.

the United Nations ("CPIUN"), the Convention on Privileges and Immunities of United Nations

Specialized Agencies ("CPISA"), and the International Organization Immunities Act ("IOIA").[29]


**PAHO's Actions Constitute Internationally Wrongful Acts For Which There is No Immunity**

57.     Courts recognize that "forced labor constitutes a violation of a well-known,

universally recognized norm of international law."[30]  Defendants' participation in the Cuba-Brazil-

CSMC Mais Medicos Program violates international law, including binding United Nations rules

and protocols outlawing forced labor and human trafficking and requiring compensation and

access to judicial remedies for victims such as Plaintiffs and other Cuban doctors whose trafficking

PAHO enabled, manages, and enforces.  Defendants' conduct violated, and continues to violate,

the following rules and norms of international law and United Nations conventions and protocols,

to which Brazil, Cuba, and the United States are parties.

58.     The 1930 Convention No. 29, by the General Conference of the International

Labour Organization (ILO), defines forced labor as: "All work or service which is exacted from

---

[29] The provisions for immunity in the United Nations Charter, the Convention on Privileges and
Immunities of the United Nations ("CPIUN"), and the Convention on Privileges and Immunities
of the Specialized Agencies ("CPISA") do not by their terms apply to sub-organizations such as
PAHO.  Even if those conventions were deemed to apply to PAHO and its officials, the
immunities provided therein would not apply to Defendants' actions alleged in this Amended
Complaint.  Defendants here are alleged to have intentionally violated the UN's own rules and
conventions, Brazilian law, U.S. and international law, and PAHO's Constitution and rules; their
actions cannot be said to be "necessary for the fulfillment of the purposes" of the UN or
PAHO.  Nor can actions by the individual Defendants that far exceed the authority of the UN and
PAHO itself be considered to be "acts performed in their official capacity."  *See* United Nations
Charter, Article 105(1); CPIUN, Section 18; and CPISA, Section 19; and the IOIA, 22 U.S.C.
§288(d).  All Defendants' intentional, illegal actions transgress all possible authority for which
immunity might be claimed.  *See Jimenez v. Aristeguieta*, 311 F.2d 547, 557-58 (5th Cir. 1962);
*In re Estate of Ferdinand Marcos Human Rights Litig.*, 25 F.3d 1467, 1471 (9th Cir. 1994).

[30] *Licea v. Curacao Drydock, Co., Inc.,* 584 F.Supp.2d 1355, 1366 (S.D. Fla. 2008).

any person under the menace of any penalty and for which the said person has not offered himself voluntarily." (ILO C.29, Art. 1).

59.     The 1957 ILO Abolition of Forced Labour Convention (No. 105), building on the provisions of the 1930 Forced Labour Convention, states that the General Conference of the ILO adopted "further proposals with regard to the abolition of certain forms of forced or compulsory labour constituting a violation of the rights of man referred to in the Charter of the United Nations and enunciated by the Universal Declaration of Human Rights."  In Article 1, each Member which ratifies the Convention undertakes "to suppress and not to make use of any form of forced or compulsory labor … as a method of mobilizing and using labour for purposes of economic development."   In Article 2, each member undertakes "to take effective measures to secure the immediate and complete abolition of forced or compulsory labour as specified in Article 1 of this Convention."

60.     The Protocol to Prevent and Punish Trafficking in Persons, Especially Women and Children, was adopted as Annex II to the United Nations Convention Against Transnational Organized Crime, Resolution 55/25, adopted 8 January 2001.  It is known as the "UN Trafficking in Persons Protocol," or the "Palermo Protocol" and

> Declar[es] that effective action to prevent and combat trafficking in persons, especially women and children, requires a comprehensive international approach in the countries of origin, transit, and destination that includes measures to prevent such trafficking, to punish the traffickers and to protect the victims of such trafficking, including by protecting their internationally recognized rights . . .

61.     The Palermo Protocol is an applicable source of international law binding on PAHO, Brazil, the United States, Cuba, and the individual Defendants.  Article 3(a) defines "trafficking in persons" as follows:

> (a) "Trafficking in persons" shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs;

Article 3(b) provides that the "consent of the victim" shall be irrelevant where an individual has been victimized by the practices identified in Article 3(a):

> (b) The consent of a victim of trafficking in persons to the intended exploitation set forth in subparagraph (a) of this article shall be irrelevant where any of the means set forth in subparagraph (a) have been used;

62.     Article 4 of the Palermo Protocol, "Scope of Application," provides: "this Protocol shall apply except as otherwise stated herein, to the prevention, investigation, and prosecution of the offences established in accordance with article 5 of this Protocol, where those offenses are transnational in nature and involve an organized criminal group, as well as to the protection of victims of such offences."

63.     Article 5 of the Palermo Protocol, "Criminalization," provides that [e]ach State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences the conduct set forth in article 3 of this Protocol, when committed intentionally."

64.     Article 6 of the Palermo Protocol, "Protection of victims of trafficking in persons," in paragraph 6, requires each state party to ensure its legal system provides a means of compensating victims of human trafficking:

> Each State Party shall ensure that its domestic legal system contains measures that offer victims of trafficking in persons the possibility of obtaining compensation for damage suffered.

65.     Articles 3, 4, 5, and 6 are directly applicable to Plaintiffs' claims, because they establish that Defendants' actions violate bedrock rules of international law, and mandate that Member States outlaw and provide remedies for violations of these laws proscribing human trafficking.   These provisions also constitute a waiver of immunity for guilty international organizations such as PAHO and mandate that U.S. courts entertain actions such as this one notwithstanding the Defendants' likely assertion of immunity under the UN Charter, the IOIA, or any other source.

66.     The UN, ILO, and other sources of international law have pinpointed violations of the law against human trafficking in both the recruitment process as well as the implementation of the work that trafficked laborers are required to perform.   The UN Office on Drugs and Crime, Vienna, recently reported:

> The ILO also considers deceptive, coercive, or leveraged recruitment to be key elements in trafficking in persons. . . . . Indicators of Deceptive Recruitment include deception about the nature of the job, location, employer, conditions of work, the legality of work contracts, housing and living conditions, legal documentation or obtaining legal migration status, travel and recruitment conditions, wages and earnings, and educational opportunities.  Indicators of Coercive Recruitment include violence against victims or their family members, confiscation of documents, debt bondage, isolation, confinement, surveillance, threats of denunciation to authorities, threats against victims of their family members, and withholding of money.[31]

67.     The 2015 Vienna Report further elaborates on the actions that constitute forced labor and human trafficking under the ILO's Forced Labour Convention (No. 29) definition of forced labour: as "all work or service which is exacted from any person under the menace of any penalty and for which that said person has not offered himself voluntarily."  It states:

---

[31] *The Role of Recruitment Fees and Abuses and Fraudulent Practices of Recruitment Agencies in Trafficking in Persons*, *in 2015*, United Nations Office on Drugs and Crime, (2015 Vienna Report), at 16.

This means that a person is in a forced labour situation if he or she is working under conditions to which he or she did not originally consent, or consented to due to deception or coercion, and they cannot leave that job without penalty or a threat of penalty.  A penalty could include physical constraint or punishment, or other forms of abuse such as threats of deportation, the confiscation of passports, or the non-payment of wages, which effectively binds a worker to a job or employer.

According to the ILO, the indicators of forced labour include:  abuse of vulnerability; deception, restriction of movement, isolation physical and sexual violence, intimidation and threats, retention of identity documents, withholding of wages, debt bondage, abusive working and living conditions, and excessive overtime.[32]

68.     According to a different 2015 UN Report on Forced Labor and Human Trafficking:

In the current globalized economic context the terms "forced labour", "human trafficking", "slavery and slavery-like practices" or "contemporary forms of slavery" are often used interchangeably to refer to extreme forms of labour exploitation and abuse that occur at the nexus of involuntary work and new forms of coercion. These practices and institutions may be regulated by different international legal instruments and monitored or supervised by different human rights bodies, but they all have one thing in common - they constitute gross violations of fundamental human rights to life, liberty, and dignity in violation of international human rights norms and standards. [33]

69.     In 2011 the UN's International Law Commission proposed, and the UN General Assembly approved, the Final Draft Articles on the Responsibility of International Organizations "DARIO" or "Articles"), which is binding on PAHO and the individual defendants.[34]  Under the

---

[32] *Id*., at 24.

[33] *Draft Report on Forced Labour and Human Trafficking in the Southern African Development Community, Sub-regional Conference on the Ratification and Implementation of the new ILO Protocol on Forced Labour, Lusaka, Zambia, 17-18th November, 2015*, quoting *General Survey on the Fundamental Conventions Concerning the Rights at Work in Light of the ILO Declaration on Social Justice for a Fair Globalization 2008*, ILO:  Geneva, 2012, para. 252.

[34] On December 9, 2011, the UN General Assembly adopted Resolution A/RES/66/100, "Responsibility of international organizations," which provides that the General Assembly "Takes note of the articles on the responsibility of international organizations, presented by the International Law Committee, the text of which is annexed to the present resolution, and commends them to the attention of Governments and international organizations without

Articles, Defendants' enabling, managing, enforcing, and benefiting financially from the violations of international law and of domestic laws against forced labor and human trafficking of Plaintiffs and others over a five year period, constitute internationally wrongful acts, and render Defendants liable for compensating Plaintiffs and other Cuban medical professionals.  They also require the United States, including its judicial system, to provide remedies, including compensation for Plaintiffs and others similarly situated.  In addition, the Articles and Defendants' internationally wrongful conduct require that Defendants cease and desist its reprehensible conduct.

70.     The Articles constitute a waiver of immunity for international organizations such as PAHO that engage in international wrongful acts, and mandate that PAHO and the individual Defendants compensate victims of its wrongful acts, and that U.S. courts entertain actions such as this one notwithstanding the Defendant's likely assertion of immunity under the UN Charter, the IOIA, or any other source, including the following provisions:

Article 1
The present draft articles apply to the international responsibility of an international organization for an internationally wrongful act.

Article 4
There is an internationally wrongful act of an international organization when conduct consisting of an action or omission:
(a)  is attributable to that organization under international law; and
(b)  constitutes a breach of an international obligation of that organization.

Article 5
[T]he characterization of an act of an international organization as internationally wrongful is governed by international law.

Article 6
1.    The conduct of an organ or agent of an international organization in the performance of functions of that organ or agent shall be considered an act of that

---

prejudice to the question of their future adoption or other appropriate action."  This means the Articles are binding on PAHO and other UN organizations, regardless whether the Articles are formally adopted by any number of Member nations.

under international law, whatever position the organ or agent holds in respect of the organization.

2.  The rules of the organization apply in the determination of the functions of its organs and agents.

Article 10

There is a breach of an international obligation by an international organization when an act of that international organization is not in conformity with what is required of it by that obligation, regardless of the origin or character of the obligation concerned.

Article 14

An organization which aids or assists a State or another international organization in the commission of an internationally wrongful act by the State or the latter organization is internationally responsible for doing so if:

(a)  the former organization does so with knowledge of the circumstances of the internationally wrongful act; and

(b)  the act would be internationally wrongful if committed by that organization.

71.    Accordingly, under these articles, PAHO, as an international organization under the umbrella of the World Health Organization and the United Nations, is subject to and responsible for complying with the articles defining the nature and scope of internationally wrongful acts for conduct engaged in by the organization or its officials or agents, or which knowingly aids or assists a State in the commission of an internationally wrongful act, and so are the individual Defendants. Other articles supply additional rules governing Defendants' conduct:

Article 30

The international organization responsible for the internationally wrongful act is under an obligation:

(a)  to cease that act, if it is continuing;

(b) to offer appropriate assurances and guarantees of non-repetition, if circumstances so require.

Article 31

1.  The responsible international organization is under an obligation to make full reparation for the injury caused by the internationally wrongful act.

2.  Injury includes any damage, whether material or moral, caused by the internationally wrongful act of an international organization.

Article 32
    1.   The responsible international organization may not rely on its rules as justification for failure to comply with its obligations under this Part.
    2.   Paragraph 1 is without prejudice to the applicability of the rules of an international organization to the relations between the organization and its member States and organizations.

Article 33
    1.   The obligations of the responsible international organization set out in this Part may be owed to one or more States, to one or more other organizations, or to the international community as a whole, depending in particular on the character and content of the international obligation and on the circumstances of the breach.
    2.   This Part is without prejudice to any right, arising from the international responsibility of an international organization, which may accrue **directly to any person** or entity other than a State or an international organization.

Article 34
Full reparation for the injury caused by the internationally wrongful act shall take the form or restitution, compensation and satisfaction, either singly or in combination, in accordance with the provisions of this Chapter.

Article 36
    1.  The international organization responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.
    2.  The compensation shall cover any financially assessable damage including loss of profits of profits insofar as it is established.

72.     Articles 30-38 thus required, at the time of Plaintiffs' First Amended Complaint, Defendants to cease engaging in internationally wrongful acts, and prohibit PAHO and the individual Defendants from "relying on its rules as justification" for failure to comply with its obligations, such as asserting immunity to avoid providing documentation of its relationship with Cuba and other unlawful acts after being warned by its external auditors that it was engaging in wrongful activity.  Nor can Defendants justify their conduct under the PAHO/WHO mandate to provide health care to underserved areas in Latin America, because PAHO's Constitution does not authorize PAHO to violate laws against forced labor and human trafficking as a means to provide health care to underserved areas in Brazil.  Immunity does not mean impunity.  Further, the Articles

require PAHO and its officials to make full reparation, including compensation for the damage caused by its internationally wrongful act, including interest, and also make clear that PAHO's obligations under the Articles accrue directly to "any person other than a State or an international organization," which means individuals such as Plaintiffs and other Cuban medical professionals have the right to enforce the articles directly.

