# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RAMONA MATOS RODRIGUEZ, *et al.*,

        Plaintiffs,

    v.

PAN AMERICAN HEALTH
ORGANIZATION, *et al.*,

        Defendants.

Civil Action No. 20-cv-00928-JEB

## PAN AMERICAN HEALTH ORGANIZATION'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Patrick J. Carome (#385676)
David W. Bowker (#989309)
Daniel S. Volchok (#497341)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
E-mail:  patrick.carome@wilmerhale.com

*Counsel for putative defendant*
*Pan American Health Organization*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.      Dismissal Is Required Because PAHO Is Immune From This Suit.................................. 2

        A.      PAHO Is Immune Under The U.N. Charter ........................................................ 2

        B.      PAHO Is Immune Under The WHO Constitution ............................................... 8

        C.      PAHO Is Immune From This Suit Under The IOIA............................................ 11

                1.      The waiver exception is inapplicable...................................................... 11

                2.      The commercial-activity exception does not apply ................................ 12

                3.      The expropriation exception is inapplicable ........................................... 19

II.     Dismissal Is Warranted Under The Doctrine Of International Comity ........................... 21

III.    Dismissal Is Required Because PAHO Has Not Been Properly Served.......................... 23

CONCLUSION............................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott v. Abbott*,
  560 U.S. 1 (2010) .............................................................................................................. 23

*Adams v. United States*,
  391 F.3d 1212 (Fed. Cir. 2004) ....................................................................................... 20

*Al-Bihani v. Obama*,
  619 F.3d 1 (D.C. Cir. 2010) ........................................................................................... 3, 8

*Asakura v. City of Seattle*,
  265 U.S. 332 (1924) ............................................................................................................ 3

*Ashraf-Hassan v. Embassy of France*,
  40 F. Supp. 3d 94 (D.D.C. 2014) ................................................................................ 11, 12

*Benjamins v. British European Airways*,
  572 F.2d 913 (2d Cir. 1978) ............................................................................................... 3

*Blanco v. United States*,
  775 F.2d 53 (2d Cir. 1985) ................................................................................................. 5

*Broadbent v. Organization of American States*,
  628 F.2d 27 (D.C. Cir. 1980) ........................................................................................... 15

*de Csepel v. Republic of Hungary*,
  714 F.3d 591 (D.C. Cir. 2013) ......................................................................................... 19

*Devengoechea v. Bolivarian Republic of Venezuela*,
  889 F.3d 1213 (11th Cir. 2018) ........................................................................................ 19

*El-Hadad v. United Arab Emirates*,
  496 F.3d 658 (D.C. Cir. 2007) ......................................................................................... 15

*Ivy Society Sports Group, LLC v. Baloncesto Superior Nacional*,
  2009 WL 2252116 (S.D.N.Y. July 28, 2009) ................................................................... 24

*Jam v. International Finance Corp.*,
  139 S. Ct. 759 (2019) ................................................................................................. 11, 13

*Johnson v. UMG Recordings, Inc.*,
  2018 WL 4111912 (M.D. Tenn. Aug. 29, 2018) .............................................................. 24

*In re Korean Air Line Disaster of Sept. 1, 1983*,
  664 F. Supp. 1488 (D.D.C. 1987) .................................................................................... 25

*Laker Airways Ltd. v. Sabena, Belgian World Airlines,*
    731 F.2d 909 (D.C. Cir. 1984) ..................................................................21

*LaVenture v. United Nations,*
    279 F. Supp. 3d 394 (E.D.N.Y. 2017) ......................................................11

*Lubian v. Republic of Cuba,*
    2011 WL 13186846 (S.D. Fla. Jan. 25, 2011) ..........................................14

*Lubian v. Republic of Cuba,*
    440 F. App'x 866 (11th Cir. 2011) ...........................................................14

*Means v. United States Conference of Catholic Bishops,*
    836 F.3d 643 (6th Cir. 2016) ....................................................................23

*Medellín v. Texas,*
    552 U.S. 491 (2008) .........................................................................2, 3, 8, 9

*Mendaro v. World Bank,*
    717 F.2d 610 (D.C. Cir. 1983) ..................................................................13

*Muenzberg v. Barnes,*
    1998 WL 61207 (N.D. Cal. Feb. 5, 1998) ...............................................24

*Nemariam v. Ethiopia,*
    491 F.3d 470 (D.C. Cir. 2007) ..................................................................20

*Nichols v. Vilsack,*
    183 F. Supp. 3d 39 (D.D.C. 2016) ............................................................23

*Northwest Forest Resource Council v. Dombeck,*
    107 F.3d 897 (D.C. Cir. 1997) ..................................................................22

*OBB Personenverkehr AG v. Sachs,*
    136 S. Ct. 390 (2015) ..........................................................13, 14, 17, 18

*Odhiambo v. Republic of Kenya,*
    764 F.3d 31 (D.C. Cir. 2014) ....................................................................17

*Oetjen v. Central Leather Co.,*
    246 U.S. 297 (1918) ..................................................................................21

*Philipp v. Federal Republic of Germany,*
    894 F.3d 406 (D.C. Cir. 2018) ..................................................................21

*Republic of Argentina v. Weltover, Inc.,*
    504 U.S. 607 (1992) ..................................................................................19

*Rettig v. Pension Benefit Guaranty Corp.*,
  744 F.2d 133 (D.C. Cir. 1984) ....................................................................................19

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ............................................................................................12, 13

*Scott v. Philadelphia Housing Authority*,
  2011 WL 1791095 (E.D. Pa. May 11, 2011) ................................................................20

*Simon v. Republic of Hungary*,
  812 F.3d 127 (D.C. Cir. 2016) ...............................................................................20, 21

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
  566 U.S. 560 (2012) ....................................................................................................19

*Tarros S.p.A. v. United States*,
  982 F. Supp. 2d 325 (S.D.N.Y. 2013) ...........................................................................5

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
  30 F.3d 148 (D.C. Cir. 1994) ......................................................................................25

*United States v. Khatallah*,
  160 F. Supp. 3d 144 (D.D.C. 2016) ...............................................................................5

*United States v. One Gulfstream G-V Jet Aircraft*,
  941 F. Supp. 2d 1 (D.D.C. 2013) .................................................................................22

*United States v. Postal*,
  589 F.2d 862 (5th Cir. 1979) .........................................................................................5

*VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*,
  748 F.3d 780 (7th Cir. 2014) .........................................................................................5

*Weinberger v. Rossi*,
  456 U.S. 25 (1982) .........................................................................................................8

*Williams v. United States*,
  86 Fed. Cl. 594 (2009) ................................................................................................20

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
  296 F.3d 1154 (D.C. Cir. 2002) ...................................................................................11

*Zappia Middle East Construction Co. v. Emirate of Abu Dhabi*,
  215 F.3d 247 (2d Cir. 2000) ........................................................................................19

## STATUTES AND RULES

18 U.S.C. § 1589 ............................................................................................13, 14, 15

22 U.S.C. § 288a ...........................................................................................................11, 25

28 U.S.C.
    § 1406 ...............................................................................................................23
    § 1603 ...............................................................................................................12
    § 1605 ........................................................................................................ *passim*
    § 1608 ...............................................................................................................25

Federal Rule of Civil Procedure 12 ...........................................................................23

Pub. L. No. 80-643, 62 Stat. 441 (1948) ...............................................................8, 10

## INTERNATIONAL AGREEMENTS

Agreement Between the World Health Organization and the Pan American Health
    Organization, World Health Assembly Res. 2.91 (June 30, 1949), in *World
    Health Organization Basic Documents* 41 (49th ed. 2020),
    https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=47 ..................9, 10