73.     Further, Article 40 provides:

1.  The responsible international organization shall take all appropriate measures in accordance with its rules to ensure that its members provide it with the means for effectively fulfilling its obligations under this Chapter.

2.  The members of a responsible international organization shall take all the appropriate measures that may be required by the rules of the organization in order to enable the organization to fulfil its obligations under this Chapter.

74.     Therefore, under Article 40, the United States government, as a Member State, cannot ignore the evidence that Defendants have violated UN protocols and conventions and other sources of international law.  Article 40 proscribes PAHO and its officials from asserting immunity and requires the United States, as a Member State, to "enable PAHO to fulfill its obligations under this Chapter," i.e. to provide an effective judicial forum for injured parties such as Plaintiffs to recover the compensation and ceasing of the internationally wrongful acts from PAHO. Article 41 and 42 provide:

Article 41
1.  This article applies to the international responsibility which is entailed by a serious breach by an international organization of an obligation arising under a peremptory norm of general international law.
2.  A breach of such an obligation is serious if it involves a gross or systematic failure by the responsible international organization to fulfil the obligation.

Article 42
1.  States and international organizations shall cooperate to bring an end through lawful means any serious breach within the meaning of Article 41.

> 2.   No State or international organization shall recognize as lawful a situation created by a serious breach within the meaning of article 41, nor render aid or assistance in maintaining that situation.
> 3.   This article is without prejudice to the other consequences referred to in this Part and to such further consequences that a breach to which this Chapter applies may entail under international law.

75.     Under Article 41, Defendants' five-year role supplying forced labor in Brazil, and pocketing over $75 million in fees, constitute a "systematic failure." Therefore, under Article 42, the United States and PAHO "shall cooperate to bring an end" to PAHO's serious breaches, and neither the U.S. government nor PAHO shall "recognize as lawful a situation created by a serious breach within the meaning of Article 41, nor render aid or assistance in maintaining that situation." Accordingly, Defendants may not contend their behavior is "lawful," i.e., immune, nor may the U.S. courts deem Defendants' conduct to be "lawful," i.e., immune.

76.     The Articles are emphatic that individuals such as Plaintiffs have the right to enforce its provisions, as well as other obligations imposed by international law.   Article 50 provides: "This Chapter is without prejudice to the entitlement that a person or entity other than a State or an international organization may have to invoke the international responsibility of an international organization."

**Experiences of Individual Plaintiffs**

*Dr. Ramona Matos Rodriguez*

77.     Dr. Ramona Matos Rodriguez is a doctor who was employed in the Mais Medicos venture in 2013.  She had previously served in a Cuban medical mission in Bolivia.  The director of the hospital where Dr. Matos worked selected her as one of four doctors requested by authorities for a medical mission to Brazil.  Her name was submitted to a political committee to determine whether or not she would be a political liability.   The committee investigated Plaintiff's "commitment to the revolution."  Her name and the names of her colleagues were also submitted to G-2, the Cuban intelligence service.  Although Plaintiff was not aware at the time, she later learned that G-2 agents came to her neighborhood and talked to her neighbors about her reliability as a party member.

78.     Plaintiff was ordered to attend Portuguese language training, and training in indoctrinating the people she would be treating in Brazil.   The goals of the indoctrination were to collect intelligence about who might be hostile to Cuba, and to propagandize the people about the achievements of the Cuban Revolution, and why it would be a good thing for the Brazilians to adopt that same ideology.

79.     Plaintiff knew that if she did not accept the assignment and sign, she would be subjected to various forms of harassment, intimidation, and retaliation by the Cuban government.  Plaintiff was not shown her contract until the day before she boarded the flight to Brazil.  She and other Cuban doctors who had been selected were gathered in a hall, and a member of the Cuban State Security stood before the group and said: "Here is the name of the person responsible for supervising you – fill in that name."  He wrote the name on the blackboard.  Then, he instructed Plaintiff and the others to write their own name in the blank line, and then sign the last page, and

turn it in.  Plaintiff had no opportunity to negotiate any of the terms of the agreement.  She had no choice but to sign it.

80.    Plaintiff's agreement, titled "Individual Contract for the Provision of Overseas Professional and Technical Services,"[35] was entered into with a private entity titled La Sociedad Mercantil Cubana Comercializadora de Servicios Medicos Cubanos, S.A, ("CSMC").  CSMC is described in the Contract as "signing under a mandate from the Ministry of Public Health of the Republic of Cuba."  Under the Contract, CSMC's obligation is to "guarantee the fulfillment of the obligations assumed under the Technical Cooperation Agreement Between the Ministry of Public Health of the Republic of Cuba and the Pan American Health Organization/World Health Organization for Expanded Access by the Brazilian Population to Primary Health Care."   It provided:

---

**I.  PURPOSE**

**CSMC** is hereby establishing the working relationship with the **CUBAN HEALTHCARE PROFESSIONAL** with regard to the services that the latter will provide in the Federal Republic of Brazil, under the terms and conditions agreed to herein.

**II.   RIGHTS AND OBLIGATIONS OF THE PARTIES**

**2.1   ON THE PART OF CSMC**

a)    It guarantees the fulfillment of the obligations assumed under the **TECHNICAL COOPERATION AGREEMENT BETWEEN THE MINISTRY OF PUBLIC HEALTH OF THE REPUBLIC OF CUBA AND THE PAN AMERICAN HEALTH ORGANIZATION/WORLD HEALTH ORGANIZATION FOR EXPANDED ACCESS BY THE BRAZILIAN POPULATION TO PRIMARY HEALTH CARE, hereinafter referred to as the LEGAL INSTRUMENT,** which sets forth and requires the rights and obligations arising thereunder for the **CUBAN HEALTHCARE PROFESSIONAL.**

---

[35] Original untranslated title: "Contrato Individual Para La Pretacion De Servicios Professionales Y Tecnicos En El Exterior."

81.     The Contract provided that CSMC would pay Plaintiff the equivalent of $1,000 USD per month, of which $600 would be deposited in a savings account in Cuba provided by CSMC.  While in "Brazilian territory," Plaintiff would have access to only $400 per month, paid in Brazilian reals, in an account created in Brazil for that purpose.

82.     The Contract also set forth the Plaintiff's obligations, which included having the necessary qualifications, ability, and experience to provide the services agreed to in the "Legal Instrument," i.e. the Technical Cooperation Agreement between PAHO and the Cuban government.  The Contract also included severe limits on Plaintiff's personal freedoms, including obligations which remained secret and opaque.  These included the obligations to:

a)   Fulfill the duties, tasks, and obligations assumed under the LEGAL INSTRUMENT of which she will be advised before leaving Cuba, during the 21 days of training she will receive upon her arrival in the Federal Republic of Brazil and by the Directorate of the Cuban Medical Mission in Brazil.

b)   Personally comply with the [full] work day, with working hours, shifts and rest periods she has been given, established at the institutions in the Federal Republic of Brazil where she will receive training and where she will render her services, in accordance with the LEGAL INSTRUMENT she has signed.

c)   Comply, insofar as her conduct is concerned, with the provisions of Resolution No. 168, the "Disciplinary Rules for Cuban civil workers providing services overseas as collaborators" dated March 29, 2010, issued by the Republic of Cuba's Ministry of Foreign Trade and Foreign Investment, of which she shall be advised during her training prior to leaving for overseas.

d)   Produce any documentation she is asked for [which is] needed to make the proper arrangements in the country in which she will provide her services, in accordance with the LEGAL INSTRUMENT she has signed.

e)   Keep in her possession her Passport and the Physical Person Card (PPC) delivered to her by the Brazilian authorities, and she shall be responsible for keeping same updated, as appropriate, and also for losing or mislaying same or allowing same to deteriorate.

f)   Comply with Cuban legislation with regard to marrying a foreign national; this will not relieve her from fulfilling the obligations arising under the said LEGAL INSTRUMENT and this Contract, unless determined otherwise upon

44

> prior authorization in writing from the highest echelons of the Directorate of the Cuban Medical Mission in Brazil.
>
> g)    Acknowledge that the representatives designated by the Ministry of Public Health of the Republic of Cuba to the Directorate of the Cuban Medical Mission in the territory of Brazil are vested with sufficient powers to act in her name and on her behalf before the Brazilian authorities and the OPS/OMS, in accordance with the LEGAL INSTRUMENT she has signed.

83.    Contrary to the representations in the Contract, Dr. Matos:

- was never shown the referenced "LEGAL INSTRUMENT", i.e., the Cooperation Agreement between PAHO/WHO and the Cuban Government (in fact, the Agreement has never been made public, nor has it been provided to the Federal Republic of Brazil and PAHO's external auditors);

- to the best of her knowledge, never signed the "LEGAL INSTRUMENT;"

- was never provided with a copy or advised about the "Disciplinary Rules;"

- was never provided with copies of, nor explained, the laws of the Federal Republic of Brazil, nor its customs and traditions, nor the other stated requirements.

84.    Dr. Matos's Contract also provided that if she did not fulfill the assignment, she would be liable to CSMC for "outstanding debts and obligations," and would be precluded from practicing medicine in Brazil thereafter:

> 3.5    If the CUBAN HEALTHCARE PROFESSIONAL abandons the mission, refuses to return to the national territory of Cuba and/or commits any other serious disciplinary offense, CSMC will comply with current legislation in the Republic of Cuba in order to file any claims and legal complaints available in order to recoup the outstanding debts and obligations of the CUBAN HEALTHCARE PROFESSIONAL and it will enforce the provisions of the LEGAL INSTRUMENT and Brazilian legislation with regard to prohibiting the CUBAN HEALTHCARE PROFESSIONAL from exercising the profession in Brazilian territory covered by the work permit and medical registration acquired pursuant to the LEGAL INSTRUMENT she has signed.

85.     In order to monitor and control Plaintiff's and other Cuban doctors' actions in Brazil, the government of Cuba embedded intelligence personnel in the Mais Medicos Program. Cuba's government security apparatus disguised informants as drivers, electricians, and other auxiliary personnel embedded with the Mais Medicos program.   There were also doctors who were members of the Communist Party who served in the medical mission who engaged in monitoring, surveilling, and reporting on Plaintiff and the other Cuban medical professionals in Brazil.

86.     The Cuban doctors who were Communist Party Members became PAHO's representatives in Brazil.  As the Mais Medicos program grew, PAHO's presence increased as well, in order to provide PAHO a mechanism for (a) control and surveillance of Plaintiff and other Cuban medical personnel, i.e., enforcement of PAHO's formal agreement with CSMC for the Mais Medicos program in Brazil, and (b) implementation of the "complementary protocols," i.e., 52 in total, between PAHO and Brazil, in theory, because PAHO was taking care of the doctors. However, these PAHO officials were not taking care of the doctors, but were serving as Cuban government intelligence and surveillance forces.

87.     Further, contrary to the Brazilian government's representations to its auditors, PAHO representatives did not play any role in performing or funding actual medical training, education, travel, housing, or other program related tasks for the Cuban doctors.  That is, Brazil's stated position to its auditors that PAHO used the 5% fee for administrative expenses related to the implementation of the Mais Medicos program is contrary to Plaintiff's observations and to official records showing that the Brazilian Federal government and local governments, not PAHO, paid for most if not all of the expenses of the program.

46

88.     Every night, Plaintiff and other Cuban doctors were required to confirm to the "assessors" or "advisors" that every member of the medical mission was in bed for the night.   The doctors from other countries were lodged on the other side of the compound where Plaintiff lived, so Plaintiff could see the other doctors getting ready to go out to movies, etc., but she and the other Cuban doctors had to stand in line for roll call after dinner with a 6:00 P.M. curfew.

89.     One night, Plaintiff decided she wanted a piece of bread and a cigarette. The destination was less than half a mile away (there were bakeries on every corner).   A doctor who was a Communist Party member told her she would turn in Plaintiff if she went a half block to the bakery for a piece of bread and a cigarette.   The rule was that if Plaintiff or any other Cuban mission member wanted to go out after curfew, even if they were invited out, they had to get permission of a "supervisor."   The problem was that the supervisor was located in the capital— over a mile away.   There was no way to get that permission locally, so as a practical matter Plaintiff and the other doctors could not leave the compound after 6:00 P.M.

90.     As noted, Plaintiff's contract with PAHO and the CSMC provided that she would be paid $400 per month while in Brazil, with $600 per month being sent to Cuba for her to receive when the mission ended.   After a several months in Brazil, Plaintiff learned that the Brazilian doctors and the non-Cuban doctors were being paid R$10,000 per month, 20 times more than she was earning (10 times what she would have received after returning to Cuba and collecting the funds on deposit).

91.     Plaintiff Dr. Matos decided to defect.   She was transported by a Brazilian national for nine hours from Pacaja, a small town in the Amazonian area, to Macapa, the largest city in the region, then driven another three hours to Brasilia.   She entered the U.S. Embassy and told her story to the Embassy personnel, who asked a lot of questions and told her she would get an answer

in 45 days.  Although Plaintiff was pursued by the Cuban intelligence services, the Brazilian government refused to track her down for the Cubans because to do so would have violated Brazilian law.  Plaintiff was introduced to Senator Callado, a member of the Brazilian Congress, who arranged for her to address a session of the Congress, which was broadcast live throughout Brazil.  Plaintiff told the Congress and the national audience about the conditions under which the Cuban Mais Medicos doctors were being mistreated, including that she wasn't informed about her working location or conditions or her compensation until the day she departed from Cuba, that she was being paid only $1,000 per month while Brazilian and non-Cuban doctors received at least $10,000 per month, and that she and the other Cuban doctors were told they could bring their relatives to Brazil but learned it was practically impossible because they needed to obtain exit visas from Cuba.  She informed the Congress about the workday controls by "an adviser of the Cuban Project, who, she understood, was connected to PAHO," and enumerated many of the other stifling conditions imposed on her and the other Cuban doctors in Brazil.