Constitution of the World Health Organization,
    July 22, 1946, 62 Stat. 2679, 14 U.N.T.S. 185 ...................................... *passim*

Convention for the Unification of Certain Rules Relating to International
    Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, U.N.T.S. No. 876 ...........4

Convention on the Privileges and Immunities of the Specialized Agencies,
    Nov. 21, 1947, 33 U.N.T.S. 261 ....................................................................7

United Nations Charter,
    June 26, 1945, 59 Stat. 1031, U.N.T.S. 993............................................ *passim*

Vienna Convention on the Law of Treaties,
    1155 U.N.T.S. 331 ..........................................................................................8

## OTHER AUTHORITIES

14D Charles Alan Wright et al., *Federal Practice & Procedure* (4th ed. 2013)...........23

72 C.J.S. *Process* (2020).............................................................................................25

*Black's Law Dictionary* (11th ed. 2019)..............................................................19, 25

Documents of the United Nations Conference on International Organization
    (1945), https://digitallibrary.un.org/record/1300969?ln=en .......................4, 6, 7

H.R. Rep. No. 94-1487 (1976)....................................................................................19

Oona A. Hathaway, *Treaties' End: The Past, Present, and Future of International
    Lawmaking in the United States*, 117 Yale L.J. 1236 (2008) .............................8

PAHO, *Standardized Format for PAHO Project Documents and Profiles*,
https://iris.paho.org/bitstream/handle/10665.2/46210/Standarized_Format.
pdf ...........................................................................................................................16

Report of the Preparatory Commission of the United Nations, U.N. Doc. PC/20
(1945), https://digitallibrary.un.org/record/519440?ln=en ............................4, 7

*Restatement (Fourth) of Foreign Relations Law* (2008).............................................4, 5

*Restatement (Third) of Foreign Relations Law* (1987)..................................................8

Steven S. Gensler & Lumen N. Milligan, *Federal Rules of Civil Procedure, Rules
and Commentary* (2020 ed.) ..........................................................................23

United Nations, *Funds, Programmes, Specialized Agencies and Others*,
https://www.un.org/en/sections/about-un/funds-programmes-specialized-
agencies-and-others/index.html ........................................................................6

U.N. General Assembly Resolution 35/217 (V) (Dec. 17, 1980) ..................................17

**INTRODUCTION**

Plaintiffs' opposition provides no sound reason to deny the Pan American Health Organization's motion to dismiss.  PAHO is immune from this suit on three separate and independent grounds:  It is afforded absolute immunity from suit in national courts by the U.N. Charter, it enjoys that same degree of immunity under the Constitution of the World Health Organization ("WHO"), and it is immune from this suit under the International Organizations Immunities Act ("IOIA").  Plaintiffs' allegations fail to overcome those immunities.  Plaintiffs do not genuinely dispute, for instance, that the terms of the U.N. Charter and WHO Constitution separately afford absolute immunity from suit to organizations that fall under their umbrellas. Plaintiffs instead dispute that those immunities are enforceable in federal court and apply to PAHO.  But they are wrong on both counts; both treaties use mandatory language and so are self-executing, and both apply to PAHO, which is an integral component of the U.N., the WHO, and the system of international organizations the United States helped create.

Plaintiffs also fail to establish jurisdiction under any of the exceptions to immunity that the IOIA incorporates from the Foreign Sovereign Immunities Act ("FSIA").  Plaintiffs concede that they have no basis to allege that PAHO has waived its immunity.  And they cannot rebut PAHO's argument that the expropriation exception, by its plain text, does not apply to international organizations, which lack the sovereign power to nationalize (or "take") property in violation of international law.  Finally, Plaintiffs have not sufficiently alleged that PAHO engaged in *any* conduct that lies at the heart of their forced-labor claims, much less any conduct outside of PAHO's public-health mission that both qualifies as "commercial" and occurred in the United States—as is required to bring their claims within the commercial-activity exception.

Plaintiffs' arguments regarding international comity and service also are unavailing.  As to comity, they contend that the Brazilian executive, legislative, and judicial acts that PAHO's motion

1

identified did not consider Plaintiffs' U.S.-law claims, but that is not the test, as the cases Plaintiffs cite make clear.  As to service, Plaintiffs concede their failure to serve PAHO in compliance with the FSIA; they argue only that PAHO waived its defense by moving to transfer, an argument refuted by relevant caselaw, and that the FSIA's service provision does not govern international organizations, an argument that conflicts with both the text of the IOIA and the law of this case.

## ARGUMENT

### I.   DISMISSAL IS REQUIRED BECAUSE PAHO IS IMMUNE FROM THIS SUIT

#### A.   PAHO Is Immune Under The U.N. Charter

The U.N. Charter confers immunity on PAHO from any form of legal process absent an express waiver.  Mem. 12-20.  Because the United States is a party to the Charter and PAHO has not waived its immunities, it must be dismissed from this case.  Plaintiffs respond that the Charter neither binds the United States nor confers immunity on PAHO.  Opp. 4-15.  Plaintiffs are wrong.

Article 105 of the U.N. Charter vests the United Nations "Organization"—including its specialized agencies, such as the WHO—with "such privileges and immunities as are necessary for the fulfilment of [their] purposes."  United Nations Charter art. 105, § 1, June 26, 1945, 59 Stat. 1031, U.N.T.S. 993 ("U.N. Charter").  As PAHO explained (Mem. 14-18), such privileges include immunity from suit in national courts.  Plaintiffs argue that article 105 does not bind the United States, and that even if it does, it does not confer immunity from suit on PAHO.  Opp. 5-11.  Plaintiffs are incorrect.

1.      Article 105 of the Charter binds the United States.  A provision of an international treaty is "self-executing"—and thus "has automatic domestic effect as federal law upon ratification"—when the provision "itself conveys [that] intention."  *Medellín v. Texas*, 552 U.S. 491, 505 & n.2 (2008).  As the Supreme Court explained in *Medellín*, the paradigmatic signal of such an "intention" is a treaty provision's use of mandatory language.  *Id.* at 505.  The provision

at issue in *Medellín*—article 94 of the U.N. Charter—provided only that U.N. member states would "undertake to comply" with International Court of Justice ("ICJ") decisions.  *Id.* at 508.  The Court held that article 94 was not self-executing because "[i]t does not provide that the United States 'shall' … comply with an ICJ decision," but merely "call[s] upon governments" to do so.  *Id.*

Article 105, by contrast, *does* use mandatory language, stating that the organization "shall" enjoy necessary privileges and immunities.  U.N. Charter art. 105, ¶ 1.  Consistent with *Medellín*, such a provision should generally be deemed self-executing—as courts, including the Supreme Court, have concluded when confronted with treaty provisions imposing mandatory obligations on member states.  *See Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924) (treaty stating that citizens of Japan "shall have" and "shall receive" certain rights in the United States is self-executing); *Benjamins v. British European Airways*, 572 F.2d 913, 917-918 (2d Cir. 1978) (treaty provisions stating that carriers "shall be liable for damage sustained" are self-executing); *see also Al-Bihani v. Obama*, 619 F.3d 1, 21 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing en banc) (absent mandatory language like "'shall' or 'must,'" treaty is not self-executing).  Article 105 thus is plainly self-executing.