92.     A Brazilian lawyer filed a petition to the Brazilian Supreme Court to allow Plaintiff to leave the country.  A judge granted the petition to allow her to leave the Congress building and not be disturbed in the exercise of her constitutional rights.  Cuba, meanwhile, was putting as much pressure as possible to keep Plaintiff in Brazil, and the Brazilian President responded by signing a Presidential Decree purporting to prevent Plaintiff from practicing medicine there.  Yet, the Brazilian Federal Police, exercising their duty to protect Members of Congress, gave Plaintiff around-the-clock protection until Brazilian Federal agents accompanied her to airport and on her flight to the United States, where Plaintiff was paroled under the U.S. government's Cuban Medical Professional Parole Program.

*Dr. Tatiana Carballo Gomez*

93.      Plaintiff Dr. Tatiana Carballo Gomez is a Cuban physician who worked in Cuban medical missions in Venezuela, Belize, and Brazil.   She was working in Venezuela in 2013 when she was informed by the head of the mission from the Cuban Ministry of Health that she and some of her colleagues would be transferred to Brazil.   Plaintiff understood she would be subject to harassment and reprisals by the Cuban government if she did not accept.   She immediately began a 45-day course of study of Portuguese, and was also trained in methods of political indoctrination that she would be required to employ among the Brazilian population she would be serving as a doctor.   The point of the indoctrination was to praise the Cuban government, and urge the population to support leftist politicians in Brazil who were favorable to the Cuban government.

94.      Plaintiff was not told or shown the terms of her contract until the day before she traveled to Sao Paolo.   She was handed a form contract with two sets of blanks, one for information about her assigned CSMC "representative" during her stay in Brazil, and one for information about herself.   Plaintiff was not allowed to reject or negotiate any of the terms of the contract.   Prior to being transported to Brazil, Plaintiff was not informed about the place she would be working, nor the nature of the work she would do in Brazil.

95.      Just as in Dr. Matos's Contract, in Doctor Carballo's Contract, the contracting parties were herself and the private entity CSMC, which signed "under a mandate from the Ministry of Public Health of the Republic of Cuba."   Like Dr. Matos, Plaintiff Dr. Carballo was never shown the referenced "LEGAL INSTRUMENT," was never provided with a copy of or advised about the "Disciplinary Rules," and was never provided with copies of, nor explained, the laws of the Federal Republic of Brazil, nor its customs and traditions, nor the other stated requirements.

49

96.     Plaintiff Carballo's Contract provided that she would be paid $1,200 per month. Yet after working in Brazil she learned that doctors from Brazil and from other countries than Cuba in the same program were paid 8 times more, $10,800 per month.  She also learned that the Cuban Government was receiving $10,000 per month based on her work, whereas Brazilian doctors and doctors from other countries were receiving the full amount that the Brazilian government paid PAHO/WHO for the same services.  Plaintiff and other Cuban doctors asked the Cuban security personnel, i.e. the "advisors" or "assessors" who oversaw their lives and work in Brazil, why Cuban doctors were not getting the full amount paid by Brazil.  The Cuban Vice Minister of Health personally traveled to Brazil and told Plaintiff that the money she and the other Cuban doctors were not receiving was going back to Cuba, to pay for hospitals and other improvements.

97.     In Brazil, Plaintiff followed her specific orders to tell patients to vote against the sitting Mayor "because he did not belong to the PT Party, and if he was reelected, the patients would lose their health care."   The Mayor, who Plaintiff had previously treated, came to see her to complain.  He reminded Plaintiff that she was not only acting improperly to campaign against him as a PAHO representative, but it was untrue because the Mayor had in fact supported bringing the doctors to the town.   Plaintiff reported her encounter with the Mayor to the Cuban "advisors," who were actually Cuban intelligence officials, and they gave her permission to stop indoctrinating patients as a result of the Mayor's complaint.

98.     Plaintiff Carballo was closely supervised by "assessors' or "advisors" in Brazil. The advisors were in contact with Cuban Communist Party Members living among them.    The advisors conducted surveillance, going to her house to check up on her activities, without trying to conceal their intent.   Every movement was scrutinized by the advisors.   One time, one of

Plaintiff's Cuban medical colleagues wrote to her via social media to complain that they were not getting paid enough, and Plaintiff was warned by the advisors, who were monitoring her social media, not to talk about that subject.   In Plaintiff's view, the advisors were there "to catch you, capture you, and send you home, using the threat there were 1000 people in line in Cuba to replace her and her colleagues."

99.     Historically, Cuban Communist Party members started in the Party in a youth organization called "José Martí Pioneers."  As a result, it was natural for Plaintiff and her Cuban colleagues to refer to the Communist Party "advisors" in Brazil as "Pioneers." In one instance, in a WhatsApp chat, Plaintiff wrote that the Pioneers' only role in Brazil was to control, intimidate, and make the doctors' lives difficult.  She was immediately informed by her "advisor" not to use the term "Pioneer" any more.

100.     PAHO personnel in Brazil were connected to the program were all Cubans, and they were also members of the Cuban intelligence services.  They served as "advisors," who surveilled, threatened, and disciplined Plaintiff and other Cuban medical personnel.   This arrangement defies customary international organizational policies and practices, under which organizations are represented by members of multiple countries in their overseas missions.

101.     The PAHO advisors informed Plaintiff and other Cuban doctors that the reason PAHO was involved in the Mais Medicos Program was that the U.S. blockade of Cuba required PAHO to be the intermediary between Brazil and Cuba.   As reflected in the Brazilian Court of Audit and PAHO audit reports, PAHO's role in creating, managing, and enforcing the Cuba-Brazil-CSMC human trafficking enterprise has nothing to do with U.S. laws outlawing certain areas of trade with Cuba.

102.    Dr. Carballo was informed during her training that she would be able to have her family members from Cuba visit her in Brazil.  But when her daughter came and was granted the customary 6-month visa by Brazil, the "advisor" informed Plaintiff that if her daughter did not leave after 3 months, Plaintiff would be sent back to Cuba herself.   Plaintiff also asked for her minor (14-year old) son to be able to visit, and the Brazilian government gave him a 3-year visa.  When Cuban intelligence found out, they made her sign a supplemental agreement (with CSMC) that she would not allow her son or any other visitor to stay in Brazil more than 3 months at a time, or else Plaintiff would be expelled and returned to Cuba.   The supplemental contract violated Brazilian law governing travel rights for Plaintiff and her children, and made her minor son a hostage because he had to return to Cuba every 3 months, creating significant risk of harm to him if Plaintiff tried to defect.   This was the final straw for Plaintiff and soon afterward she began her efforts to defect, with her minor son, to the United States.

103.    The Brazilian government and PAHO have falsely attempted to justify PAHO's 5% fee from the Brazil-Cuba-CSMC venture to their auditors as payment for expenses incurred in administering the Mais Medicos Program.  However, according to Plaintiff Carballo, PAHO was not involved in her recruitment, selection, training, travel, payment of her per diem, or lodging. Plaintiff was specifically aware that her lodging expenses were paid by the local government, not PAHO.  Other records show that the Brazilian Federal government and local governments directly paid for the Mais Medicos expenses that Brazil and PAHO have claimed were paid for from PAHO's 5% fee.   Records show that the Brazilian Federal Government paid directly for the doctors' training, transportation, logistical support, and other Mais Medicos expenses, and that local governments paid for their lodging and per diem.   Any argument that PAHO paid Mais Medicos administrative fees and expenses from its 5% of the total paid by Brazil is not accurate.

104.    Plaintiff was able to escape from the Cuban government's control in a very risky move that succeeded only through good fortune.  It was widely known that Cuban intelligence officials were watching and lingering outside the U.S. consulate in Brazil, so Plaintiff applied via the internet for approval under the Cuban Medical Professional Parole Program created by the Bush Administration.   Her visa was approved on January 6, 2017.  Twenty-one days after being approved, Plaintiff sold everything she owned and came to the United States.

105.    After coming to the U.S., Plaintiff applied to the Cuban Interests Section for a new passport as identification, and sent in her red Cuba-Brazil-only travel document.  She obtained a new passport, but when she asked the Cuban Interests Section to return the red Cuba-Brazil travel document, it refused, to minimize the availability of proof that Cuba was limiting Plaintiff's mobility while in Brazil.

### Drs. Russela Margarita Rivero Sarabia  &  Fidel Cruz Hernandez

106.    Plaintiffs Dr. Russela Margarita Rivero Sarabia and Dr. Fidel Cruz Hernandez are a married couple, both physicians.  They were serving in Venezuela when they were "invited" to be part of the Cuban medical mission to Brazil.  They understood that if they refused to participate in the medical mission, they would be disadvantaged in their work or education, or subject to even more harsh measures, and so would their family members.

107.    Plaintiffs were offered "more money" to transfer to Brazil, but they were not informed that the cost of living in Brazil would be significantly higher; at that time, the Real-to-Dollar exchange rate was 1:1.  Not a single doctor who was "offered" to go to Brazil refused.

108.    Plaintiffs were given contracts by a Cuban official which they were expected to sign.  There was no negotiation, nor any contact with PAHO, the Cuban officials, or the company whose name appeared on the Contract, La Sociedad Mercantil Cubana Comercializadora de Servicios Medicos Cubanos, S.A. ("CSMC").   Plaintiffs were recruited and signed by Cuban

government officials.   It was well-known that the Cuban officials who proposed the Brazil mission were members of the Cuban State Security apparatus, G-2, located in Venezuela.

109.    Once Plaintiffs accepted the assignment for Brazil, they were sent to Cuba for a "thirty-day vacation" which included fifteen days of Portuguese language training.   They were brought to a theater with about 4,000 other medical professionals, shown two pages of an agreement, and told to sign.   Prior to departing for Brazil, Plaintiffs were not told where they would be posted or what their work responsibilities would be.   After they arrived in Brazil, they learned they would only receive $1,200 per month, a fraction of the amount they were promised.   Upon arrival in Brazil, Plaintiffs were concentrated in a facility with thousands of other Cuban doctors and taught more Portuguese.   Then they were split into groups of about 1,000 medical professionals, and only then were Plaintiffs and their Cuban medical colleagues informed about the work they were going to do in Brazil, and where they would be sent to do it.   Plaintiffs were first sent to Recife, then to Gravatá, where they were divided into groups of 100, and then sent to São Paolo.   Each group received different orders.   Plaintiffs were then assigned to Guaraujá, and "stationed" there for two and a half years.

110.    After arriving in Brazil, Plaintiffs learned they were receiving 30% of the amounts paid by Brazil, and Cuba was getting 70%.   However, they later learned Cuba was receiving at least 85% of the money being paid by Brazil for their work.   Plaintiffs protested to PAHO officials. Plaintiffs were then visited by a Cuban government official who came to Brazil to inform them that the money they weren't receiving was a "donation" from them to Cuba, to help subsidize hospitals and medical care at home.   The name of the official was Marcia Cobas.

111.    In the two and a half years Plaintiffs served in Brazil, they did not receive a raise. Moreover, during that time, the Brazilian Real was changing in value so their purchasing power

was decreasing; yet Plaintiffs received no adjustment from PAHO for the currency decline.  In contrast, the Cuban government did receive increases to account for the change in the exchange rate.  PAHO deprived Plaintiffs of increasing amounts of the compensation to which they were entitled, reducing their effective rate of pay from $1200 per month to $900 per month, due to the exchange rate, while PAHO simultaneously increased Cuba's share proportionately.[36]

112.    Plaintiffs were also promised by PAHO that all of their health-related expenses would be paid by Cuba, yet when Dr. Sarabia went to Cuba to see her dying father, who did pass away, the cost of her travel was in fact deducted from her compensation, contrary to what she had been promised.

113.    Plaintiffs were required to conduct intelligence, surveillance, and security activities among the native Brazilian population, which substantially overshadowed their medical work. Plaintiffs and other Cuban medical professionals in Brazil were themselves also under continuous surveillance by Cuban state security personnel.  Cuban intelligence officers would show up at all hours to check up on them, to make sure they were doing the assigned intelligence / security / surveillance activities, which had nothing to do with providing health care services.  In addition, if Plaintiffs were going to travel within Brazil, they had to report the time, and places they were going and coming.  Plaintiffs and the other Cuban doctors, as well as the Cuban security overseers, who worked for PAHO understood that it was illegal under Brazilian law for the Plaintiffs' movements to be so restricted and supervised.  The Cuban security personnel represented

---

[36] The decline in value of the Brazilian real during this time period affects the calculation of the aggregate amounts of U.S. dollars PAHO received, disbursed, and retained, as referenced in this Complaint.  The aggregate sums referenced in this Complaint represent the minimum amounts of U.S. dollars paid by Brazil to PAHO, for purposes of calculating Plaintiffs' damages.

themselves to be PAHO representatives, because it was illegal for a Cuban, or any foreign government official or representative, to perform such a function in Brazil.

114.     Plaintiffs were given a red travel document in Brazil, which was different than their Cuban passport.  The red document was only capable of being stamped by Brazil, not by any other country.