Plaintiffs concede that article 105 "employs the mandatory 'shall,'" Opp. 5, but claim that the principle described in *Medellín* does not apply on the ground that paragraph 3 of article 105 states that the General Assembly "may" make recommendations as to the "details" of the organization's privileges and immunities and "may" propose future conventions for this purpose, *id.* at 6.  Contrary to Plaintiffs' contention, the fact that Paragraph 3 contemplates possible "*future* action," *id.*, does nothing to undercut the unqualified mandate of paragraph 1 that "[t]he organization shall enjoy … such privileges and immunities as are necessary for the fulfilment of its purposes."   Indeed, paragraph 3's express declaration that there "*may*" be later

"recommendations" or "propos[als]"—in contrast to "shall," as used in paragraph 1—confirms that paragraph 1 was immediately operative, not conditioned on the completion of any future process. And as Plaintiffs acknowledge (Opp. 6), the Charter's drafters expressly *rejected* Plaintiffs' reading, explaining that paragraph 3 "does not impair the provisions" of paragraph 1 and that paragraph 1 "sets forth a rule obligatory for all members *as soon as the Charter becomes operative*." 13 Documents of the United Nations Conference on International Organization 704 (1945) (emphasis added) ("U.N.C.I.O. Documents").[1] The Report of the Preparatory Commission of the United Nations, U.N. Doc. PC/20 (1945) ("Report"), likewise stated (at 60) that "under [a]rticle 105 of the Charter," U.N. immunities "operate[] from the coming into force of the Charter and [are] therefore applicable even before the General Assembly has made the recommendations or proposed the conventions referred to in" paragraph 3.[2]

Plaintiffs also err in suggesting that the lack of further details in paragraph 1 of article 105—what they call its "indeterminacy"—"prevents it from having effect as a matter of domestic law" absent implementing legislation. Opp. 6-7. But the fact that paragraph 1 of article 105 lacks details does not render it unenforceable by courts. The aviation treaty known as the Warsaw Convention, for instance, obligates parties to take "necessary" actions without defining what those actions are, *see, e.g.*, Convention for the Unification of Certain Rules Relating to International Transportation by Air, arts. 16, 20, Oct. 12, 1929, 49 Stat. 3000, U.N.T.S. No. 876, yet the Supreme

---

[1] https://digitallibrary.un.org/record/1300969?ln=en (all cited websites visited Sept. 4, 2020).

[2] https://digitallibrary.un.org/record/519440?ln=en. Plaintiffs argue that *after* ratification of the Charter, the United States took the view that article 105 "may not" have been self-executing. Opp. 7. But one signatory's post-ratification view is not an authoritative source as to the article's meaning; the "subsequent practice of the parties" has primary relevance to a treaty's construction only if it "establishes the agreement of the parties regarding [the] interpretation of the treaty," *Restatement (Fourth) of Foreign Relations Law* § 306 cmt. c (2018) ("*Restatement (Fourth)*"). Plaintiffs do not even argue that that is the case here.

Court has repeatedly held that it is self-executing in its entirety, *see Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252-253 (1984).  And courts regularly read similarly expansive terms in treaties to be self-executing and enforceable.  *See, e.g.*, *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 748 F.3d 780, 786-787 (7th Cir. 2014) (treaty provision treating "material" contract terms differently from "nonmaterial" terms deemed self-executing); *Blanco v. United States*, 775 F.2d 53, 60-61 (2d Cir. 1985) (same for treaty provision with "very general language" about "freedom of access to the courts").  The same conclusion is warranted here—particularly since Plaintiffs concede that the General Assembly viewed "something approaching absolute immunity" as "necessary" to fulfill the U.N.'s purpose, Opp. 10.

Finally, the cases Plaintiffs cite for the proposition that the Charter is not self-executing (Opp. 7-8) do not consider article 105 or any other Charter provision with language as mandatory as article 105's.  Plaintiffs' cases instead address provisions that merely set out "[p]rinciples," *United States v. Khatallah*, 160 F. Supp. 3d 144, 152 (D.D.C. 2016), or instruct signatories to "undertake to make [resources] available," *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325, 342 (S.D.N.Y. 2013).  And to the extent that some of Plaintiffs' cases contain stray statements about whether the Charter *as a whole* is self-executing, those statements are dicta and are not persuasive because they fail to recognize that "[a] treaty need not be wholly self-executing," *United States v. Postal*, 589 F.2d 862, 884 n.35 (5th Cir. 1979).  Rather, a single treaty may contain both self-executing and non-self-executing provisions—making "the inquiry … an assessment of whether the *particular treaty provision at issue* is self-executing."  *Restatement (Fourth)* § 310 cmt. b (emphasis added).  No case Plaintiffs cite addresses a provision like the one at issue here.

2.    Article 105 confers absolute immunity on PAHO from suit in national courts. Although Plaintiffs concede that "the [U.N.] General Assembly … decided that something

5

approaching absolute immunity was 'necessary'" to fulfill the organization's purpose, Opp. 10, they dispute whether that absolute immunity extends to PAHO.  PAHO, however, is indisputably an integral part of the WHO, which falls under the umbrella of the U.N. system as one of the U.N.'s "specialized agencies."  *See* Mem. 3-5.  According to the United Nations itself, "[t]he World Health Organization is the directing and coordinating authority on international health within the United Nations system."  United Nations, *Funds, Programmes, Specialized Agencies and Others.*[3] And the text of Article 105 extends immunity broadly to the entire "Organization," i.e., the U.N. system, without limitation or restriction.  Plaintiffs' contrary textual argument—that the "relevant clause" of article 105 "refers only to 'the Organization,' meaning the United Nations itself" (Opp. 9)—is demonstrably incorrect.  Use of the term "Organization" in paragraph 1 of Article 105 plainly refers to more than "the United Nations itself," as Article 105 elsewhere refers twice to "the United Nations," including in the same sentence as the term "Organization," thus confirming that the term "Organization" has a different meaning from just the "United Nations itself."

Plaintiffs also point to "drafting history" in an effort to narrow the meaning of "Organization," Opp. 9, but the very page they cite establishes that the term "Organization" in Article 105 was meant to be expansive, covering not just the United Nations but "all [of its] agencies … as well as the other bodies and organisms which might subsequently be established" by virtue of the Charter.  13 U.N.C.I.O. Documents 704.  The WHO is plainly such an entity, established expressly "as a specialized agency within the terms of Article 57" of the U.N. Charter. Constitution of the World Health Organization, preamble, July 22, 1946, 62 Stat. 2679, 14 U.N.T.S. 185 ("WHO Const.").  The commentary Plaintiffs highlight (Opp. 9) does not refer to

---

[3]   https://www.un.org/en/sections/about-un/funds-programmes-specialized-agencies-and-others/ index.html.

"U.N. specialized agencies," much less purport to exclude them from Article 105.

Plaintiffs contend that "specialized agencies" are merely "brought into … relation" with the United Nations and thus cannot benefit from immunity under article 105 (*id.*), but the plain language of article 105 caused the General Assembly and Member States to conclude otherwise. The General Assembly and Member States understood based on Article 105 that specialized agencies such as the WHO, and not just the United Nations itself, share in the immunities the article establishes. Paragraph 3 authorized the General Assembly to propose not just a single convention that would "determin[e] the details" of paragraph 1 for the United Nations *itself*, but rather to propose two or more "*conventions*" that would elaborate on the immunities already conferred by paragraph 1 for both the United Nations and its specialized agencies. U.N. Charter art. 105, ¶ 3. This explains why the commission that drafted those conventions provided a report to the General Assembly discussing the specialized agencies' immunities in detail, *see* Report 61-62 (addressing whether the specialized agencies should share the exact immunities as the United Nations itself); *id.* at 63-67 (discussing agency immunities). Finally, the General Assembly ultimately "recommend[ed]" as "necessary" within the meaning of article 105 two "conventions" to provide further "details" on the privileges and immunities contemplated in paragraph 1 of Article 105—one convention for the United Nations itself and one for its specialized agencies. The latter convention spells out that specialized agencies have "immunity from every form of legal process" absent an express waiver. Convention on the Privileges and Immunities of the Specialized Agencies, art. III, § 4, Nov. 21, 1947, 33 U.N.T.S. 261. Those immunities, which stem directly from article 105, apply to PAHO by virtue of that article. And, as Plaintiffs' own source makes clear (Opp. 9), "[t]he terms privileges and immunities indicate in a general way all that could be considered necessary to the realization of the purposes of the Organization," including

"immunity from jurisdiction."  13 U.N.C.I.O. Documents 705.