115.     In Brazil, Plaintiffs were working in an area that didn't justify the level of medical support assigned, so they were in fact conducting more intelligence / security / surveillance activities than medical services.  Plaintiffs were also required to provide false information about the medical services being provided and information being gathered.  They were instructed to report that they were seeing fifteen patients per day, when they were in fact seeing three or four. They were even instructed to destroy unused medicines which were not being used as reported.

## CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this action against the Defendants Pan American Health Organization ("PAHO"), Joaquin Molina, Alberto Kleiman, and Does No. 1-10, as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated.

117.    The Class is defined as follows:

> Cuban doctors and other medical and health care professionals and personnel who worked in Brazil in the Mais Medicos program between 2013 and 2018, and who resided in the U.S. at any time after October 2018.

118.    The size of the class is approximately 3,500 individuals, with approximately 1,500 currently residing in South Florida.

119.    There are numerous questions of law and fact common to the class including, but not limited to, the following common issues of fact:

   a)   Whether Plaintiffs and other Cuban Mais Medicos participants were "recruited" under the Cuban government's policy and practice of threatening repercussions (including personal threats and threats to the livelihoods and property of their families, colleagues, and friends) if they did not "volunteer."

   b)   Whether Plaintiffs and other Cuban Mais Medicos participants were denied details about the location and nature of the work they would be doing.

   c)   Whether Plaintiffs and other Cuban Mais Medicos participants were allowed to negotiate the terms of their employment agreements, or allowed to see separate legal instruments referenced in material provisions of their employment agreements.

   d)   Whether Plaintiffs and other Cuban Mais Medicos participants were severely limited in their ability to have family members visit them in Brazil.

   e)   Whether Plaintiffs and other Mais Medicos participants were severely restricted in their activities and movements in Brazil, including being required to obtain permission to leave their quarters after curfew from "assessors" or "advisers" posted by Cuba and PAHO to monitor the Plaintiffs' movements, and whether these "assessors" and "advisers" were employed by PAHO and/or by the Cuban government.

57

f) Whether Plaintiffs and other Cuban Mais Medicos participants were paid 10% or some other fraction of the total amount paid by Brazil to PAHO for their medical services.

g) What amounts PAHO collected from Brazil for its role in the Mais Medicos Program, what amounts PAHO retained for its role in the program, what amounts PAHO remitted to the Cuban government, and what amounts PAHO withheld from Plaintiffs and Cuban Mais Medico participants, which Plaintiffs and other Cuban doctors could not obtain until they returned to Cuba.

h) Whether PAHO paid any of expenses of the Mais Medicos program such as training, transportation, logistical support, lodging, and per diem expenses, or whether such expenses were paid by the Brazilian Federal government and local governments.

i) Whether Defendants were aware that their participation in the Mais Medicos Program raised serious legal issues and whether PAHO was advised to set aside a reserve to potential compensate victims of the unequal working conditions PAHO created, managed, and enforced.

j) Whether PAHO refused to provide its external auditors and the Brazilian Government's Court of Audit with documentation about its role in the Mais Medicos program, including documentation about its payments to the Cuban government and/or CSMC.

k) Whether PAHO and the other Defendants knowingly received a financial or other benefit from the creation, management, and enforcement of the Mais Medicos Program.

120. Plaintiffs' Complaint raises a number of common issues of law, including but not limited to the following:

a) Whether PAHO's and the other Defendants' management and enforcement of the Mais Medicos Program's exploitation of Plaintiffs and the Class (and/or PAHO's knowing receipt of financial benefits from such conduct) violated U.S. laws against forced labor and human trafficking, as set forth in 18 U.S.C. §§1589 and 1590.

b) Whether PAHO's and the other Defendants' actions constitute a knowing receipt of financial benefits from participation in a forced labor venture and entitle Plaintiffs and the Class to recover damages and reasonable attorney's fees under 18 U.S.C. §1595.

c) Whether PAHO's and the other Defendants' actions constitute the conduct of an enterprise through a pattern of racketeering activity, i.e., forced labor and human

trafficking, with Cuba, Brazil, and CSMC, in violation of 18 U.S.C. §§ 1589 and 1590, and possibly the U.S. Embargo on Cuba, punishable under the U.S. Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1).

d)   Whether PAHO's and the other Defendants' actions were in violation of universally recognized human rights laws, unauthorized by PAHO's Constitution, ultra vires, and a reason to disqualify PAHO's immunities under its Constitution and applicable U.N. agreements.

e)   Whether, under the Articles on the Responsibility of International Organizations, PAHO, as an international organization that engaged in internationally wrongful acts, and the individual Defendants, who engaged in internationally wrongful acts, are  obligated to compensate Plaintiffs and the Class,[37] and waived all immunities under UN agreements and protocols, as well as under any U.S. laws.

f)   Whether, under the Articles on the Responsibility of International Organizations, the United States, as a Member State, is obligated to provide Plaintiffs and other Class members with an effective forum to enforce all of the Articles, including but not limited to ensuring compensation to Plaintiffs through the U.S. court system.

g)   Whether, under Article 41 of the Articles on the Responsibility of International Organizations, PAHO's and the individual Defendants' actions constitute a systemic failure to fulfill its obligation of the peremptory norm of general international laws against forced labor, requiring that the United States and PAHO "cooperate to bring an end" to PAHO's serious breaches, and requiring that neither the U.S. government nor PAHO shall "recognize as lawful a situation created by a serious breach within the meaning of Article 41."

h)   Whether PAHO's role in the Mais Medicos Program constituted commercial activity for purposes of 28 U.S.C. Section 1605(a)(2), and *Jam v. International Fin. Corp.*, 139 S. Ct. 7592 (2019).

i)   Whether PAHO's actions constitute a taking of Plaintiffs' property in violation of international law for purposes of 28 U.S.C. Section 1605(a)(3), and *Jam v. International Fin. Corp.*, 139 S. Ct. 7592 (2019).

j)   Whether PAHO waived any immunity claims based on its conduct, as well as applicable international agreements and conventions, for purposes of 28 U.S.C. Section 1605(a)(1) and *Jam v. International Fin. Corp.*, 139 S. Ct. 7592 (2019).

---

[37] In the fall of 2018, Brazil's newly elected President Jair Bolsonaro announced that, after he assumed office in January 2019, Brazil would not hire Cuban doctors through PAHO, but would pay them directly and provide them with an opportunity to qualify to stay in Brazil long-term. Cuba then recalled the doctors from Brazil, though several thousand remained to take up President Bolsonaro's offer.

121.     Plaintiffs' claims are typical of the claims of the class as a whole.

122.     Plaintiffs will fairly and adequately protect the interests of the class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the remainder of the class. Plaintiffs have obtained counsel experienced and qualified to prosecute this action and class actions generally.

123.     Prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress of claims too small to support the expense of individual, complex litigation that involves experts in foreign languages and from foreign countries as well as experts from the United States.

124.     Class treatment is also appropriate because Defendants have acted uniformly with respect to all class members in that all were subject to the same policies of restricted freedom of movement, limited pay, limited access to family, and other restraints and threats described above.

125.     Further, the questions of law and fact common to the members of the class predominate over any questions affecting any individual member, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy between Plaintiffs and Defendants.

126.     Joinder of all class members who are geographically dispersed and number, upon information and belief, in the thousands is impracticable.  Furthermore, the expense and burden of individual litigation makes it impractical to redress the wrong done to them on an individual-by-individual claim basis.

## COUNT I:

## VIOLATION OF 18 U.S.C. § 1589 AND 1590
## THE TRAFFICKING VICTIMS PROTECTION ACT

127.     Plaintiffs repeat and re-allege Paragraphs 1-115 above as if fully set forth herein.

128.     As to all of the allegations and causes of action set forth below, "Plaintiffs" shall include the named Plaintiffs and Class members.

129.     PAHO's and the individual Defendants' participation in the Cuba-Brazil-CSMC Mais Medicos Program violated United States laws prohibiting human trafficking, including the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589(a), which forbids "provid[ing]" or "obtain[ing]" human labor:

>    (1)  by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

>    (2) by means of serious harm or threats of serious harm to that person or another person;

>    (3) by means of the abuse or threatened abuse of law or legal process; [or]

>    (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, 18 U.S.C. § 1589(a)(1-4).

130.     Further, PAHO knowingly benefited financially, and the individual Defendants knowingly benefited financially and received other things of value, from trafficking of Plaintiffs with Brazil, Cuba, and CSMC, in violation of 18 U.S.C. § 1589(b), which makes it a crime to:

>    [K]nowingly benefi[t], financially or by receiving anything of value, from participating in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any such means. 18 U.S.C. § 1589(b).

131.    PAHO's and the individual Defendants' actions violated 18 U.S.C. §§ 1589(a) and

(b) under the definitions provided in 18 U.S.C. § 1589(c), which are as follows:

> (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

> (2)  The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.
> 18 U.S.C. § 1589(c)(1-2).

132.    PAHO's actions violated 18 U.S.C. § 1589 because it knowingly provided and

obtained the labor or services of Plaintiffs by threats of force, physical restraint, threats of physical

restraint, serious harm, threats of serious harm, abuse of laws and legal process, threats of  abuse

of laws and legal process, and by participating in a scheme, plan, or pattern intended to cause

Plaintiffs and Class members to believe that if they did not comply with the restrictions and work

under the conditions PAHO instituted and enforced, they would suffer serious harm or physical

restraint. In addition, PAHO knowingly benefited financially by participating in the Mais Medicos

venture by receiving in excess of $75 million in payments from Brazil. PAHO profited from the

Mais Medicos venture, knowing, or in reckless disregard of the fact that, the Mais Medicos venture

was engaged in the illegal activity described herein, and the individual Defendants benefited

financially and received other things of value as well.  Defendants continue to violate 18 U.S.C. §

1589.

133.    PAHO's and the individual Defendants' actions also violate 18 U.S.C. § 1590,

which provides:

**§1590.    Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.**

(a)   Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. . . .

(b)   Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section shall be subject to the penalties under subsection (a).

134.    PAHO and the individual Defendants knowingly participated in the recruitment, harboring, and transportation of, and provided and obtained Plaintiffs' labor and services in violation of 18 U.S.C. §1590.   In addition, Defendants obstructed, and attempted to obstruct, and interfered with Plaintiffs and other Class members who attempted through legal means to escape or obtain relief in the Brazilian legal system, or convince Brazil to withdraw from the Cuban-PAHO Mas Medicos venture.

135.    PAHO's and the individual Defendants' actions entitle Plaintiffs to a civil remedy under 18 U.S.C. § 1595(a), which provides:

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

136.    Plaintiffs are victims of Defendants' violation of 18 U.S.C. §1589 and 1590, and bring this action against Defendants because they perpetrated human trafficking as described herein, and PAHO knowingly benefited financially from its participation in the Mais Medicos venture with Cuba, Brazil, and CSMC, and Plaintiffs invoke the jurisdiction of this Court to recover damages and reasonable attorney's fees under 18 U.S.C. § 1595(a). Plaintiffs seek

recovery of (a) the difference between the sums they were paid and the sums Brazil paid to PAHO for Plaintiffs' labor as medical professionals in Brazil in the Mais Medicos program, and (b) all other damages they suffered as a consequence of PAHO's engagement in and profiting from illegal human trafficking.

WHEREFORE, Plaintiffs demand a judgment for Plaintiffs' damages as described above, plus reasonable attorney's fees, in addition to all other relief the Court deems just and proper. Plaintiffs also demand a jury trial as to all claims triable by a jury.

**COUNT II:**

**VIOLATION OF 18 U.S.C. § 1962**
**RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

137.     Plaintiffs repeat and re-allege Paragraphs 1-115 as if fully set forth herein.

138.     As to all of the claims and causes of action set forth below, "Plaintiffs" shall include the named Plaintiffs and Class members.

139.     Defendants' conduct described herein violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d).

140.     PAHO and the individual Defendants conspired to create, and conducted the Mais Medicos enterprise, together with Brazil, Cuba, and CSMC, through a pattern of racketeering activity, namely, a pattern of forced labor in violation of 18 U.S.C. § 1589 and § 1590, as alleged above.  Defendants' violations of 18 U.S.C. § 1589 and § 1590 year after year from 2013 to 2018 constitute a "pattern" of RICO predicates that are related and continuous.[38] Over three thousand victims of Defendants' participation in the Mais Medicos enterprise currently reside in the United States, and 1,500 currently reside in South Florida.

141.     PAHO's and the individual Defendants' enabling, brokering, and enforcement of the forced labor and trafficking of Plaintiffs and thousands of other Cuban medical professionals was knowing and intentional. Defendants were original, indispensable participants in the enterprise to export Cuban medical professionals to Brazil regardless of their consent and in circumvention of Brazilian laws, including laws mandating equal pay.  In order to conduct the enterprise, Defendants, Cuba, CSMC, and Brazilian officials, recruited participants through political and legal intimidation; denied "recruits" information about their posts and duties, forced them to sign

---

[38] See footnote 37, *supra*.

employment agreements, withheld wages; restricted their movements and engaged in surveillance, control, and threats to ensure that they followed the program's strict rules (in accordance with the wishes of the Cuban government); and paid Plaintiffs and the Class members a fraction of the wages paid by Brazil for the doctors' work, while paying 85% to Cuba and keeping 5% for "fees" for itself, in violation of PAHO's constitution, U.S. law, UN rules and protocols, and other mandates of international law.