### B.        PAHO Is Immune Under The WHO Constitution

The WHO Constitution independently affords PAHO absolute immunity from suit.  Article 67 confers on the WHO—and, by extension, PAHO, which is the WHO's regional office for the Americas, *see* Mem. 5—"such privileges and immunities as may be necessary for the fulfilment of its objective and for the exercise of its functions."  WHO Const. art. 67(a).  Such privileges and immunities, as PAHO explained (Mem. 14-18), include immunity from suit in national courts.  As they do with the U.N. Charter, Plaintiffs argue that the WHO Constitution is not self-executing and does not confer immunity on PAHO.  Opp. 11-15.  These arguments, too, fail.

1.        The WHO Constitution is enforceable in domestic courts because it is a treaty that "conveys [that] intention," *Medellín*, 552 U.S. at 505.  Plaintiffs incorrectly respond that the WHO Constitution is neither a treaty nor domestic law because its terms and provisions have been enacted into U.S. law by virtue of a congressional-executive agreement (Opp. 11-12).  But as "the constituent instrument of an international organization created by agreement of states parties, *see* Vienna Convention on the Law of Treaties art. 5, 1155 U.N.T.S. 331, it is a treaty.  And by virtue of Congress's approval and President Truman's signature, *see* Pub. L. No. 80-643, 62 Stat. 441 (1948), it *is* federal legislation and its provisions are thus U.S. law.  *See Weinberger v. Rossi*, 456 U.S. 25, 28-34 (1982) (treating congressional-executive agreement as domestic U.S. law); *Al-Bihani*, 619 F.3d at 35 & n.17 (Kavanaugh, J., concurring in denial of rehearing en banc) (calling congressional-executive agreements that are self-executing "domestic U.S. law"); *Restatement (Third) of Foreign Relations Law* § 303 cmt. 3 (1987) ("The prevailing view is that the Congressional-Executive agreement can be used as an alternative to the treaty method in every instance."); Hathaway, *Treaties' End*, 117 Yale L.J. 1236, 1321 (2008) (a congressional-executive agreement "not only has the status equivalent to federal statutory law, it *is* federal statutory law").

Plaintiffs' contention that the particular provision at issue here—article 67 of the WHO Constitution—is not self-executing (Opp. 12-13) fares no better.  Like article 105 of the U.N. Charter, article 67 uses mandatory (in fact, virtually identical) language, providing that the WHO "*shall* enjoy … such privileges and immunities as may be necessary for the fulfilment of its objective and for the exercise of its functions."  WHO Const. art. 67(a) (emphasis added).  And again, *Medellín* explains that treaty provisions that are phrased as "directives" and use mandatory language like "'shall' or 'must,'" generally signify that the drafters intended the provision to be self-executing.  552 U.S. at 508.  Plaintiffs argue that the "[s]urrounding provisions" use "shall" in a conditional manner (for instance, stating that certain things "shall" occur only after the completion of some other process, *e.g.*, WHO Const. art. 69), thus suggesting that article 67's use of "shall" was meant to be exhortative, not directive.  Opp. 12-13.  But the fact that *other* provisions use "shall" conditionally shows that the drafters knew how to draft such a provision—and they did not do so in article 67.  Plaintiffs' comparative argument thus undercuts their position.

2.      The WHO Constitution confers immunity not just on the WHO, but on PAHO as well.  PAHO became the WHO's "regional office" for the Western Hemisphere in 1949.  Agreement Between the World Health Organization and the Pan American Health Organization, World Health Assembly Res. 2.91 (June 30, 1949) ("WHO-PAHO Agreement"), in *World Health Organization Basic Documents* 41 (49th ed. 2020).[4]  As such, PAHO became an "integral part" of the WHO, WHO Const. art. 45, entitled to share its rights—including its immunities—under its Constitution.  Plaintiffs protest that PAHO is not actually a part of the WHO under article 45, insofar as article 44 authorizes the WHO only to "establish" regional offices, *id.* art. 44(b), and PAHO predated the WHO.  Opp. 13-14.  This is spurious.  Nothing in the text of articles 44 and

---

[4] https://apps.who.int/gb/bd/pdf_files/BD_49th-en.pdf#page=47.

9

45 prohibits the WHO from incorporating a preexisting organization as a "regional office" (as opposed to establishing a new one).  To the contrary, as Plaintiffs acknowledge, Opp. 14, the WHO Constitution provides that PAHO "shall in due course be integrated with" the WHO, *id.* art. 54— a process that took place only a few years later, in 1949.  *See* WHO-PAHO Agreement preamble.  Plaintiffs also argue that PAHO has "maintained its separateness and autonomy" from the WHO, Opp. 14, pointing to provisions that permit PAHO to continue to operate its own programs.  But the preservation of some regional autonomy in a regional office, by agreement with the WHO, does not mean that PAHO is not a full part of the WHO, as the agreement and PAHO's own constitution make clear.  *See, e.g.*, *id.* art. 4 (PAHO's director shall also serve as Regional Director of the WHO); *id.* art. 8 (WHO to fund PAHO operations).  There is no credible argument that the WHO's Constitution does not shield PAHO too.[5]

3.      Finally, while the operative complaint had asserted that PAHO had somehow waived its absolute immunities as an entity within the U.N. system, *see* SAC ¶¶ 6, 14, 57-76, Plaintiffs' opposition all but abandons that claim, contending only that neither the WHO Constitution nor the U.N. Charter confer absolute immunity on PAHO because PAHO allegedly "facilitated human trafficking in violation of its own constitution."  Opp. 11; *see also id.* at 13 (asserting without elaboration that the WHO Constitution "does not immunize PAHO for *ultra vires* conduct").  But Plaintiffs cite no authority for the proposition that ultra vires conduct waives absolute immunity.   And as PAHO explained (Mem. 18-20)—without any response from

---

[5] Plaintiffs suggest that PAHO's "claim to immunity based on the WHO Constitution may be negated by" President Trump's announcement that the United States will withdraw from the WHO.  Opp. 14 n.5.  But any withdrawal will not take effect until a year after that announcement, or July 2021.  *See* Pub. L. No. 80-643, § 4, 62 Stat. 441, 442 (1948).  Until withdrawal actually occurs, the WHO Constitution is binding federal law, which Plaintiffs do not appear to dispute.  Nor have Plaintiffs offered any basis to assume that any withdrawal would apply retroactively to this case.

Plaintiffs—such an implied-waiver theory would vitiate the established rule that an organization can waive absolute immunity only through a "clear and unambiguous manifestation of [its] intent," *LaVenture v. United Nations*, 279 F. Supp. 3d 394, 399-400 (E.D.N.Y. 2017), *aff'd*, 746 F. App'x 80 (2d Cir. 2018) (per curiam).  PAHO has made no clear and unambiguous waiver here.

### C.      PAHO Is Immune From This Suit Under The IOIA

Plaintiffs say that this suit falls within three exceptions to immunity under the IOIA/FSIA: waiver, commercial activity, and expropriation.  Opp. 15-33.  In fact, none of the three applies.