142.    Additionally, Defendants, along with the government of Cuba, individuals within the Brazilian government, and the private corporation CSMC, engaged in a RICO conspiracy under 18 U.S.C. §1962(c), in that Defendants enabled, brokered, and enforced the Cuba-Brazil-CSMC program of forced labor and human trafficking of over 8,000 Cuban medical professionals, including Plaintiffs.

143.    Defendant PAHO collected a minimum of $1.5 billion from Brazil in furtherance of the conspiracy in the United States, of which PAHO distributed more than $1 billion to Cuba and/or the private company with whom it had contracted, CSMC.  PAHO retained in excess of $75 million from the conspiracy in its bank accounts in Washington, D.C., and, contrary to Brazil's and PAHO's representations to auditors and Congressional investigators, PAHO did not use brokering fees from Brazil to defray Mais Medicos program expenses.  PAHO illegally misappropriated Plaintiffs' wages, i.e. property under U.S. and international law, by taking it into its Washington, D.C. bank accounts, and then illegally transferring Plaintiffs' property to Cuba and retaining the rest, causing Plaintiffs domestic injury under 18 U.S.C. § 1964(c), giving rise to Plaintiffs' RICO claims herein.[39]   In addition, Plaintiffs allege, on information and belief, that

---

[39] *See, e.g., Bascunan v. Alsaca*, 874 F.3d 806, 818-22 (2d Cir. 2017).

Defendants violated the U.S. Embargo on Cuba, 31 C.F.R. Part 515, giving rise to an additional domestic injury for RICO Purposes.[40]

144.    Plaintiffs have suffered damages from Defendants' creation, management, control, and profiting from the Brazil-Cuba-CSMC venture to violate Plaintiffs' rights through human trafficking, and PAHO's illegally misappropriating Plaintiffs' wages, i.e. property under U.S. and international law, by taking it into its Washington, D.C. bank accounts, and then illegally transferring Plaintiff's property to Cuba and retaining the rest.  Plaintiffs seek recovery of (a) the difference between the sums they were paid and the sums Brazil paid to PAHO for Plaintiffs' labor as medical professionals in Brazil in the Mais Medicos program, and (b) all other damages they suffered as a consequence of PAHO's engagement in and profiting from illegal human trafficking, trebled as required under 18 U.S.C. § 1964(c).

145.    Plaintiffs have retained the undersigned law firms and are entitled to recovery of reasonable attorney's fees under 18 U.S.C. § 1964, for which they also seek recovery herein.

---

[40] *Licea v. Curacao Drydock, Co., Inc.,* 584 F.Supp.2d 1355, 1359 (S.D. Fla. 2008).

WHEREFORE, Plaintiffs demand a judgment for Plaintiffs' damages as described above, trebled, plus reasonable attorney's fees, in addition to all other relief the Court deems just and proper.  Plaintiffs also demand a jury trial as to all claims triable by a jury.

Dated:  May 12, 2020                    Respectfully submitted,

DUBBIN & KRAVETZ LLP
Samuel J. Dubbin, P.A. (admitted *pro hac vice*)
Florida Bar No. 328189
1200 Anastasia Avenue
Coral Gables, Florida 33134
Tel: (305) 371-4700
        sdubbin@dubbinkravetz.com

CUNEO GILBERT & LaDUCA LLP
Jonathan W. Cuneo
Peter Gil-Montllor (to apply *pro hac vice*)
4725 Wisconsin Ave, NW, Suite 200
Washington, D.C. 20016
Telephone:  (202) 789-3960
        jonc@cuneolaw.com
        pgil-montllor@cuneolaw.com

COOPER & KIRK, PLLC
Charles J. Cooper
Michael Kirk
Haley N. Proctor
1523 New Hampshire Ave., N.W.
Washington D.C. 20036
Tel: 202-220-9660
        ccooper@cooperkirk.com

*Attorneys for Plaintiffs*

By:_____
        Jonathan W. Cuneo

# EXHIBIT 1

# CUBA 2016 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Cuba is an authoritarian state led by Raul Castro, who is president of the Council of State and Council of Ministers, Communist Party (CP) first secretary, and commander in chief of security forces.  The constitution recognizes the CP as the only legal party and the leading force of society and of the state.  The government conducted the April 2015 municipal elections with relative administrative efficiency, but they were neither free nor fair; a CP candidacy commission prescreened all candidates and the government treated non-CP candidates differently.

The national leadership, including members of the military, maintained effective control over the security forces.

The principal human rights abuses included the abridgement of the ability of citizens to choose their government; the use of government threats, physical assault, intimidation, and violent government-organized counter protests against peaceful dissent; and harassment and detentions to prevent free expression and peaceful assembly.

The following additional abuses continued:  harsh prison conditions; arbitrary, short-term, politically motivated detentions and arrests; selective prosecution; denial of fair trial; and travel restrictions.  Authorities interfered with privacy by engaging in significant monitoring and censoring of private communications.  The government did not respect freedoms of speech and press, restricted internet access, maintained a monopoly on media outlets, circumscribed academic freedom, and maintained some restrictions on the ability of unregistered religious groups to gather.  The government refused to recognize independent human rights groups or permit them to function legally.  In addition, the government continued to prevent workers from forming independent unions and otherwise exercising their labor rights.

Government officials, at the direction of their superiors, committed most human rights abuses.  Impunity for the perpetrators remained widespread.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

**a. Arbitrary Deprivation of Life and other Unlawful or Politically Motivated Killings**

There were no confirmed reports that the government or its agents committed arbitrary or unlawful killings during the year.

**b. Disappearance**

There were no reports of politically motivated long-term disappearances during the year, although there were several reports of detained activists whose whereabouts were temporarily unknown because the government did not register these detentions.  On August 1, the Cuban Commission on Human Rights and Reconciliation (CCDHRN), an independent human rights nongovernmental organization (NGO), reported human rights activist Carlos Manuel Figueroa could not be located.  The NGO later reported that he was detained for five days and then placed under house arrest until August 13 for filming the detentions of members of the independent civil society group Damas de Blanco (Ladies in White).

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

The law prohibits abusive treatment of detainees and prisoners.  There were reports, however, that members of the security forces intimidated and physically assaulted human rights and prodemocracy advocates, dissidents, and other detainees and prisoners during detention and imprisonment, and that they did so with impunity.  Some detainees and prisoners endured physical abuse, sometimes by other inmates, with the acquiescence of guards.

There were reports of police assaulting detainees or being complicit in public harassment of and physical assaults on peaceful demonstrators (see section 2.b.).

On January 10, activists Antonio Rodiles and Ailer Gonzalez reported state security officers injected them with an unknown substance when they participated in a public march calling for the release of political prisoners.  Medical evaluations in Miami produced inconclusive results about the nature of the substance.

On March 27, police officers allegedly beat two members of the Damas de Blanco with cables, and one Dama suffered an arm sprain.  Members of the Damas de Blanco reported receiving head injuries, bites, bruises, and other injuries during government-sponsored counter protests and detentions.

On July 20, Guillermo "Coco" Farinas, president of the United Anti-Totalitarian Forum (FANTU), complained of a beating by police officers that caused injuries to his ribs, abdomen, and tongue when he tried to visit a police station to check on a fellow FANTU activist.

**Prison and Detention Center Conditions**

Prison conditions continued to be harsh.  Prisons were overcrowded, and facilities, sanitation, and medical care were deficient.  There were reports of prison officials assaulting prisoners.

Physical Conditions:  The government provided no information regarding the number, location, or capacity of detention centers, which included not only prisons but also work camps and other kinds of detention facilities.

Prison and detention cells reportedly lacked adequate water, sanitation, space, light, ventilation, and temperature control.  Although the government provided basic food and some medical care, many prisoners relied on family for food and other basic supplies.  Potable water was often unavailable.  Prison cells were overcrowded.  Prisoners often slept on concrete bunks without a mattress, with some reports of more than one person sharing a narrow bunk.  Where available, mattresses were thin and often infested with vermin and insects.  Women also reported lack of access to feminine hygiene products and inadequate prenatal care.

Prisoners, family members, and NGOs reported inadequate health care, which led to or aggravated multiple maladies.  Prisoners also reported outbreaks of dengue, tuberculosis, hepatitis, and cholera.  There were reports of prison deaths from heart attacks, asthma, HIV/AIDS, and other chronic medical conditions, as well as from suicide.

Political prisoners and the general prison population were held in similar conditions.  Political prisoners who refused to wear standard prison uniforms were denied certain privileges, such as access to prison libraries and standard reductions in the severity of their sentence (for example, being transferred from a maximum-security to a medium-security prison).  Political prisoners also reported that fellow inmates, who they believed were acting on orders of prison authorities, threatened or harassed them.

Prisoners reported that solitary confinement was a common punishment for misconduct and that some prisoners were isolated for months at a time.

The government subjected prisoners who criticized the government or engaged in hunger strikes and other forms of protest to extended solitary confinement, assaults, restrictions on family visits, and denial of medical care.

Administration:  There was no publicly available information about prison administration or recordkeeping.

A legal department within the Attorney General's Office is empowered to investigate allegations of abuse in the prison system.  The results of these investigations were not publicly accessible.  By law prisoners and detainees may seek redress regarding prison conditions and procedural violations, such as continued incarceration after a prison sentence has expired.  Prisoners reported that government officials refused to allow or accept complaints, or failed to respond to complaints.

Prisoners and pretrial detainees had access to visitors, although some political prisoners' relatives reported that prison officials arbitrarily canceled scheduled visits.  Some prisoners were able to communicate information about their living conditions through telephone calls to human rights observers and family members.

The Cuban Council of Churches, the largest Protestant religious organization, reported that it organized weekly chaplain services for all prisons in the country. There were isolated reports that prison authorities did not inform inmates of their right to access religious services, delayed months before responding to such requests, and limited visits by religious groups to a maximum of two or three times per year.

Independent Monitoring:  The government did not permit monitoring of prison conditions by independent international or domestic human rights groups and did not permit access to detainees by international humanitarian organizations. Although the government pledged in previous years to allow a visit by the UN special rapporteur on torture and other cruel, inhuman, and degrading treatment or punishment, no visit occurred during the year.  The government allowed foreign journalists to tour specific prisons, but others have been off-limits since 2013.

**d. Arbitrary Arrest or Detention**

Arbitrary arrests and short-term detentions continued to be a common government method for controlling independent public expression and political activity. By law police have wide discretion to stop and question citizens, request identification, and carry out arrests and searches. Police used laws against public disorder, contempt, lack of respect, aggression, and failing to pay minimal or arbitrary fines as ways to detain civil society activists. Police officials routinely conducted short-term detentions, at times assaulting detainees. The law provides that police officials furnish suspects a signed "act of detention," noting the basis, date, and location of any detention in a police facility and a registry of personal items seized during a police search, but this law was not always followed. Arbitrary stops and searches were most common in urban areas and at government-controlled checkpoints at the entrances to provinces and municipalities.

Police and security officials continued to use short-term and sometimes violent detentions to prevent independent political activity or free assembly. Such detentions generally lasted from several hours to several days. The CCDHRN counted 9,940 detentions through the end of the year, compared with 8,616 in 2015. Members of the #TodosMarchamos campaign, which included Damas de Blanco, reported weekly detentions of members to prevent demonstrations. The largest opposition group, Patriotic Union of Cuba (UNPACU), also reported an increase in short-term detentions. Long-term imprisonment of peaceful government critics, while rare, sometimes occurred. In December UNPACU published a list of 46 political prisoners throughout the country serving more than one month in prison for reported peaceful protests or assemblies.

The law allows a maximum four-year preventive detention of individuals not charged with an actual crime, with a subjective determination of "potential dangerousness," defined as the "special proclivity of a person to commit crimes, demonstrated by conduct in manifest contradiction of socialist norms." Mostly used as a tool to control "antisocial" behaviors, such as substance abuse or prostitution, authorities also used such detention to silence peaceful political opponents. On March 14, authorities charged UNPACU activist Luis Bello Gonzalez with precriminal social dangerousness and sentenced him to three years in prison. UNPACU leaders alleged authorities arrested and charged Gonzalez because of his regular participation in protests alongside other UNPACU members.

**Role of the Police and Security Apparatus**

The Ministry of Interior exercises control over police, internal security forces, and the prison system. The ministry's National Revolutionary Police is the primary

law enforcement organization.  Specialized units of the ministry's state security branch are responsible for monitoring, infiltrating, and suppressing independent political activity.  The police supported state security agents by carrying out house searches, arresting persons of interest to the ministry, and providing interrogation facilities.

The police routinely violated procedural laws with impunity and at times failed or refused to provide citizens with legally required documentation, particularly during arbitrary detentions and searches.  Security force members also committed civil rights and human rights abuses with impunity.

Although the law on criminal procedure prohibits the use of coercion during investigative interrogations, police and security forces at times relied on aggressive and physically abusive tactics, threats, and harassment during questioning.  Detainees reported that officers intimidated them with threats of long-term detention, loss of child custody rights, denial of permission to depart the country, and other punishments.

There were no official mechanisms readily available to investigate government abuses.

Undercover police and Ministry of Interior agents were often present and directed activities to disrupt efforts at peaceful assembly (see section 2.b.).

According to independent reports, state-orchestrated counter protests directed against independent civil society groups and individuals, including the Damas de Blanco and other organizations, were organized to prevent meetings or to shame participants publicly (see section 2.a.).  The Damas de Blanco and other members of the #TodosMarchamos campaign experienced weekly government-sponsored counter protests at their usual gathering place in Havana from January until March, when the government shut down the demonstrations altogether.  Government-sponsored counter protests continued for several months outside of the Damas de Blanco headquarters to prevent large demonstrations by activists.