#### 1.      *The waiver exception is inapplicable*

Plaintiffs' waiver arguments fail at the outset because Plaintiffs have not alleged an "express" waiver by PAHO.  Although the FSIA contemplates the possibility, in some contexts, of implied waivers, the IOIA permits international organizations to "waive their immunity" only "*expressly*."  22 U.S.C. § 288a(b) (emphasis added).  Although *Jam v. International Finance Corp.*, 139 S. Ct. 759 (2019), clarified key aspects of 288a(b), it did not address the IOIA's express-waiver provision.  Plaintiffs' failure to allege an express waiver is therefore fatal.

Even under the FSIA's waiver standard, a foreign sovereign "will not be found to have waived its immunity unless it has clearly and unambiguously done so," *World Wide Minerals, Ltd. v. Rep. of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002).  And courts "almost unanimously restrict[] instances of implied waiver to three particular circumstances" involving voluntary assumption of obligations under U.S. law.  *Ashraf-Hassan v. Emb. of France*, 40 F. Supp. 3d 94, 100 (D.D.C. 2014) (Boasberg, J.).  Plaintiffs fail to plead any such circumstances.  Mem. 21-25.

Plaintiffs do not dispute the FSIA's waiver standards.  Their complaint alleges instead that PAHO waived immunity through unlawful and *ultra vires* conduct.  *See* SAC ¶¶ 14, 57-76.  While Plaintiffs briefly allude to that theory in their opposition (at 11, 13), they neither offer support for it nor confront PAHO's explanation of its flaws.  And they now pivot to a new position: that PAHO

"may" have waived its IOIA immunity by entering into an agreement of the kind described in *Ashraf-Hassan v. Embassy of France*, and that they are entitled to jurisdictional discovery to try to identify some such agreement.  Opp. 33.  But Plaintiffs have no credible basis to allege that PAHO has entered into any such agreement (it has not), and as explained in PAHO's opposition to Plaintiffs' cross-motion, discovery would not be appropriate here in any event.

2.    <i>The commercial-activity exception does not apply</i>

Plaintiffs' commercial-activity arguments do not satisfy any prong of that FSIA exception, for two independent reasons.  28 U.S.C. § 1605(a)(2).  First, PAHO has engaged in no commercial activity in connection with the Mais Médicos program; it has merely provided administrative support and public-health expertise to a public-health program set up and supported by PAHO Member States, in accord with PAHO's core public-health mission.  Second, the requisite "nexus" between Plaintiffs' claims and the United States is absent.

a.    As explained (Mem. 26-29), PAHO has not engaged in any "commercial activity" in connection with Mais Médicos.  Mais Médicos was a governmental public-health initiative implemented in Brazil in accordance with Brazilian law that rapidly expanded access to primary public health-care services by mobilizing tens of thousands of doctors, including many employed in the civil service of the Cuban government, to ameliorate a profound shortage of doctors in Brazil in general, and to serve poor and vulnerable populations in particular.  PAHO's role supporting Mais Médicos was fully consistent with its public-health mission and in no way commercial.  Mais Médicos is an example of the multilateral work that lies at the core of PAHO's mission, akin to a sovereign engaging in a public act, not "a private player within the market," *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993); *see also Jam*, 139 S. Ct. at 772; Mem. 26-27, rendering the commercial-activity exception inapplicable.  Plaintiffs dispute the relevance of PAHO's mission to the commercial-activity analysis, Opp. 27, but this mission shows that the "character" of the

12

conduct in question was part of PAHO's core function, 28 U.S.C. § 1603(d); *see also Nelson*, 507 U.S. at 360.  And the very "purpose of the immunities accorded international organizations [under the IOIA] is to enable the organizations to fulfill their functions."  *Mendaro v. World Bank*, 717 F.2d 610, 617 (D.C. Cir. 1983).  Helping its member states provide public-health services to their citizens not only falls squarely within PAHO's mission; it is also the very reason for PAHO's existence—and "not the sort [of activity] that a private party could engage in," Tr. of Oral Arg. 28, *Jam*, 139 S. Ct. 759 (No. 17-1011).  It is therefore not "commercial."

Plaintiffs' contrary arguments center on three allegations: (1) that PAHO allegedly had agreements with Brazil and Cuba to "purchase … medical services" and "enforce" alleged contracts between Plaintiffs and those countries; (2) that PAHO allegedly had an agreement with Cuba to compensate it "for the utilization of its medical professionals"; and (3) that PAHO allegedly was "compensated" for performing "services" such as "money laundering and strong arming."  Opp. 24-27.  None of these brings the case within the commercial-activity exception.

At the outset, none of these allegations constitutes the "gravamen" of Plaintiffs' claims, i.e., the conduct at the "core of" those claims, or the "foundation" of Plaintiffs' suit, as the FSIA commercial-activity exception requires, *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015).  Plaintiffs allege (e.g., SAC ¶ 129) that they were the victims of forced labor, and that their services were obtained "by means of force, … physical restraint, … serious harm," threats thereof, or abuse of process, 18 U.S.C. § 1589(a).  The gravamen of the suit is thus the alleged forced labor itself—the alleged events that "actually injured" Plaintiffs, *OBB*, 136 S. Ct. at 396.  And as the Supreme Court explained in *OBB*, a plaintiff injured by tortious conduct cannot "recast" a claim from which a defendant is immune simply by pointing to other conduct (even related conduct) that would qualify for an exception to immunity, *id.*; a court must look to "the 'essentials' of a …

narrative." *Id.* at 397.  Yet Plaintiffs attempt to recast their claims in exactly this way.  Again, the "essentials" of their claims are that their allegedly coerced participation in Mais Médicos made them victims of unlawful trafficking.  But Plaintiffs do not genuinely argue that *PAHO* engaged in trafficking or coerced their participation; they allege that *Cuba* did.  *E.g.*, SAC ¶¶ 79, 91, 93, 104.  Even taking Plaintiffs' allegations as true, then, PAHO had no involvement in the events that "actually injured" them, *OBB*, 136 S. Ct. at 396.

Those events, moreover, were "not commercial in nature," *Lubian v. Republic of Cuba*, 440 F. App'x 866, 868 (11th Cir. 2011) (per curiam).  Plaintiffs erroneously argue that *Lubian* is inapposite, asserting that the claims there were "'based upon' Cuba's 'exercise of police powers' in furtherance of its medical mission to Venezuela."  Opp. 27-28.  But Plaintiffs' claims here are functionally identical:  Plaintiffs, like the plaintiffs in *Lubian*, claim that they were "sent by the Cuban government to" a foreign country and "forced to provide healthcare services" in suboptimal conditions.  *Lubian v. Republic of Cuba*, 2011 WL 13186846, at *1 (S.D. Fla. Jan. 25, 2011), *aff'd*, 440 F. App'x 866; *see* SAC ¶¶ 1-5, 23-27, 77-115.  The only distinction between the two cases is that Plaintiffs, cognizant of the immunity the FSIA confers on foreign states, have attempted to shoehorn PAHO into a suit in which it too has no place.

*OBB* also forecloses Plaintiffs' suggestion (Opp. 19, 22) that PAHO's alleged conduct lies at the foundation of their claim under 18 U.S.C. § 1589**(b)**, which prohibits "knowingly benefit[ting] … from participation" in a forced-labor "venture."  The plaintiff in *OBB* similarly argued that some of her claims involved *additional* "wrongful action," such as the defendant's failure to warn her about risks it had negligently created.  136 S. Ct. at 396.  The Supreme Court rejected that argument, explaining that "however [she] frame[d] her suit, the incident" that *injured* the plaintiff "remain[ed] at its foundation."  *Id.*  So too here:  Plaintiffs' attempt to also plead a

14

§ 1589(b) claim does not allow them to shift the focus away from the alleged trafficking and forced labor that they say injured them and that lie at the heart of their complaint.