**Arrest Procedures and Treatment of Detainees**

Under criminal procedures, police have 24 hours after an arrest to present a criminal complaint to an investigative police official.  The investigative police have 72 hours to investigate and prepare a report for the prosecutor, who in turn

has 72 hours to recommend to the appropriate court whether to open a criminal investigation.

Within the 168-hour detention period, detainees must be informed of the basis for the arrest and criminal investigation and have access to legal representation.  Those charged may be released on bail, placed in home detention, or held in continued investigative detention.  Once the accused has an attorney, the defense has five days to respond to the prosecution's charges, after which a court date usually is set. Prosecutors may demand summary trials "in extraordinary circumstances" and in cases involving crimes against state security.

There were reports that defendants met with their attorneys for the first time only minutes before their trials and were not informed of the basis for their arrest within the required 168-hour period.

Reports suggested bail was available, although typically not granted to those arrested for political activities.  Time in detention before trial counted toward time served, if convicted.

Detainees may be interrogated at any time during detention and have no right to request the presence of counsel during interrogation.  Detainees have the right to remain silent, but officials do not have a legal obligation to inform them of that right.

By law investigators must complete criminal investigations within 60 days. Prosecutors may grant investigators two 60-day extensions upon request, for a total of 180 days of investigative time.  The supervising court may waive this deadline in "extraordinary circumstances" and upon special request by the prosecutor.  In that instance no additional legal requirement exists to complete an investigation and file criminal charges, and authorities may detain a person without charge indefinitely.

Arbitrary Arrest:  Officials often disregarded legal procedures governing arrest, detaining suspects longer than 168 hours without informing them of the nature of the arrest or affording them legal counsel.

Pretrial Detention:  The government held detainees for months or years in investigative detention, in both political and nonpolitical cases.  In nonpolitical cases delays were often due to bureaucratic inefficiencies and a lack of checks on police.

<u>Detainee's Ability to Challenge Lawfulness of Detention before a Court</u>:
Detainees are able to challenge in court the legal basis or arbitrary nature of their
detention, but these challenges were rarely successful, especially regarding
detentions alleged to have been politically motivated.  On December 6, the mother
of graffiti artist Danilo Maldonado, known as "El Sexto," petitioned the court for a
writ of habeas corpus after authorities detained her son on November 26; El Sexto
had painted graffiti on an exterior wall of a Havana hotel.  The court denied the
petition, and his mother submitted a second petition on December 13, which
remained pending at year's end.

## e. Denial of Fair Public Trial

While the constitution recognizes the independence of the judiciary, the judiciary
is directly subordinate to the National Assembly and the CP, which may remove or
appoint judges at any time.  Political considerations thoroughly dominated the
judiciary, and there was virtually no separation of powers between the judicial
system, the CP, and the Council of State.

Civilian courts exist at the municipal, provincial, and national levels.  Special
tribunals convene behind closed doors for political ("counterrevolutionary") cases
and other cases deemed "sensitive to state security."  Officials denied entry to trials
by some observers during the year.  Military tribunals may also have jurisdiction
over civilians if any of the defendants are members of the military, police force, or
other law enforcement agency.

**Trial Procedures**

Due process rights apply equally to all citizens as well as foreigners, but courts
regularly failed to protect or observe these rights.  The law presumes defendants to
be innocent until proven guilty, but authorities often ignored this, placing the
burden on defendants to prove innocence.

Defendants generally have the right to a public trial, but politically motivated trials
were at times held in secret, with authorities citing exceptions for crimes involving
"state security" or "extraordinary circumstances."  Many cases were concluded
quickly and were closed to the press.  Interpretation was sometimes provided
during trials, but the government claimed that limited resources prevented
interpreters from always being available.

The law requires that defendants be represented by an attorney, at public expense, if necessary.  Defendants' attorneys may cross-examine government witnesses and present witnesses and evidence.  Only state attorneys are licensed to practice in criminal courts.

Criteria for admitting evidence were arbitrary and discriminatory.  According to reports, prosecutors routinely introduced irrelevant or unreliable evidence to prove intent or testimony about the revolutionary credentials of a defendant.

Defense attorneys have the right to review the investigation files of a defendant, but not if the charges involve "crimes against the security of the state."  In these cases defense attorneys were not allowed access until charges were filed.  Many detainees, especially political detainees, reported their attorneys had difficulties accessing case files due to administrative obstacles.

In trials where defendants are charged with "potential dangerousness" (see section 1.d.), the state must show only that the defendant has "proclivity" for crime, so an actual criminal act need not have occurred.  Penalties may be up to four years in prison.  Authorities normally applied this provision to prostitutes, alcoholics, young persons who refused to report to work centers; repeat offenders of laws restricting change of domicile; and political activists who participated in public protests.

The law recognizes the right of appeal in municipal courts but limits it in provincial courts to cases involving lengthy prison terms or the death penalty.

**Political Prisoners and Detainees**

The government continued to deny holding any political prisoners but refused access to its prisons and detention centers by international humanitarian organizations and the United Nations.

The number of political prisoners was difficult to determine.  Lack of governmental transparency and systemic violations of due process rights obfuscated the true nature of criminal charges, investigations, and prosecutions, allowing government authorities to prosecute and sentence peaceful human rights activists for criminal violations or "dangerousness."  The government used the designation of "counterrevolutionary" for inmates deemed to be political opposition, but it did not release those numbers.  The government continued to deny access to its prisons and detentions centers by independent monitors who

could help determine the size of the political prisoner population.  At least two independent organizations estimated there were 75 to 95 political prisoners.  The government closely monitored these organizations, which often faced harassment from state police.

On September 23, authorities arrested independent lawyer Julio Alfredo Ferrer Tamayo during a police raid on the legal aid center Cubalex (see section 1.f.).  Although police released all other detained employees in less than 24 hours, Ferrer remained in detention through the end of the year.  According to Cubalex, Ferrer received a suspended three-year sentence in February for allegedly falsifying documents in relation to the attempted establishment of a civil society organization in 2010, and police cited this earlier arrest as a reason for refusing his release.

Political prisoners reported the government held them in isolation for extended periods.  They did not receive the same protections as other prisoners or detainees.  The government also frequently denied political prisoners access to home visits, prison classes, telephone calls, and, on occasion, family visits.

**Civil Judicial Procedures and Remedies**

Although it is possible to seek judicial remedies through civil courts for violations of administrative determinations, independent legal experts noted that general procedural and bureaucratic inefficiencies often delayed or undermined the enforcement of administrative determinations and civil court orders.  Civil courts, like all courts in the country, lacked independence and impartiality as well as effective procedural guarantees.  No courts allowed claimants to bring lawsuits seeking remedies for human rights violations.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

The constitution protects citizens' privacy rights in their homes and correspondence, and police must have a warrant signed by a prosecutor or magistrate before entering or conducting a search.  Nevertheless, there were reports that government officials routinely and systematically monitored correspondence and communications between citizens, tracked their movements, and entered homes without legal authority and with impunity.  Additionally, in August civil society organizations complained that text messages containing specific words including "democracy" and "dissident" were systematically blocked.

Police searched homes and seized personal goods without legally required documentation.

In May, and again in November, UNPACU reported major search and seizure operations at private homes used as headquarters in Santiago de Cuba and Havana. In both cases police confiscated printed materials, cameras, computers, printers, flash drives, and money.

On September 23, the Center for Legal Information (Cubalex), an independent legal aid center, reported a large search and seizure operation of its headquarters. Police seized five computers, four laptops, multiple hard drives, USB drives, cell phones, and more than 300 records of legal cases. Police also strip-searched Cubalex lawyers, threatened the employees with prison time, and opened an investigation into their alleged illicit activities.

The Ministry of Interior employed a system of informants and neighborhood committees, known as "Committees for the Defense of the Revolution," to monitor government opponents and report on their activities. Agents from the ministry's General Directorate for State Security subjected foreign journalists, visiting foreign officials and diplomats, academics, and businesspersons to frequent surveillance, including electronic surveillance.

The CP is the only legally recognized political party, and the government actively suppressed attempts to form other parties (see section 3). The government encouraged mass political mobilization and favored citizens who actively participated (see section 2.b.).

Family members of government employees who leave international work missions without official permission at times faced government harassment or loss of employment, access to education, or other public benefits.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Press**

The constitution provides for freedom of speech and press only insofar as it "conforms to the aims of socialist society." Laws banning criticism of government leaders and distribution of antigovernment propaganda carry penalties ranging from three months to 15 years in prison.

Freedom of Speech and Expression:  The government had little tolerance for public criticism of government officials or programs and limited public debate of issues considered politically sensitive.  State security regularly harassed the organizers of independent fora for debates on cultural and social topics to force them to stop discussing issues deemed controversial.  Forum organizers reported assaults by state security, video surveillance installed outside of venues, and detention of panelists and guests on the days they were expected to appear.

Several government workers reported being fired for expressing dissenting opinions or affiliating with independent organizations.  For example, in August local radio station journalist Jose Ramirez Pandoja was fired for publishing a controversial speech by the deputy director of the CP's official newspaper, *Granma,* on his personal blog.  The speech cited young journalists leaving traditional media outlets due to censorship policies and low salaries.

Several university professors and researchers reported they were forced from their positions or demoted for expressing ideas or opinions outside of government-accepted norms.

During the year some religious groups reported greater latitude to express their opinions during sermons and at religious gatherings, although most members of the clergy continued to exercise self-censorship.  Religious leaders in some cases criticized the government, its policies, and even the country's leadership without reprisals.  The Roman Catholic Church operated a cultural and educational center in Havana that hosted debates featuring participants expressing different opinions about the country's future.  On January 8, the government closed open-air churches in Camaguey and Las Tunas and detained three pastors associated with the Apostolic movement, an unregistered network of Protestant churches.  The government claimed that the pastors erected the churches without permission, but the pastors denied that claim.  One of the pastors was later charged and convicted of violating neighborhood noise ordinances related to his Sunday sermons.

Press and Media Freedoms:  The government directly owned all print and broadcast media outlets and all widely available sources of information.  News and information programming was generally uniform across all outlets, with the exception of broadcasts of Venezuelan government news programming.  The government also controlled nearly all publications and printing presses, and the CP must give prior approval for printing of nearly all publications.  The party censored public screenings and performances.  The government also limited the importation of printed materials.  Foreign correspondents in the country had limited access to

and often were denied interviews with government officials.  They also struggled to gather facts and reliable data for stories.  Despite meeting government vetting requirements, official journalists who reported on sensitive subjects did so at personal risk, and the government restricted the ability of official journalists to work for unofficial media outlets in addition to their official duties.  *Granma* correspondent Jose Antonio Torres remained in prison at the end of the year; he was sentenced in 2012 to 14 years' imprisonment on charges of espionage for articles he wrote.

Violence and Harassment:  The government does not recognize independent journalism, and independent journalists sometimes faced government harassment, including detention and physical abuse.  Most detentions involved independent journalists who filmed arrests and harassment of #TodosMarchamos activists.  Several journalists were detained, had their equipment confiscated, and were harassed for covering the aftermath of Hurricane Matthew.  Some independent journalists reported interrogations by state security agents for publishing articles critical of government institutions.

Censorship or Content Restrictions:  The law prohibits distribution of printed materials considered "counterrevolutionary" or critical of the government.  Foreign newspapers or magazines were generally unavailable outside of tourist areas.  Distribution of material with political content--interpreted broadly to include the Universal Declaration of Human Rights, foreign newspapers, and independent information on public health--was not allowed and could result in harassment and detention.

The government sometimes barred independent libraries from receiving materials from abroad and seized materials donated by foreign governments, religious organizations, and individuals.  Government officials also confiscated or destroyed cameras and phones of individuals to prevent them from distributing photographs and videos deemed objectionable, such as those taken during arrests and detentions.  Activists reported interrogations and confiscations at the airport when arriving from the United States.  On August 1, human rights activist Ivan Hernandez Carillo reported being detained and beaten when he arrived at the airport in Havana after he refused to go to a small room to have his belongings searched.  On August 12, independent lawyer Laritza Diversent was briefly questioned when she returned from testifying on freedom of expression before the UN special rapporteur.  Security officials confiscated all materials related to this event.  Independent think tank Convivencia reported nine police citations and

interrogations in September and October during which state security questioned members about their participation in international conferences.

Libel/Slander Laws:  The government uses defamation of character laws to arrest or detain individuals critical of the country's leadership.

**Internet Freedom**

The government restricted or disrupted access to the internet and censored some online content, and there were credible reports that the government monitored without appropriate legal authority the limited e-mail and internet chat rooms and browsing that were permitted.  The government controlled all internet access, except for limited facilities provided by a few diplomatic missions and a small but increasing number of black market facilities.

While the International Telecommunication Union reported that 31 percent of citizens used the internet in 2015, access often was limited to a national intranet that offered only e-mail or highly restricted access to the World Wide Web.  Other international groups reported lower internet penetration, with approximately 5 percent of the population having access to open internet.

The government selectively granted internet access to certain areas in the city and sectors of the population consisting mostly of government officials, established professionals, some professors and students, journalists, and artists.  Others could access e-mail and internet services through government-sponsored "youth clubs," internet cafes, or Wi-Fi hot spots approved and regulated by the Ministry for Information, Technology, and Communications.  Users were required to purchase prepaid cards and provide personal information in order to access the internet in these centers.