Even if any of Plaintiffs' allegations regarding PAHO could be considered core to their claims, none of PAHO's activities were "commercial." Plaintiffs first allege that PAHO had a role in facilitating the Cuban government's employment of its own public-health professionals, including Plaintiffs and others. *See* Opp. 25-27; SAC ¶ 5 (Plaintiffs were employed by "the Cuban government"); *see also* SAC ¶¶ 80, 95, 108. But the D.C. Circuit has repeatedly held that a foreign government's employment of its own nationals is "quintessentially" *not* commercial in nature. *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 664 (D.C. Cir. 2007); *see also Broadbent v. Org. of Am. States*, 628 F.2d 27, 34 (D.C. Cir. 1980). Plaintiffs assert that their contracts "do not fit within" this caselaw, Opp. 25, but they do not explain why. Despite Plaintiffs' insinuations, PAHO did not enter into "contract[s] [to] purchase … medical services" from Cuba, Opp. 24, nor does the complaint allege that it did, *see* SAC ¶ 45 (describing an agreement between Brazil and Cuba), *cited at* Opp. 24; to the contrary, Plaintiffs' allegations make clear, as noted, that Plaintiffs were public-health professionals employed by the Cuban government, not by PAHO.

Plaintiffs' opposition also vaguely suggests that PAHO "approved … agreements" that affected Plaintiffs, Opp. 25, 26, but it does not suggest, and there is no allegation in the complaint, that PAHO ever entered into, "approved," or played any role in any public-employment contracts between Plaintiffs and the Cuban government. As to PAHO's alleged agreement with Cuba to "compensate" Cuba by facilitating payments from the Brazilian government to the Cuban government for the services its public-health professionals rendered, *id.* at 25-26, any such agreement to provide administrative services in support of national public-health programs or initiatives between or among Member States would simply reflect PAHO's performance of a core

function: assisting Member States with their public-health initiatives.  And Plaintiffs' suggestion that the Cuban government "profits" from its employment of public-health professionals as part of an intergovernmental program, Opp. 26, is immaterial to whether *PAHO's* alleged conduct was "commercial" in nature.  Finally, Plaintiffs' (incorrect) allegation that PAHO entered into an agreement with a "commercial entity," Opp. 24 & n.7, is likewise irrelevant:  By Plaintiffs' own allegations, that entity apparently is a Cuban government-controlled instrumentality, *see* SAC ¶¶ 80, 95, suggesting again that Plaintiffs' true complaint is with that foreign state, not with PAHO.

Plaintiffs' remaining allegations center on PAHO's supposed role in "perform[ing] services for which it was compensated."  Opp. 26-27.  To begin with, however, Plaintiffs' opposition improperly recharacterizes the complaint's allegations.  *Compare* Opp. 26 (citing SAC ¶¶ 87 and 103 for the proposition that PAHO engaged in "money laundering and strong arming") *with* SAC ¶¶ 87, 103 (containing no such allegations).  Plaintiffs' actual allegations, taken as true, do not show that PAHO engaged in "commercial" activity in providing public-health expertise and administrative support to Member States in connection with Mais Médicos.  For instance, Plaintiffs concede that PAHO received money not from a commercial or market participant but from the Brazilian government, in connection with its public-health program.  *See, e.g.*, SAC ¶¶ 18, 38. PAHO's receipt of funds for its role in providing technical and administrative support to a public-health program implemented by Member States does not render that role "commercial." Moreover, Plaintiffs' use of the term "profit" is a misnomer; the fees PAHO charged in connection with Mais Médicos were part of the standard, U.N.-wide practice (approved by Member States) requiring Member States that benefit from an organization's work in connection with an "extra-budgetary project" to pay the organization a percentage fee to cover its "program support costs" for its work on that project.  *See* PAHO, *Standardized Format for PAHO Project Documents and*

*Profiles* 58;[6] *see also* U.N. Gen. Assembly Res. 35/217 (V), at 248-249 (Dec. 17, 1980) (approving 13% annual contribution rate for program support costs).[7]  In the end, the technical cooperation that PAHO rendered to its Member States involved with Mais Médicos was part of its core function of supporting public-health programs.  PAHO's activities were not in any way "commercial."

b.      Even if Plaintiffs had alleged that PAHO engaged in commercial activity that constituted the "gravamen" of their forced-labor claims, their arguments would still fail.  The FSIA requires a "nexus" between the gravamen of their complaint and the United States.  28 U.S.C. § 1605(a)(2); *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35-43 (D.C. Cir. 2014); *see* Mem. 29-32.  Plaintiffs' claims fail this test because the acts at the heart of their claims occurred in Cuba or Brazil.

As an initial matter, Plaintiffs' efforts to establish a jurisdictional nexus between their claims and the United States lack merit because the only arguments they make about PAHO's own conduct, *see* Opp. 16-17, have little to do with the "foundation" of their suit—the forced labor that Plaintiffs allege "actually injured" them, *OBB*, 136 S. Ct. at 396; *see supra* Part I.B.2.a.  As to prongs 1 and 2 of the commercial-activity exception—each of which requires Plaintiffs to show that their suit is "based upon" conduct that occurred "in the United States," 28 U.S.C. § 1605(a)—Plaintiffs focus on PAHO's alleged role in "making policy, management, and enforcement decisions" in the United States.  Opp. 17-18.  But a plaintiff in an IOIA/FSIA case cannot maintain a claim based on injuries suffered abroad merely by alleging that related "policy" decisions were made in the United States.  *See OBB*, 136 S. Ct. at 396-397.  As the Court explained in *OBB*, "the 'essentials' of a personal injury narrative" will generally "be found at the 'point of contact'—'the

---

[6] https://iris.paho.org/bitstream/handle/10665.2/46210/Standardized_Format.pdf.

[7] https://undocs.org/en/A/RES/35/217.

place where the boy got his fingers pinched.'" *Id.* at 397.  Here, that is plainly overseas, where Plaintiffs allegedly were coerced by the Cuban government, SAC ¶¶ 77-79, 93-94, 106-108, and allegedly trafficked and mistreated, *id.* ¶¶ 85-92, 96-102, 110-115.

Plaintiffs respond that this argument "would require the Court to conclude that the 'gravamen' of Plaintiffs' suit against *PAHO* is wrongful conduct *by other entities and individuals*." Opp. 20.  Exactly right:  The gravamen of their suit *is* wrongful conduct by other entities outside the United States, not by PAHO.  Plaintiffs suggest that, for this reason, the Court must "focus on the conduct *by PAHO* upon which [their] claims are based."  *Id.*  But Plaintiffs' claims are *not* "based upon" alleged conduct by PAHO.  They are "based upon" alleged conduct by sovereign states that Plaintiffs declined to sue.  Plaintiffs cannot simply substitute a defendant whose alleged conduct neither lies at the heart of their suit nor has the necessary nexus to the United States.