During the year the government increased the number of Wi-Fi hot spots at computer centers to more than 200 countrywide.  The government also expanded Wi-Fi hot spots in areas outside computer centers and proposed a pilot program to install internet in the homes of a limited number of persons in Old Havana. Authorities reviewed the browsing history of users, reviewed and censored e-mail, employed internet search filters, and blocked access to websites considered objectionable.  Access cost approximately two convertible pesos (CUC) ($2) per hour, still beyond the means of many citizens, whose average official income was approximately 23 CUC ($23) per month.

While the law does not set specific penalties for unauthorized internet use, it is illegal to own a satellite dish that would provide uncensored internet access.  The government restricted the importation of wireless routers, reportedly actively targeted private wireless access points, and confiscated equipment.

The use of encryption software and transfer of encrypted files are also illegal. Despite poor access, harassment, and infrastructure challenges, a growing number of citizens maintained blogs in which they posted opinions critical of the government, with help from foreign supporters who often built and maintained the blog sites.  The government blocked local access to many of these blogs.  In addition, a small but growing number of citizens could use Twitter, Facebook, Instagram, and other social media channels to report independently on developments in the country, including observations critical of the government. Like other government critics, bloggers faced government harassment, including detention and physical abuse.

Foreigners could buy internet access cards from the national telecommunications provider and use hotel business centers, where internet access could be purchased only in hard currency.  Access usually cost between five and 10 CUC ($5 to $10) an hour, a rate well beyond the means of most citizens.  Citizens usually could purchase internet access at the national telecommunications provider and use hotel business centers.

Human rights activists reported frequent government monitoring and disruption of cell phone and landline services prior to planned events or key anniversaries related to human rights.  The government-owned telecommunications provider ETECSA often disconnected service for human rights organizers, often just before their detention by state security, or to disrupt planned activities.

During the 54-day hunger strike of activist Guillermo "Coco" Farinas, the government reportedly disrupted Farinas' telephone service and intercepted calls to provide false information.

**Academic Freedom and Cultural Events**

The government restricted academic freedom and controlled the curricula at all schools and universities, emphasizing the importance of reinforcing "revolutionary ideology" and "discipline."  Some academics refrained from meeting with foreigners, including diplomats, journalists, and visiting scholars, without prior government approval and, at times, the presence of a government monitor.  Those

permitted to travel abroad were aware that their actions, if deemed politically unfavorable, could negatively affect them and their relatives back home.  During the year the government allowed some religious educational centers greater space to operate.

Outspoken artists and academics faced some harassment and criticism orchestrated by the government.  For example, in April academic Omar Everleny Perez Villanueva was expelled from the Center for the Study of the Cuban Economy at the University of Havana for "indiscipline" and for having "unauthorized conversations with foreign institutions," which included talking to foreign press and criticizing the government's slow pace of economic reforms.

In June art historian Yanelys Nunez Leyva was fired from a cultural magazine for contributing to a developing online platform called the Cuban Museum of Dissent featuring leaders in Cuban history who had rebelled against political doctrines.

Public libraries required citizens to complete a registration process before the government granted access to books or information.  Citizens could be denied access if they could not demonstrate a need to visit a particular library.  Libraries required a letter of permission from an employer or academic institution for access to censored, sensitive, or rare books and materials.  Religious institutions organized small libraries.  Independent libraries remained illegal but continued to exist and faced harassment and intimidation.

## b. Freedom of Peaceful Assembly and Association

## Freedom of Assembly

Although the constitution grants a limited right of assembly, the right is subject to the requirement that it may not be "exercised against the existence and objectives of the socialist state."  The law requires citizens to request authorization for organized meetings of three or more persons, and failure to do so could carry a penalty of up to three months in prison and a fine.  The government tolerated some gatherings, and many religious groups reported the ability to gather without registering or facing sanctions.

Independent activists faced greater obstacles, and state security forces often suppressed attempts to assemble, even for gatherings in private dwellings and in small numbers.  This trend was particularly pronounced in the eastern part of the country.  For example, on March 27, UNPACU reported that state security forces

forcibly detained more than 150 activists in the provinces of Santiago de Cuba, Las Tunas, and Guantanamo during a peaceful protest.

The government also continued to organize repudiation acts in the form of mobs organized to assault and disperse those who assembled peacefully.  Participants arrived in government-owned buses or were recruited by government officials from nearby workplaces or schools.  Participants arrived and departed in shifts, chanted revolutionary slogans, sang revolutionary songs, and verbally taunted the targets of the protest.  The targets of this harassment at times suffered physical assault or property damage.  Government security officials at the scene, often present in overwhelming numbers, did not arrest those who physically attacked the victims or respond to victims' complaints and instead frequently orchestrated the activities.  Officials reportedly took direct part in physical assaults.

The government did not grant permission to independent demonstrators or approve public meetings by human rights groups or others critical of any government activity.

In July police began blocking private UNPACU meetings in eastern provinces.  On September 22, police detained 24 activists who were attempting to participate in a routine UNPACU meeting.  Separately, in Havana, on September 22, police detained three labor union activists and placed five under house arrest to stop a meeting organized by human rights activist Ivan Hernandez Carrillo.  The government also blocked meetings for independent academic and cultural organizations.  For example, on September 23, Dagoberto Valdes, founder and director of the think tank Convivencia, suspended a course in Pinar del Rio on civic learning after two civil society participants from Cienfuegos were barred from entering the province.

**Freedom of Association**

The government routinely denied citizens freedom of association and did not recognize independent associations.  The constitution proscribes any political organization not officially recognized.  A number of independent organizations, including opposition political parties and professional associations, operated as NGOs without legal recognition.

Recognized churches (including the Roman Catholic humanitarian organization Caritas), the Freemason movement, and a number of fraternal and professional organizations were the only associations legally permitted to function outside the

formal structure of the state, the CP, and government-organized groups.  Religious groups are under the supervision of the CP's Office of Religious Affairs, which has the authority to deny permits for religious activities and exerted pressure on church leaders to refrain from including political topics in their sermons.

Nonreligious groups must register through the Ministry of Justice to receive official recognition.  Authorities continued to ignore applications for legal recognition from new groups, including several new religious groups as well as women's rights and gay rights organizations, thereby subjecting members to potential charges of illegal association.

The government continued to afford preferential treatment to those who took an active part in CP activities and mass demonstrations in support of the government, especially when awarding valued public benefits, such as admissions to higher education, fellowships, and job opportunities.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

There continued to be restrictions on freedom of movement within the country, foreign travel, and migration with the right of return.  The government also controlled internal migration from rural areas to Havana.

In-country Movement:  Although the constitution allows all citizens to travel anywhere within the country, changes of residence to Havana were restricted.  The local housing commission and provincial government authorities must authorize any change of residence.  The government may fine persons living in a location without authorization from these bodies and send them back to their legally authorized place of residence.  There were reports that authorities limited social services to persons who lived in Havana illegally.  Police occasionally threatened to prosecute for "dangerousness" anyone who returned to Havana after expulsion.

The law permits authorities to bar an individual from a certain area within the country, or to restrict an individual to a certain area, for a maximum of 10 years. Under this provision authorities may internally exile any person whose presence in

a given location is determined to be "socially dangerous." Some dissidents reported that authorities prevented them from leaving their home provinces or detained and returned them to their homes.

Foreign Travel: The government continued to require several classes of citizens to obtain permission for emigrant travel, including highly specialized medical personnel; military or security personnel; many government officials, including academics; and some former political prisoners or well-known activists. In December 2015 the government reimposed exit permit requirements on medical personnel for nonimmigrant travel, reversing a 2012 law that simplified the process by only requiring a supervisor's permission. In March the government allowed former political prisoners arrested during the 2003 Black Spring--and released in 2010 and 2011 on parole--one opportunity to travel outside the country for the first time since their arrest. Government authorities barred a second attempt when two of these activists requested permission to travel in July.

Emigration and Repatriation: Individuals seeking to migrate legally stated they also faced police interrogation, fines, harassment, and intimidation, including involuntary dismissal from employment. Government employees who applied to migrate legally to the United States reportedly sometimes lost positions when their plans became known. Some family members of former government employees who emigrated from the island lost public benefits or were denied passports to travel and join their family members abroad.

The law provides for imprisonment of up to three years or a fine of 500 nonconvertible pesos (CUP) ($20) for first-time "rafters" (those who attempted to depart using clandestinely constructed vessels). The largest fine reported during the year was 3,000 CUP ($120) for an unauthorized departure from the country. Most persons caught attempting unauthorized departures via sea were detained briefly. In the case of military or police defectors, or those traveling with children, the punishment could be more severe. Prison terms were also more common for persons attempting to flee to the United States through the Guantanamo U.S. Naval Station.

Under the terms of the 1994 U.S.-Cuba Migration Accord, the government agreed not to prosecute or retaliate against migrants returned from international or U.S. waters, or from the U.S. Naval Station at Guantanamo, after attempting to emigrate illegally if they had not committed a separate criminal offense. The government prevented independent trips to monitor repatriated Cubans outside of Havana.

Some would-be migrants alleged harassment and discrimination, such as fines, expulsion from school, and job loss, and others reported more severe punishment.

**Protection of Refugees**

Access to Asylum:  The constitution provides for the granting of asylum to individuals persecuted for their ideals or actions involving a number of specified political grounds.  The government has no formal mechanism to process asylum for foreign nationals.

Temporary Protection:  On the small number of cases of persons seeking asylum, the government worked with the Office of the UN High Commissioner for Refugees and other humanitarian organizations to provide protection and assistance, pending third-country resettlement.  In addition, the government allowed foreign students who feared persecution in their home countries to remain in the country after the end of their studies, until their claims could be substantiated or resolved.

**Section 3. Freedom to Participate in the Political Process**

While a voting process to choose candidates exists, citizens do not have the ability to choose their government through the right to vote in free and fair elections or run as candidates from outside the CP, and the government retaliated against those who sought peaceful political change.

**Elections and Political Participation**

Recent Elections:  Government-run bodies prescreened all candidates in the April 2015 municipal elections, and once approved by the CP, candidates ran for office mostly uncontested.  There were reports that the government altered the public biographies of non-CP candidates who attempted to run in the elections by labeling them as "counterrevolutionaries."

Political Parties and Political Participation:  Government-run commissions preapproved all CP candidates for office and rejected independent candidacies without explanation or the right of appeal.  Dissident candidates reported the government tampered with their candidate biographies and organized protests to besmirch their names.  The government routinely used propaganda campaigns in the state-owned media to criticize its opponents.

Participation of Women and Minorities:  There were no official restrictions on women or minorities, and the government actively promoted participation of both in government.  According to *Granma*, women constituted 30 percent of the Council of Ministers, 39 percent of the Council of State, 49 percent of the National Assembly, and more than half of the provincial presidents.  Women remained underrepresented in the most powerful decision-making bodies; there were no women on the executive committee of the Council of Ministers, or in positions of military leadership.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption, and the government was highly sensitive to corruption allegations and often conducted anticorruption crackdowns.

Corruption:  The law provides for three to eight years' imprisonment for "illegal enrichment" by authorities or government employees.  The government did not implement the law effectively, and officials sometimes engaged in corrupt practices with impunity.  There were numerous reports of law enforcement and other official corruption in enforcement of a myriad of economic restrictions and government services.  There were widespread reports of police corruption.  Multiple sources reported that when searching homes and vehicles, police sometimes took the owner's belongings or sought bribes in place of fines or arrests.

Financial Disclosure:  The law does not require appointed and elected officials to disclose their assets.

Public Access to Information:  The law provides for public access to government information, but requests for information routinely were rejected.  The government engaged in limited public outreach activities.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The government did not recognize domestic human rights groups or permit them to function legally.  Several human rights organizations continued to function outside the law, including the CCDHRN, UNPACU, the Christian Liberation Movement, the Assembly to Promote Civil Society, and the Lawton Foundation for Human Rights.  The government subjected domestic human rights advocates to intimidation, harassment, and periodic short-term detention.

No officially recognized, independent NGOs monitored human rights.  The government refused to recognize or meet with any unauthorized NGOs that monitored human rights.  Furthermore, there were reports of explicit government harassment of individuals who met with unauthorized NGOs.

The United Nations or Other International Bodies:  The government continued to deny international human rights organizations, the United Nations and its affiliate organizations, and the International Committee of the Red Cross access to prisoners and detainees.

Government Human Rights Bodies:  For the first time, the Cuban government hosted a structured bilateral dialogue in which Cuban authorities provided substantive comments about human rights problems in the country.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

### Women

Rape and Domestic Violence:  The law criminalizes rape, including spousal rape, and the government enforced the law.  Penalties for rape are at least four years' imprisonment, with longer prison terms or death as possible penalties, depending on the circumstances of the rape.

The law does not recognize domestic violence as a distinct category of violence but prohibits threats and violence, including those associated with domestic violence.  Penalties for domestic violence are covered by provisions against assault and range from fines to prison sentences of varying lengths, depending on the severity of the offense.

To raise awareness about domestic violence, the government continued to carry out media campaigns.  Official television, radio, and print media occasionally discussed issues pertaining to women, including domestic violence.  In addition, a few government-organized groups held conferences and worked with local communities to improve services.  The UN Children's Fund (UNICEF) reported that the government ran counseling centers for women and children in most municipalities, with staff trained in assisting victims of abuse.

Sexual Harassment:  The law provides penalties for sexual harassment, with potential prison sentences of three months to five years.  The government did not

release any statistics on arrests, prosecutions, or convictions for offenses related to sexual harassment during the year.  Civil society groups noted sexual harassment was underreported.