That leaves prong 3, which requires a lawsuit to be "based upon an act outside the territory of the United States … [which] causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  As PAHO explained (Mem. 30-32), Plaintiffs cannot satisfy this requirement merely by alleging that money "came to rest in PAHO's bank account in Washington, D.C." (Opp. 21).  The "direct effect" at issue must be precipitated by an action of the defendant that is (a) part of the "gravamen" of the suit, *OBB*, 136 S. Ct. at 395, and (b) "in connection with a commercial activity," 28 U.S.C. § 1605(a)(2).  As discussed, Plaintiffs allege no action by PAHO that satisfies either of these requirements.  PAHO was not engaged in any commercial activity, and the actions that Plaintiffs allege PAHO took are not part of the gravamen of their suit.  And even if money ended up in U.S. bank accounts, that would not have been the *direct* effect of the acts at the heart of this suit.  A "direct effect" must "follow[] as an immediate consequence of" such an act, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (quotation marks omitted).  And as PAHO explained

18

(Mem. 31), Plaintiffs do not allege facts that, if true, would establish that deposits in U.S. bank accounts were the *immediate* result of alleged forced labor by the Cuban government.

### 3. The expropriation exception is inapplicable

The FSIA's expropriation exception, which applies where property is "taken in violation of international law" (and that property has a nexus with commercial activity in the United States), 28 U.S.C. § 1605(a)(3), does not apply here for three reasons.

a. International organizations such as PAHO lack the capacity to nationalize or "take" property within the meaning of the expropriation exception, as that sovereign act can be undertaken only by states. *See* Mem. 33. Plaintiffs protest that PAHO has no "evidence" for this reading (Opp. 30-31), but the "evidence" is the text of the statute itself. Statutory terms are generally given their "ordinary meaning," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012), which means that a "taking" refers to "[t]*he government's* … acquisition of private property," *Black's Law Dictionary* (11th ed. 2019) (emphasis added). It is unsurprising, therefore, that those courts to have addressed the issue have held that the term "taken" in § 1605(a)(3) "refers to acts of a sovereign, not a private enterprise, that deprive a plaintiff of property without adequate compensation." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000); *accord Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1229 (11th Cir. 2018); *see also de Csepel v. Republic of Hungary*, 714 F.3d 591, 600 (D.C. Cir. 2013) ("expropriation 'constitute[s] a quintessentially sovereign act'"). The FSIA's "legislative history … provides [additional] persuasive evidence" of this limitation, *Rettig v. Pension Benefit Guar. Corp.*, 744 F.2d 133, 149 (D.C. Cir. 1984), linking § 1605(a)(3) to the "nationalization" or "expropriation" of property, H.R. Rep. No. 94-1487, at 19 (1976). Presumably this explains

19

Plaintiffs' failure to cite a single case applying the exception to an international organization.[8]

b.      Plaintiffs also fail to allege the existence of any property that was "taken in violation of international law," 28 U.S.C. § 1605(a)(3).  What they allege is that the Cuban government (their employer) paid them a lower wage than other doctors in the Mais Médicos program received and subjected them to inadequate working conditions.  *E.g.*, SAC ¶¶ 1, 5.  But being underpaid or mistreated does not amount to an unlawful "taking."  Mem. 33-34 (citing *Adams v. United States*, 391 F.3d 1212, 1220 (Fed. Cir. 2004)); *see also Scott v. Phila. Hous. Auth.*, 2011 WL 1791095, at *5 (E.D. Pa. May 11, 2011) ("Those [courts] that have considered the issue … have found that withheld wages do not give rise to a Takings Clause claim."); *accord Williams v. United States*, 86 Fed. Cl. 594, 605-606 (2009).

Plaintiffs object to this conclusion, arguing that wages are "property," and that their wages were "[i]mplicitly" taken without compensation by someone (even if not PAHO).  Opp. 29-30.  But none of the cases they cite holds that an entity that denies workers compensation "takes" or "expropriates" those wages within the meaning of the FSIA, i.e., to "transfer [the wages] to one's own possession," *Nemariam v. Ethiopia*, 491 F.3d 470, 481 (D.C. Cir. 2007); *see also Adams*, 391 F.3d at 1220 (explaining that plaintiffs "confuse a property right cognizable under the Takings Clause of the Fifth Amendment with a … right to payment of a monetary entitlement under a compensation statute").  Nor is the taking of wages an FSIA expropriation if it plays "an integral part" in the violation of another international norm.  Opp. 30.  That argument is foreclosed by the D.C. Circuit's holding that such a theory is cognizable only if the alleged taking *itself* constitutes

---

[8] Plaintiffs suggest that PAHO's argument is "reminiscent" of one rejected in *Simon v. Republic of Hungary*, 812 F.3d 127, 142 (D.C. Cir. 2016)—namely, that "a sovereign does not violate international law when it takes property belonging to its own nationals."  Opp. 31-32 & n.8.  That is in fact an entirely different argument.  *Simon* says nothing about the word "takes," nor does PAHO make any argument along the lines of the reasoning *Simon* rejected.

such a violation, *Simon*, 812 F.3d at 142, which the withholding of wages does not.

c.      Finally, this case does not satisfy the expropriation exception's domestic-nexus prong, which requires that the "taken" property, or property exchanged for it, be "present in the United States in connection with a commercial activity carried on in the United States," 28 U.S.C. § 1605(a)(3).  As explained, *see supra* Part I.B.2, Plaintiffs do not plausibly allege that PAHO engaged in any relevant commercial activity, much less commercial activity in the United States.

## II.   DISMISSAL IS WARRANTED UNDER THE DOCTRINE OF INTERNATIONAL COMITY

Plaintiffs' claims should likewise be dismissed under the doctrine of international comity. *See* Mem. 35-37.  Comity counsels against "permitting the validity of the acts of one sovereign state to be reexamined and … condemned by the courts of another."  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303-304 (1918); *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984).  Plaintiffs' suit attacks the validity of a public-health program that the sovereign nation of Brazil established and upheld through legislative, executive, and judicial acts.  For this Court to second-guess such acts would contravene principles of comity.

Plaintiffs' responses fail.  First, Plaintiffs wrongly contend, Opp. 33-35, that PAHO's comity defense is foreclosed by *Philipp v. Fed. Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018), *cert. granted*, 2020 WL 3578677 (U.S. July 2, 2020) (No. 19-351), which rejected a different comity defense based on reasoning inapposite here.  *Philipp* considered whether a federal court in an FSIA case could "decline to exercise [jurisdiction] as a matter of international comity unless the plaintiffs first exhaust domestic remedies."  *Id.* at 414.  Although the court found such an exhaustion requirement inconsistent with the FSIA, its decision did not rest, as Plaintiffs suggest, on a categorical holding that "'comity' is not available" in an FSIA case, Opp. 33-34.  To the contrary, the D.C. Circuit held that an across-the-board exhaustion requirement was inconsistent with the FSIA because some FSIA provisions expressly require plaintiffs to exhaust

remedies in foreign courts while others do not, raising "the inference that [the] omission … must have been intentional."  894 F.3d at 415.  PAHO's argument is not that comity requires Plaintiffs to exhaust their remedies abroad; it is that comity counsels deference to foreign sovereigns' legislative, executive, and judicial acts establishing that Mais Médicos was lawful.  Mem. 35-37.

Plaintiffs' other attacks on PAHO's comity defense also lack merit.  It is irrelevant that Brazilian courts adjudicated the legality of Mais Médicos under Brazilian laws rather than under "the TVPRA and RICO."  Opp. 36.  Even the precedents Plaintiffs cite do not hold that a comity defense requires the foreign tribunal to adjudicate the exact same claim pending before a U.S. court.  The relevant inquiry is whether the foreign litigation involved the same "issues" or "subject matters," *Northwest Forest Resource Council v. Dombeck*, 107 F.3d 897, 901 (D.C. Cir. 1997), or "accomplish[ed] the [same] aim" as, *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 9 (D.D.C. 2013), the U.S. case.  This case easily satisfies that test.  Brazil's highest court rejected challenges to the legality of the Mais Médicos program that concerned the same issues and subject matter presented here.  *See* Mem. Exs. C, E.  Here, Plaintiffs claim that they were subjected to forced labor by the Cuban government in connection with the Mais Medicos program, in violation of U.S. and international law.  SAC ¶¶ 23-32, 57-115.  In Brazil, a group of physicians made the same "slave labor" claims about Mais Medicos under both Brazilian law and international law.  Mem. Ex. E.  Brazil's highest court rejected those claims, finding that the participating Cuban doctors "were aware of [the program's] conditions" and were "not coerced into accepting" positions.  Mem. Ex. D.  This Court would have to contradict the Brazilian high court's ruling to rule for Plaintiffs here.