Reproductive Rights:  Couples and individuals have the right to decide the number, spacing, and timing of their children; manage their reproductive health; and have access to the information and means to do so, free from discrimination, coercion, and violence.  Access to information on modern contraception and skilled health attendance during pregnancy, at delivery, and in postpartum care was available, but access to information and contraception to prevent the spread of HIV/AIDS was limited.

Discrimination:  The law accords women and men equal rights, the same legal status, and the same responsibilities with regard to marriage/divorce, parental duties, home maintenance, and professional careers.  The law grants working mothers preferential access to goods and services and provides for equal pay for equal work.

**Children**

Birth Registration:  Citizenship is normally derived by birth within the country's territory, and births were generally registered promptly.  Those who emigrate abroad and have children must request a Cuban passport for the child before re-entering Cuba.  Children born outside of Cuba to parents on official business are granted Cuban citizenship.

Child Abuse:  There was no apparent pattern of violence against or abuse of children.  The government operated 174 guidance centers for women and families, charged with providing family counseling services and other assistance to individuals harmed by intrafamilial violence.

Early and Forced Marriage:  The legal minimum age of consent for marriage is 18.  Marriage for girls as young as 14 and for boys as young as 16 is permitted with parental consent.  According to UNICEF, 40 percent of women ages 20-24 were married before age 18, and 9 percent of women ages 20-24 were married before 15.  There was no available information on the government's efforts to prevent or mitigate early marriage.

Sexual Exploitation of Children:  Prostitution is legal for those age 16 and older.  While there were numerous reports of underage prostitution, there were no reliable

statistics available regarding its extent.  In October 2015 the government reported that 2,122 children were victims of sexual abuse in 2014.  The minimum age of consent is 16.  There is no statutory rape law, although penalties for rape increase as the age of the victim decreases.  The law imposes seven to 15 years' imprisonment for involving minors under 16 in pornographic acts.  The punishment may increase to 20 to 30 years or death under aggravating circumstances.  The proposal to participate in such acts is punishable with two to five years' imprisonment.  The law does not criminalize the possession of pornography, but it punishes the production or circulation of any kind of obscene graphic material with three months' to one year's imprisonment and a fine.  The offer, provision, or sale of obscene or pornographic material to minors under 16 is punishable with two to five years in prison.  International trafficking of minors is punishable with seven to 15 years' imprisonment.

The government maintained centers in Havana, Santiago de Cuba, and Santa Clara for the treatment of child sexual abuse victims.  The centers employed some modern treatment techniques, including the preparation of children to be witnesses in criminal prosecutions.

International Child Abductions:  The country is not a party to the 1980 Hague Convention on the Civil Aspects of Child Abduction.  See the Department of States *Annual Report on International Parental Child Abduction* at travel.state.gov/content/childabduction/en/elgal/compliance.html.

**Anti-Semitism**

There were between 1,000 and 1,500 members of the Jewish community.  There were no reports of anti-Semitic acts.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**Persons with Disabilities**

No known law prohibits discrimination against persons with disabilities in employment, education, access to health care, or the provision of other state services.  The Ministry of Labor and Social Security is in charge of the Employment Program for Persons with Disabilities.  A ministry resolution accords

persons with disabilities the right to equal employment opportunities and equal pay for equal work.  No information was available on compliance with this resolution.  The law recommends that buildings, communication facilities, air travel, and other transportation services accommodate persons with disabilities, but these facilities and services were rarely accessible to persons with disabilities, and information for persons with disabilities was limited.

The Special Education Division of the Ministry of Education is responsible for the education and training of children with disabilities.  Children with disabilities attended school; no information was available on whether there were patterns of discriminatory abuse in educational facilities or in mental health facilities during the year.  Some religious organizations reported they were permitted to help provide educational programs for children with disabilities.

**National/Racial/Ethnic Minorities**

Although the government's declared policy favors racial integration and inclusiveness, Afro-Cubans often suffered racial discrimination, including disproportionate stops for identity checks and searches, and some were subject to racial epithets while undergoing unlawful beatings at the hands of security agents in response to political activity.  Afro-Cubans also reported employment discrimination, particularly in sought-after positions within the tourism industry and at high levels within the government.  Afro-Cubans were represented disproportionately in neighborhoods with the worst housing conditions and were economically disadvantaged.

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

The law prohibits discrimination based on sexual orientation in employment, housing, statelessness, or access to education or health care.  Nonetheless, societal discrimination based on sexual orientation or gender identity persisted.

Mariela Castro, President Castro's daughter, headed the National Center for Sexual Education and continued to be outspoken in promoting the rights of lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons.  Throughout the year the government promoted the rights of LGBTI persons, including nonviolence and nondiscrimination in regional and international fora.  In May the government sponsored a march and an extensive program of events to commemorate the International Day Against Homophobia and Transphobia.

Several unrecognized NGOs promoted LGBTI issues and faced some government criticism, not for their promotion of such topics, but for their independence from official government institutions.  In June several independent organizations attempted to organize an LGBTI march in Havana to celebrate LGBTI Pride Month.  According to independent reports, authorities detained several activists to prevent their participation in the march and reportedly asked others not to leave their homes that day, limiting participation to fewer than five activists.

**HIV and AIDS Social Stigma**

There were reports that some persons with HIV/AIDS suffered job discrimination. The government operated four prisons exclusively for inmates with HIV/AIDS; some inmates were serving sentences for "propagating an epidemic."  Special diets and medications for HIV patients were routinely unavailable.

**Section 7. Worker Rights**

**a. Freedom of Association and the Right to Collective Bargaining**

The law, including related regulations and statutes, severely restricts worker rights by recognizing only the CP-controlled Workers' Central Union of Cuba (CTC) as the paramount trade union confederation.  All trade groups must belong to the CTC to operate legally.  The law does not provide for the right to strike.  The law also does not provide for collective bargaining, instead setting up a complicated process for reaching collective agreements.  The International Labor Organization continued to raise concerns regarding the trade union monopoly of the CTC, the prohibition on the right to strike, and restrictions to collective bargaining and agreements, including that government authorities and CTC officials have the final say on all such agreements.

The government continued to prevent the formation of independent trade unions in all sectors.  The CP chose the CTC's leaders.  The CTC's principal responsibility is to manage government relations with the workforce.  The CTC does not bargain collectively, promote worker rights, or advocate for the right to strike.  The CTC led information dissemination regarding the government's planned large-scale layoffs of government workers and in defending the government's decision to do so.

Several small, independent labor organizations operated without legal recognition, including the National Independent Workers' Confederation of Cuba, the National Independent Laborer Confederation of Cuba, and the Unitarian Council of Workers of Cuba; together they comprise the Independent Trade Union Association of Cuba, which was created in October to replace the Coalition of Independent Unions of Cuba.  These organizations worked to advance the rights of workers by offering an alternative to the state-sponsored CTC, and by advocating for the rights of small business owners and employees who represent 29 percent of the country's labor force.  The independent unions were reportedly harassed by police and infiltrated by government agents, limiting their capacity to represent workers effectively or work on their behalf.

The government may determine that a worker is "unfit" to work, resulting in job loss and the denial of job opportunities.  Persons were deemed unfit because of their political beliefs, including their refusal to join the official union, and for trying to depart the country illegally.  The government also penalized professionals who expressed interest in emigrating by limiting job opportunities or firing them.

## b. Prohibition of Forced or Compulsory Labor

The law does not appear to prohibit forced labor explicitly.  It prohibits unlawful imprisonment, coercion, and extortion, with penalties ranging from fines to imprisonment, but there was no evidence that these provisions were used to prosecute forced labor cases.  The use of minors in forced labor, drug trafficking, prostitution, pornography, or organ trade is punishable by seven to 15 years' incarceration.

Compulsory military service of young men was occasionally fulfilled by assignment to an economic entity controlled by the military or by assignment to other government services.  Allegations of forced or coerced labor in foreign medical missions persisted, although the government denied these allegations.

The government continued to use some high school students in rural areas to harvest agricultural products (also see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The legal minimum working age is 17, although the law permits the employment of children ages 15 and 16 to obtain training or fill labor shortages with parental permission and a special authorization from the municipal labor director.  The law does not permit children ages 15 and 16 to work more than seven hours per day or 40 hours per week or on holidays.  Children ages 15 to 18 cannot work in specified hazardous occupations, such as mining, or at night.

There were no known government programs to prevent child labor or remove children from such labor.  Antitruancy programs, however, aimed to keep children in school.  Inspections and penalties appeared adequate to enforce the law, as inspections for child labor were included in all other regular labor inspections.  The government reported more than 700 such inspections of state-run and private-sector enterprises during 2015.  The government penalizes unlawful child labor with fines and suspension of work permits.  There were no credible reports that children under the age of 17 worked in significant numbers.

The government used some high school students in rural areas to harvest agricultural products for government cooperatives during peak harvest time. Student participants were not paid but received school credit and favorable recommendations towards university admission.  Failure to participate or obtain an excused absence reportedly could result in unfavorable grades or university recommendations, although students were reportedly able to participate in other activities (instead of the harvest) to support their application for university admission.  There were no reports of abusive or dangerous working conditions.

**d. Discrimination with Respect to Employment and Occupation**

The law prohibits workplace discrimination based on skin color, gender, religious belief, sexual orientation, nationality, "or any other distinction harmful to human dignity," but it does not explicitly protect political opinion, social origin, disability, age, language, gender identity, or HIV-positive status or other communicable diseases.  No information was available on government enforcement of these provisions during the year.

Discrimination in employment and occupation occurred with respect to persons with HIV and members of the Afro-Cuban population.  Leaders within the Afro-Cuban community noted that some Afro-Cubans could not get jobs in sectors such as tourism and hospitality because they were "too dark."  Afro-Cuban leaders explained that fairer-skinned citizens filled jobs in sectors that deal with tourists, and these jobs were often among the best-paying positions available.  Afro-Cubans

more frequently obtained lower-paying jobs, including cleaning and garbage disposal, which prevented them from interacting with tourists, a major source of hard currency.

There were no statistics stating whether the government effectively enforced applicable laws.

## e. Acceptable Conditions of Work

The monthly minimum wage was fixed at 225 CUP ($9).  The minimum wage requirement does not apply to the non-state sector, including the self-employed.  The government supplemented the minimum wage with free education, subsidized medical care (daily wages are reduced by 40 percent after the third day of a hospital stay), housing, and some food.  Even with subsidies, the government acknowledged that the average wage of 600 CUP ($24) per month did not provide a reasonable standard of living.

The standard workweek is 44 hours, with shorter workweeks in hazardous occupations, such as mining.  The law provides workers with a weekly minimum 24-hour rest period and 24 days of paid annual holidays.  These standards apply to state workers as well as to the non-state sector, but not to the self-employed.  The law does not provide for premium pay for overtime or prohibit obligatory overtime, but it generally caps the number of overtime hours at 12 hours per week, or 160 per year.  The law provides little grounds for a worker to refuse to work overtime.  Refusal to work overtime can result in a notation in the employee's official work history that could imperil subsequent requests for vacation time.  The Ministry of Labor has the authority to establish different overtime caps as needed.  Compensation for overtime is paid in cash at the regular hourly rate or in additional rest time, particularly for workers directly linked to production or services, and it does not apply to management.  Workers complained that overtime compensation was either not paid or not paid in a timely manner.

The government set workplace safety standards and received technical assistance from the International Labor Organization to implement them.  The Ministry of Labor enforced the minimum wage and hours-of-work standards through offices at the national, provincial, and municipal levels, but the government lacked mechanisms to adequately enforce occupational safety and health standards.  There was no information available about the number of labor inspectors.  Reports from recent years suggested there were very few inspectors and that health and safety standards frequently were ignored or subject to corrupt practices.

According to government statistics, 518,479 workers were self-employed during the year, an increase of 5 percent from 2015; the total workforce in the private sector increased from approximately 25 percent to 29 percent. Self-employed and private-sector workers obtained licenses by applying to the Ministry of Labor and were subject to inspection by the government. The government maintained a list of 201 trades that may be plied privately and allowed the self-employed to hire labor. Despite criminal penalties for doing so, a significant number of workers participated in the informal economy, including individuals who actively traded on the black market and those performing professional activities not officially permitted by the government. There were no reliable reports or statistics about the informal economy.

Foreign companies operated in a limited number of sectors, such as hotels, tourism, and mining. Such companies operated on the basis of a joint venture in which the government contracted and paid company workers in pesos an amount that was a small fraction of what the company remitted to the state for labor costs. Most formal employment took place only through government employment agencies. Employers, including international businesses and organizations, were generally prohibited from contracting or paying workers directly, although many reportedly made supplemental payments under the table. The Ministry of Labor enforces labor laws on any business, organization, or foreign governmental agency based in the country, including wholly owned foreign companies operating in the country, joint-stock companies involving foreign investors operating in the country, the United Nations, international NGOs, and embassies. Cuban workers employed by these entities are subject to a number of labor regulations common to most state and non-state workers, together with some regulations specific for these kinds of entities. Government bodies, including the tax collecting agency, the Ministry of Finance and Prices, enforced regulations. There were no reports about protections for migrant workers' rights.

Past reports from an independent union cited some violations of health and safety standards at worksites throughout the country, including inadequate and poorly maintained equipment and protective gear. Official government reports cited 3,432 workplace accidents in 2015 (a reduction of 357 compared with 2014) and 70 workplace deaths (the same as 2014). The CTC provided limited information to workers about their rights and at times did not respond to or assist workers who complained about hazardous workplace conditions. It was generally understood that workers could not remove themselves from dangerous situations without

jeopardizing their employment, and authorities did not effectively protect workers facing this dilemma.