Finally, it will not violate public policy to dismiss on comity grounds.  Opp. 36-37.  The international agreements Plaintiffs cite apply equally in Brazil, meaning that the Brazilian high

court's conclusion that the Mais Médicos program did not violate applicable labor laws, Mem. Ex. D, is "entitled to considerable weight," *Abbott v. Abbott*, 560 U.S. 1, 16 (2010).  And Plaintiffs' reliance on sources that they say condemn Cuba's treatment of its own civil-service employees, Opp. 36-37, further confirms that any claims they have should lie against Cuba, not PAHO.

III.    **DISMISSAL IS REQUIRED BECAUSE PAHO HAS NOT BEEN PROPERLY SERVED**

1.    Plaintiffs erroneously argue that PAHO waived its ineffective service defense by successfully moving to transfer.  Opp. 37-39.  While Rule 12(h)(1) provides that certain Rule 12(b) defenses are waived if omitted from a motion to dismiss, PAHO did not move to dismiss in Florida; it moved to transfer under 28 U.S.C. § 1406—expressly reserving its ineffective-service defense in doing so—which does not trigger forfeiture under Rule 12(h)(1).  *See Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 648-649 (6th Cir. 2016) (a "motion to transfer venue [is] not a Rule 12 motion"); 14D Wright et al., *Federal Practice & Procedure* § 3829 (4th ed. 2020) ("Unlike a motion to dismiss for improper venue under Rule 12(b)(3), a motion to transfer venue … is not a 'defense' that must be raised by pre-answer motion or responsive pleading."); *id.* § 1352; 1 Gensler et al., *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 12 (2020 ed.) (transfer motion does not trigger forfeiture); *see also Nichols v. Vilsack*, 183 F. Supp. 3d 39, 42 (D.D.C. 2016) (distinguishing motion to transfer from Rule 12 motion).

Plaintiffs' contrary arguments fail.  It is no help to them that a court considering a transfer motion may opt to dismiss the case, *see* 28 U.S.C. § 1406(a), and conversely that a court considering a motion to dismiss under Rule 12(b)(3) may transfer the case to a more convenient venue.  Opp. 38.  The fact that "remedies" issued in response to motions to dismiss and motions to transfer *may* sometimes be "the same," *id.*, is irrelevant, as the question of waiver depends on the type of motion that the defendant actually filed.  A transfer motion is not a "motion under this rule" (i.e., Rule 12), and so does not trigger Rule 12(h), *see* Fed. R. Civ. P. 12(g)(2).

Plaintiffs are wrong that three unpublished cases adopted a contrary understanding.  Two held only that a defendant waived a Rule 12(b) defense by not raising it in a 12(b) motion.  *See Johnson v. UMG Recordings, Inc.*, 2018 WL 4111912, at *5 (M.D. Tenn. Aug. 29, 2018) (defendant waived personal-jurisdiction defense by "making that argument for the first time in its reply"); *Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional*, 2009 WL 2252116, at *2 (S.D.N.Y. July 28, 2009) (defendant waived same defense by "not mov[ing] to dismiss for lack of personal jurisdiction").  And the third reserved a timely-raised service defense for the transferee court.  *See Muenzberg v. Barnes*, 1998 WL 61207, at *2 (N.D. Cal. Feb. 5, 1998).

Lastly, Plaintiffs' assertion that PAHO "expressly requested the alternative remedy of dismissal" in its motion to transfer and subsequent papers, Opp. 38 n.11, is not true.  PAHO mentioned the possibility of dismissal on venue grounds exactly once in each document, and each time only in passing.  *See* ECF No. 18 at 10; ECF No. 42 at 2.  Plaintiffs cite no case finding a waiver under remotely similar circumstances.

2.     Plaintiffs' arguments on the merits of PAHO's ineffective-service defense fare no better.  Plaintiffs accept that, if the U.N. Charter or WHO Constitution affords PAHO absolute immunity from suit, it is also immune from service; they simply argue that neither instrument provides PAHO with such immunity.  Opp. 39.  But because both treaties do have that effect, as PAHO has explained, PAHO is absolutely immune from service as well.

Plaintiffs also make no argument that they served PAHO in accordance with the IOIA or FSIA.  They argue instead that the FSIA's service provisions are inapplicable in suits against international organizations, Opp. 39-45, but that contention fails for multiple reasons.  First, it is barred by law of the case, as Judge Gayles squarely rejected it before transferring this case.  He held that the IOIA extends to international organizations "the same immunity from … every form

of judicial process" that the FSIA provides to foreign states, including "specific provisions for service of foreign states."  ECF No. 46 at 10-11 & n.6.  "Once a court finally decides any issue of law, the law of the case [doctrine] holds that the ruling should be adhered to by a transfer[ee] court."  *In re Korean Air Line Disaster of Sept. 1, 1983*, 664 F. Supp. 1488, 1489 (D.D.C. 1987).

In any event, the IOIA's plain text establishes that only FSIA-compliant service is effective against designated international organizations.  The IOIA provides that such organizations "enjoy the same *immunity* from … *every form of judicial process* as is enjoyed by foreign governments." 22 U.S.C. § 288a(b) (emphasis added).  The term "immunity" includes "[a]ny exemption from" "service of process."  *Black's Law Dictionary* (11th ed. 2019).  And "judicial process" describes "proceedings begun by a … summons" or "a means of acquiring jurisdiction of the defendant"— that is, service of process.  72 C.J.S. *Process* § 1 (2020).  The IOIA thus expressly confers on international organizations the same immunity from service of process that the FSIA confers on foreign sovereigns, i.e., the protections afforded by 28 U.S.C. § 1608(a), which "sets forth the exclusive procedures for service on a foreign state," *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994).

Plaintiffs' last-ditch argument—that treating § 1608 as governing service on international organizations is "nonsensical" because some of its provisions seem to apply more aptly to sovereign states, Opp. 42-44—also lacks merit.  Applying § 1608 to international organizations is not as cumbersome as Plaintiffs suggest.  International organizations can, of course, make a "special arrangement for service."  28 U.S.C. § 1608(a)(1).  And if (as here) no such arrangement exists, service is possible via the State Department, as provided in § 1608(a)(4).

## CONCLUSION

The Court should dismiss Plaintiffs' claims against PAHO on grounds of lack of subject-matter jurisdiction, principles of international comity, and insufficient service of process.

25

Dated:  September 4, 2020                    Respectfully submitted,


                                             /s/ Patrick J. Carome
                                             Patrick J. Carome (#385676)
                                             David W. Bowker (#989309)
                                             Daniel S. Volchok (#497341)
                                             WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                             1875 Pennsylvania Avenue N.W.
                                             Washington, D.C. 20006
                                             Telephone:  (202) 663-6000
                                             Facsimile:  (202) 663-6363
                                             E-mail:  patrick.carome@wilmerhale.com

                                             *Counsel for putative defendant*
                                             *Pan American Health Organization*