**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RAMONA MATOS RODRIGUEZ,** *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 20-928 (JEB)** |
| **PAN AMERICAN HEALTH ORGANIZATION,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

Most public attention on human trafficking and forced labor understandably focuses on destitute victims who live on the margins of society.  In this case, however, those allegedly taken advantage of were Cuban physicians, who assert that their government, through threats and intimidation, coerced them into providing medical services in Brazil, restricted their movement and contacts while abroad, and withheld and eventually confiscated the lion's share of their wages.  Plaintiffs, four Cuban physicians now living in the United States, claim that they were victims of the Mais Medicos program, a medical mission operated by the Brazilian government in conjunction with Cuba, from 2013 to 2017.  Plaintiffs, however, do not name Cuba or Brazil as defendants in this lawsuit.  Instead, they bring this putative class action against the Pan American Health Organization, an international body affiliated with the World Health Organization and tasked with advancing public health in the Western Hemisphere.  Plaintiffs charge that PAHO provided, or knowingly benefited from others having provided, their forced labor, and they seek damages under the Trafficking Victims Protection Act and the Racketeer Influenced and Corrupt Organizations Act.

1

PAHO now moves to dismiss, principally contending that it is immune from suit under the International Organizations Immunities Act (IOIA) or, failing that, the United Nations Charter or the World Health Organization Constitution.  Until recently, this would have been an easy issue, as it was generally accepted that international organizations like PAHO are <u>absolutely</u> immune from suit under the IOIA.  The Supreme Court, however, recently overruled that approach, holding in <u>Jam v. International Finance Corp.</u>, 139 S. Ct. 759 (2019), that the IOIA provides international organizations the same (less-than-absolute) degree of immunity enjoyed by foreign sovereigns under the Foreign Sovereign Immunities Act.  PAHO's Motion thus presents several novel questions, including how to apply the FSIA's exception for "commercial activity" to an international organization like PAHO and whether the immunity-conferring provisions of the U.N. Charter or WHO Constitution are binding domestic law capable of being enforced by federal courts.

The Court ultimately concludes that it has jurisdiction over PAHO as to several, though not all, of Plaintiffs' claims against it.  The Court also rejects PAHO's alternative request that this suit be dismissed for reasons of international comity and its argument that it has not been properly served.  The case will therefore proceed.

I.    **Background**

A.  <u>Factual Background</u>

As this Opinion mainly concerns PAHO's assertion of immunity, the Court need set out only briefly the relevant facts as alleged by Plaintiffs.  (There is no occasion to assess the veracity of these factual assertions, which the Court must accept as true at this stage.)  Plaintiffs claim that they were recruited into the Mais Medicos program "under threat of harsh social, economic, political personal, reputational, and legal repercussions" from the Cuban regime and

that they were not told where they would be sent or what work they would perform.  See ECF
No. 50 (Second Amended Complaint), ¶ 2.  As to PAHO in particular, Plaintiffs' allegations
center on its role in facilitating Mais Medicos as an essential intermediary between the Cuban
and Brazilian governments.

Beginning in 2012, officials from both countries began discussing the possibility of
Brazil's joining the many countries to which Cuba "export[s] . . . medical services."  Id., ¶ 40;
see id., ¶¶ 41–47.  Per multiple State Department reports cited in the Complaint, "medical
missions" comprised of Cuban doctors "constitute a significant source of Cuban government
income," and "[s]ome participants in [those] missions as well as other sources allege that Cuban
officials force or coerce participation in the program."  Id., ¶ 30.  As relevant here, Cuban
officials proposed sending six thousand specialists in internal medicine to Brazil.  Id., ¶ 41.  As
discussions wore on, it became clear to Brazilian officials that any arrangement between the two
countries could not be implemented as an "intergovernmental agreement" because, if it were, it
would "have to be submitted to [Brazil's] Congress" as well as other government ministries and
"would generate controversy."  Id., ¶ 45 (quoting remarks of Brazil's ambassador to Cuba).  The
need to arrive at a "legal framework" for the program that would avoid a "bilateral agreement,"
"which would require approval by the Brazilian Congress," led Brazilian officials to "present[]
[to Cuba] the proposal to use the Pan American Health Organization as an intermediary,
characterizing the contracting of services as cooperation in the medical field."  Id., ¶ 47 (quoting
December 2012 diplomatic cable).

PAHO's alleged conduct in that middleman role falls into two main buckets.  First, and
Plaintiffs' main focus, PAHO agreed to serve as a financial intermediary between the two
countries.  Rather than having the Brazilian government pay Cuba directly as compensation for

the physicians, it would pay PAHO, which would then pay the Cuban regime.  Id., ¶¶ 18, 38, 50–51.  This role fulfilled an earlier agreement between PAHO and Cuba, in which PAHO had endeavored to help "triangulat[e] . . . health care cooperation and the moving of resources."  Id., ¶¶ 19(c), 49.  Formalizing its go-between status, PAHO entered into several agreements with the Brazilian government and a Cuban government-affiliated firm, which "called for Brazil to make payment to PAHO's Citibank account in Washington, D.C."  Id., ¶ 18.  "Pursuant to these agreements, PAHO collected hundreds of millions of dollars every year from Brazil and it remitted 85% to Cuba, paid 10% or less to the doctors, and kept 5% for itself."  Id.  Over the life of the Mais Medicos program, which terminated in 2018, that 5% fee amounted to over $75 million.  Id.  Plaintiffs claim that this money was not all used for legitimate administrative expenses of PAHO's program-related actions.  Id., ¶¶ 87, 103.

Second, Plaintiffs allege that PAHO played an important role in "enforc[ing]" the terms of the Mais Medico program and "cover[ing] up" its objectionable elements.  Id., ¶ 38.  The SAC repeatedly asserts in general terms that, true to that role, PAHO helped "organize[], administer[], and enforce[]" Mais Medicos.  Id., ¶ 3; see also id., ¶¶ 15, 18, 57, 86.  In addition, Plaintiffs claim that PAHO officials proposed shaping the relevant agreements to hide the fact that Cuba was also sending "consultants" (read: government minders) along with its physicians.  Id., ¶ 52; see also id., ¶ 85.  PAHO also allegedly hired Cuban intelligence officers to provide on-the-ground surveillance and help ensure doctors' compliance with their harsh employment conditions.  Id., ¶¶ 5, 86, 100, 113.  Among those conditions, Plaintiffs were not allowed their passports and thus could not travel; their day-to-day movements were limited and subject to pre-approval by their minders; their social-media presences were monitored; they were paid a relative pittance; and they were required to propagandize for Cuba to their patients.  Id., ¶¶ 27,

98, 113.  PAHO's pressure campaign was not limited to the Cuban doctors themselves; one

senior PAHO official allegedly "pressured the Brazilian Attorney General to intervene and shut

down, or divert," cases brought in the Brazilian court system by Cuban doctors.  Id., ¶ 19(e).

      B.  Procedural History

      Plaintiffs filed this action in late 2018 in the U.S. District Court for the Southern District

of Florida.  See ECF No. 1 (Complaint).  After they filed an amended complaint, see ECF No. 9,

PAHO moved to transfer the case to this district on the ground that it is the only appropriate

venue under the IOIA.  See ECF No. 18 (Mot. to Transfer) at 6–10.  The Florida district court

agreed and transferred the case, see ECF No. 46, after which Plaintiffs filed their now-operative

Second Amended Complaint.  That Complaint, styled as a putative class action on behalf of all

Cuban physicians allegedly forced into participating in the Mais Medicos program, contains two

counts, one asserting violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C.

§§ 1589–1590, and one of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18

U.S.C. §§ 1962(c)–(d).  See SAC, ¶¶ 129–36, 139–44.  Although both statutes are primarily

criminal in nature, each allows victims to obtain civil recovery of "damages and reasonable

attorneys fees."  Id. § 1595(a) (TVPA); see id. § 1964(c) (RICO).  PAHO now moves to dismiss

for lack of subject-matter jurisdiction on the grounds that it is immune from suit under the IOIA,

the U.N. Charter, and the WHO Constitution.  See ECF No. 54-1 (PAHO MTD) at 1.  It also

argues that abstention principles favor dismissal under the doctrine of international comity and

that PAHO was not properly served.  Id. at 2.

      C.  Plaintiffs' Claims

      Before assessing these arguments, the Court pauses to note an important wrinkle: while

the several alleged TVPA violations are all contained within "Count I" of the operative

Complaint, it is clear that Plaintiffs have really brought three separate TVPA claims,

corresponding with the three different sections of that statute that they assert PAHO violated.

See Matson Navigation Co., Inc. v. U.S. Dep't of Transportation, No. 18-2751, 2020 WL

4816460, at *3 (D.D.C. Aug. 19, 2020) ("One count of a complaint can include multiple

claims.") (cleaned up) (quoting Cassell v. Michaux, 240 F.2d 406, 407 (D.C. Cir. 1956)).

Recognizing as much is a key threshold step, as immunity under the FSIA (and thus the IOIA)

implicates the Court's subject-matter jurisdiction, Peterson v. Islamic Republic of Iran, 563 F.

Supp. 2d 268, 272 (D.D.C. 2008), and must therefore be evaluated "on a claim-by-claim basis."

Simon v. Republic of Hungary, 812 F.3d 127, 141 (D.C. Cir. 2016); see also Millen Indus., Inc.

v. Coordination Council for N. Am. Affairs, 855 F.2d 879, 885 (D.C. Cir. 1988) (remanding

because "[o]ne allegation of the complaint . . . may [have] be[en] sufficient to create jurisdiction"

even as most were barred by FSIA).

Plaintiffs first allege that PAHO "violated . . . 18 U.S.C. § 1589(a), which forbids

'provid[ing]' or 'obtain[ing]' human labor" by force, threats, or the like.  See SAC, ¶ 129

(emphasis added).  "Further," Plaintiffs allege in the next paragraph, PAHO "knowingly

benefited financially . . . from trafficking of Plaintiffs . . . in violation of 18 U.S.C. § 1589(b),

which makes it a crime" to benefit "from participating in a venture which has engaged in the

providing or obtaining of [forced] labor or services."  Id., ¶ 130 (emphases added); see also id., ¶

131 ("PAHO's . . . actions violated 18 U.S.C. §§ 1589(a) and (b)."); id., ¶ 132 ("PAHO[] . . .

knowingly provided and obtained the labor or services of Plaintiffs by threats . . . .  In addition,

PAHO knowingly benefited financially by participating in the Mais Medicos venture.")  Third

and finally, Plaintiffs allege (again in a separate paragraph) that PAHO's "actions also violate 18

U.S.C. § 1590," id., ¶ 133, which imposes liability on any person who "knowingly recruits,

harbors, transports, provides, or obtains by any means, any person for labor or services in violation of [section 1589]."  18 U.S.C. § 1590(a).  Section 1590, courts have explained, "imposes liability for trafficking . . . separate and distinct from liability for forced labor or services."  Gilbert v. U.S. Olympic Comm., 423 F. Supp. 3d 1112, 1133 (D. Colo. 2019); accord Baxla v. Chaudhri, 225 F. Supp. 3d 588, 593 (E.D. Va. 2016).

Each of these provisions proscribes distinct conduct — providing or obtaining forced labor under 1589(a), knowingly benefiting from participation in a venture using forced labor under 1589(b), and trafficking under 1590 — and Plaintiffs have set out each violation in "[i]ndividual numbered paragraphs within the complaint," making it "unmistakabl[e] that plaintiffs seek relief on these" separate grounds.  Save Our Sch. v. D.C. Bd. of Educ., No. 04-1500, 2005 WL 8178067, at *2 (D.D.C. Jan. 12, 2005).  Consistent with that conclusion, courts appear to treat violations of sections 1589(a), 1589(b), and 1590 as separate criminal offenses and separate bases for civil recovery.  See, e.g., Gilbert, 423 F. Supp. 3d at 1133 (differentiating 1589(a) and 1590); Adia v. Grandeur Mgmt., Inc., 933 F.3d 89, 94 (2d Cir. 2019) (same); United States v. Paz-Rodriguez, No. 20-82, 2020 WL 5607821, at *1 (N.D. Okla. Sept. 18, 2020) (differentiating 1589(a) and 1589(b)); Paguirigan v. Prompt Nursing Employment Agency LLC, No. 17-1302, 2019 WL 4647648, at *19 (E.D.N.Y. Sept. 24, 2019) (differentiating all three). The Court will therefore construe the Second Amended Complaint as asserting three distinct TVPA claims and within the Analysis below consider PAHO's invocation of immunity separately for each.

## II.    Analysis

The bulk of the Court's examination concerns immunity, but it will thereafter address international comity, service of process, and Plaintiffs' request for jurisdictional discovery.

A.  Immunity

PAHO argues first and foremost that Plaintiffs' claims must be dismissed for lack of subject-matter jurisdiction because it is immune from suit.  It expressly "contests only the legal sufficiency of the plaintiff's jurisdictional claims," and, as a result, the applicable standard "is akin to that applied under Rule 12(b)(6)."  EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A., 894 F.3d 339, 345 (D.C. Cir. 2018).  Now is therefore not the time for "a final determination whether jurisdiction exists . . .; nor [does the Court] mak[e] any final factual determinations."  Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 440 n.3 (D.C. Cir. 1990).  Instead, it must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," or an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

PAHO claims immunity from suit principally under the IOIA, but also under the immunity-related provisions of two international agreements: the U.N. Charter and the WHO Constitution.  The Court considers the three in sequence, recognizing that Defendant may escape liability if it prevails under any.

1.  *IOIA Immunity*

In considering the IOIA, the Court must rely almost exclusively on cases applying the FSIA, given the dearth of IOIA precedents to date.  This is because Jam, which was decided only last year, has altered the playing field.  After Jam, the IOIA no longer renders international

organizations to which it applies (among them PAHO) absolutely immune from suit.  Instead, like foreign sovereigns, covered international organizations are merely "presumptively immune from the jurisdiction of United States courts," and this Court has jurisdiction if "a specified [FSIA] exception applies."  Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993); see Jam, 139 S. Ct. at 771 (discussing application of FSIA exceptions under IOIA).  Plaintiffs argue that their claims fall within two such FSIA exceptions, namely: (1) claims based on the defendant's commercial activity; and (2) claims based on expropriation.  See 28 U.S.C. § 1605(a)(1)–(2). The Court now evaluates the applicability of those exceptions to each of Plaintiffs' claims.

a.   Commercial Activity

The FSIA provides that "[a] foreign state shall not be immune . . . in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  After Jam, all agree that the Court must simply replace the words "foreign state" with "international organization."  Jam v. Int'l Fin. Corp., 442 F. Supp. 3d 162, 170–71 (D.D.C. 2020).

As the text of the statute indicates, the Court's first task when assessing a specific claim is to "identify the particular conduct on which the action is 'based,'" which requires determining the "foundation" or "gravamen" of the claim by "zero[ing] in on [its] core."  OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 395–96 (2015); see also id. at 397 n.2 (suggesting gravamen may be different for different claims); Devengoechea v. Bolivarian Republic of Venezuela, 889 F.3d 1213, 1223 (11th Cir. 2018) (arguing that Sachs "expressly recognized that

the gravamina of different claims" may be different conduct).  Once the act or acts forming a claim's "essentials" are identified, Sachs, 136 S. Ct. at 397, the question becomes whether that conduct amounts to "commercial activity" or is "in connection with a commercial activity," 28 U.S.C. § 1605(a)(2), and whether the conduct "ha[s] a sufficient nexus to the United States" under the statute.  Jam, 139 S. Ct. at 772.  The nexus inquiry is relatively straightforward: the conduct at issue must either be "carried on in the United States," be "performed in the United States," or "cause[] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  The Act clarifies (sort of) that commercial activity is "carried on in the United States" if it has "substantial contact with the United States."  Id. § 1603(e).

Ascertaining whether the conduct at issue amounts to commercial activity is more difficult, especially in the context of an international organization.  As applied to foreign sovereigns, courts have long deployed an intuitive distinction: "[A] state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns."  Saudi Arabia v. Nelson, 507 U.S. 349, 360 (1993) (internal quotation omitted).  "Put differently, a foreign state engages in commercial activity . . . only where it acts 'in the manner of a private player within' the market."  Id. (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)).  Crucially, the FSIA requires courts to examine "the nature of [the activity], rather than . . . its purpose."  28 U.S.C. § 1603(d).  The question is thus "not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but rather "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce."  Weltover, 504 U.S. at 614 (internal quotation omitted).

As the district court in Jam recognized on remand from the Supreme Court, applying this test to "international organizations . . . is fraught with difficulty."  Jam v. Int'l Fin. Corp., No. 15-612, 2020 WL 4933618, at *8 (D.D.C. Aug. 24, 2020).  The core doctrinal dichotomy between commercial and noncommercial activity — acting as a sovereign versus as a market participant — cannot be easily applied to an entity like PAHO, which is, of course, not a nation state.  It is hard to imagine an action PAHO could take that would be of a type "exclusively reserved for the sovereign."  Ghawanmeh v. Islamic Saudi Acad., 672 F. Supp. 2d 3, 9 (D.D.C. 2009).

Aware of this problem, PAHO suggests that the Court should analogize its way to a different dichotomy for international organizations: "between conduct that falls within an international organization's mission," which would be non-commercial and immune, and "conduct in which the organization acts outside its mission," which would be commercial activity.  See PAHO MTD at 26–27.  That newfangled test, however, runs headlong into the existing doctrinal rule that courts must "look only to the resemblance between 'the outward form' of [the international organization's] conduct . . . and th[at] of private citizens."  El-Hadad v. United Arab Emirates, 496 F.3d 658, 667–68 (D.C. Cir. 2007) (emphasis added) (quoting Weltover, 504 U.S. at 617).  The FSIA itself, recall, clearly instructs that "[t]he commercial character of an activity shall be determined by reference to [its] nature . . . rather than by reference to its purpose."  28 U.S.C. § 1603(d).  PAHO's doctrinal reformulation would require discarding that analytical principle, as it would have courts look to the "mission or purpose," PAHO MTD at 27, behind an entity's conduct in order to determine whether it fell within the commercial-activity exception.  Just as states cannot escape the conclusion that a "contract to buy army boots or even bullets" is commercial activity on the ground that it "fulfill[ed] [the]

uniquely sovereign objective[]" of national defense, Weltover, 504 U.S. at 614, so too PAHO cannot characterize conduct as commercial because it "help[ed] its member states provide public health services to their citizens" "consistent with its public-health mission."  ECF No. 62 (PAHO Reply) at 12–13; see El-Hadad, 496 F.3d at 668 (courts must "reject[] any argument that rests on the foreign state's reasons for undertaking the activity alleged").

PAHO suggests that, the old rules notwithstanding, Jam foreshadowed a new approach for international organizations.  In that case, which was brought against an international development bank known as the International Finance Corporation, the Supreme Court suggested that "the lending activity of at least some development banks, such as those that make conditional loans to governments, may not qualify as 'commercial' under the FSIA" and thus the IOIA.  See 139 S. Ct. at 772.  *Voilà*, PAHO argues — what could be more commercial than lending?  But PAHO misunderstands the Court's apparent point, which was that under the standard approach, conditional loans to governments may not be commercial activity precisely because they may not be "'the type' of activity 'by which a private party engages in' trade or commerce."  Id. (citing Weltover, 504 U.S. at 614).  "[A]s the Government [had] suggested at oral argument," id., "lend[ing] to sovereigns" on the condition that they "enact certain restrictions . . . and change their . . . laws" is "not the sort of transaction that a private party can enter . . . into."  Tr. of Oral Arg. at 30, Jam, 139 S. Ct. 759 (No. 17-1011).  And since private parties do not and cannot engage in that sort of conditional lending, it is not commercial under the standard FSIA test.  For international organizations, then, Jam did not discard the Weltover rule — it retained it.

Courts must therefore apply the existing test as best they can to all international organizations: if the conduct alleged is "the sort of action" "typically performed by participants

in the market," it is commercial for purposes of the IOIA.  See Mwani v. bin Laden, 417 F.3d 1, 16–17 (D.C. Cir. 2005).  It must be admitted that this approach may, "[a]s Justice Breyer noted in his lone dissent" in Jam, "largely swallow the general rule that they are presumptively immune from suit."  Jam, 2020 WL 4933618, at *8 (cleaned up).  Justice Breyer, however, did not convince a majority of his colleagues on the Supreme Court to read the IOIA to avoid that outcome.  Indeed, the majority supplied several reasons why international organizations may still often have immunity even for conduct that qualifies as commercial: there is still a domestic-nexus requirement, there is still a requirement that the suit truly be "based upon" the commercial activity at issue, and it is possible that an international organization could claim immunity under a different legal instrument such as its charter, which last point the Court addresses *vis-à-vis* PAHO later in this Opinion.  See Jam, 139 S. Ct. at 771–72.  At the end of the day, this Court is not free to disregard the Supreme Court's considered decision, whatever its consequences.

In any event, many international organizations are not banks or other institutions whose activities are overwhelmingly commercial.  One can imagine a number of actions that PAHO, for example, might take that could hypothetically form the basis of a lawsuit against it but would not qualify as "engag[ing] in trade and traffic or commerce," Weltover, 504 U.S. at 614 — *e.g.*, negotiating a multilateral agreement or providing vaccinations to poor, remote communities. Here, however, it is alleged that PAHO acted quite like a bank insofar as it performed the role of financial intermediary between Cuba and Brazil.  Those actions suffice to bring one of Plaintiffs' claims — its second claim: that PAHO knowingly benefited from its participation in the Mais Medicos venture — within the commercial-activity exception.  The Court begins by discussing that claim, as it takes up the bulk of the analysis in this section, before looking at the other two.

13

*i.   TVPA Claim 2*

Plaintiffs' claim under section 1589(b) of the TVPA is their most straightforward one: according to the operative Complaint, the Mais Medicos–related agreements into which PAHO entered "called for Brazil to make payment to PAHO's Citibank account in Washington, D.C.," SAC, ¶ 18, and for PAHO to "transfer [those] hundreds of millions of dollars to the Government of Cuba." Id., ¶ 51.  Pursuant to those agreements, PAHO acted as a conduit for over $1.5 billion and retained 5%, or $75 million, for itself "in fees."  Id., ¶ 18; see also id., ¶¶ 87, 103 (alleging that money kept by PAHO was not all for administrative expenses of program).  PAHO acted in this role, per the Complaint, because for domestic political reasons the Brazilian government did not want to directly compensate the Cuban government (or its fronts) for the provision of its doctors.  Id., ¶¶ 45, 47.  Plaintiffs thus allege that PAHO knew that the Cuban component of the Mais Medicos program was "engaged in the providing or obtaining" of forced labor and received over $75 million for its "participati[on] in [that] venture."  18 U.S.C. § 1589(b).

The gravamen of this claim, accordingly, is PAHO's moving of money, for a fee, between Cuba and Brazil.  As Plaintiffs argue, even if PAHO had "played no other role in Cuba's trafficking scheme" other than as a financial intermediary, "its receipt of a financial benefit from that scheme . . . would still" amount to conduct "for which Congress has afforded Plaintiffs a private right of action."  ECF No. 58 (Opp.) at 20.  PAHO's alleged behavior as a knowing money middleman is therefore at "the core" of Plaintiffs' second TVPA claim — it is conduct that, "if proven, would entitle [Plaintiffs] to relief under [their] theory of the case." Sachs, 136 S. Ct. at 396 (quoting Nelson, 507 U.S. at 357).

The Court concludes that such conduct qualifies as commercial activity under the FSIA and thus the IOIA.  "[I]t is a normal commercial function to act for another in collecting and holding funds," Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C. Cir. 1985), and it is also a normal commercial function to act as a financial intermediary transferring funds, for a fee, from one entity to another.  In Transamerican, the defendant Somali embassy refused to accept a check made out to a Somali shipping company and instead directed the plaintiff to electronically transfer the funds intended for the company into the government's bank account.  Id. at 1001.  The Circuit had little trouble concluding that, because the Somali embassy's activities were "essentially those of a collection agent, acting on behalf of its principal," those activities were commercial in nature under the FSIA.  Id. at 1003.  "Indeed," the court explained, "had the [shipping company] not used its own government in the transaction, it could as easily have used a bank, a law firm, or any other commercial middleman."  Id.  The exact same observation can be made with regard to PAHO's role in the alleged triangular scheme with Cuba and Brazil: the financial services provided by PAHO could as easily have been provided by typical market players.  There were no doubt practical reasons why the two nations chose to use PAHO rather than a bank or other institution — according to the operative Complaint, doing so lent the enterprise a patina of legitimate medical cooperation — but that is irrelevant to the question at hand.  The key point is that the "nature" of PAHO's alleged role was commercial, see 28 U.S.C. § 1603(d), as "the particular actions" it is alleged to have performed "are the type of actions by which a private party engages in . . . commerce."  Weltover, 504 U.S. at 614; see also Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, 615 F.3d 97, 108 (2d Cir. 2010) ("Because private parties frequently take on . . . 'transfer agent' obligations," acting as such an agent qualifies as commercial activity.).

The final requirement — *viz.*, that PAHO's conduct amount to "commercial activity carried on in the United States" — is easily met here.  According to the Complaint, PAHO carried out its agreed-to role as financial intermediary using its Citibank account in Washington, D.C.  See SAC, ¶¶ 18, 50–51, 54.  Plaintiffs also allege that the Director-General of PAHO, based out of PAHO's headquarters in this city, approved the agreements committing PAHO to its role as intermediary.  Id., ¶¶ 51, 54.  That is more than enough to establish that Defendant's conduct had "substantial contact with the United States" was therefore "carried on" here under the statute.  See 28 U.S.C. § 1603(e); cf. Odhiambo v. Republic of Kenya, 764 F.3d 31, 40 (D.C. Cir. 2014) (to amount to "direct effect" under third clause of the FSIA commercial-activity exception, "breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States").  PAHO does not argue to the contrary.

Instead, it contends that the above analysis goes wrong at the threshold step of identifying the gravamen.  See PAHO MTD at 29–30; PAHO Reply at 13–14, 17–18.  As PAHO sees it, the core of Plaintiffs' claim is not any injury traceable to PAHO's financial activities, but rather is "the alleged forced labor itself."  PAHO Reply at 13.  Plaintiffs' true gripe, PAHO posits, is therefore with Cuba, the party whose conduct most directly injured them.  Id. at 13–14.  PAHO insists that Plaintiffs have engaged in an impermissible "recast[ing]" of their true claim by neglecting to name Cuba as a defendant and instead coming after PAHO, id. at 13, even though "[t]he gravamen of their suit is wrongful conduct by other entities outside the United States, not by PAHO."  Id. at 18 (emphasis removed).

In making this argument, PAHO leans heavily on Sachs, in which the Supreme Court rejected a plaintiff's attempt to "evade the [FSIA's] restrictions through artful pleading."  136 S.

Ct. at 396 (citing <u>Nelson</u>, 507 U.S. at 363).  That plaintiff had been injured after falling onto a

railroad track in Innsbruck, Austria, and brought claims including negligence, strict liability for

design defects, and failure to warn.  <u>Id.</u> at 393.  The Court concluded that the "gravamen of each

claim [was] found in the same place," <u>id.</u> at 397 n.2 — namely, "the railway's conduct in

Innsbruck," <u>id.</u> at 393 — because "[a]ll of [the] claims turn[ed] on the same tragic episode in

Austria, allegedly caused by wrongful conduct and dangerous conditions in Austria, which led to

injuries suffered in Austria."  <u>Id.</u> at 396.  For that reason, the Court concluded that although Ms.

Sachs had purchased her train ticket in the United States, that transaction (which would be

commercial activity) was not at the core of any of her claims, including her failure-to-warn claim

alleging that the defendant "should have alerted her to the dangerous conditions at the Innsbruck

train station" at the time of sale.  <u>Id.</u>  "Without the existence of the unsafe boarding conditions,"

the Court explained, "there would have been nothing to warn Sachs about when she bought" the

ticket; "[u]nder any theory of the case," therefore, "there [was] nothing wrongful about the sale

of the [ticket] standing alone."  <u>Id.</u>  Repeating this language here, PAHO claims that there would

be "nothing wrongful" about its role as a financial middleman for Cuba and Brazil "absent the

alleged forced labor."  PAHO MTD at 30.  As a result, it argues, being forced into the Mais

Medicos program must be the true crux of Plaintiffs' claim.

The Court cannot concur.  Plaintiffs' knowing-beneficiary claim against PAHO does not

rely on a "feint of language," <u>Sachs</u>, 577 U.S. at 36 (quoting <u>Nelson</u>, 507 U.S. at 363),

repackaging the same essential conduct by the same defendant as a new claim under a related but

technically distinct legal theory.  Instead, Plaintiffs' 1589(b) claim turns on separate and

separately wrongful conduct, distinct from any acts that could form the basis of a claim against

Cuba or Brazil, by a defendant other than Cuba or Brazil — to wit, PAHO's procurement of a

financial benefit from knowing participation in the allegedly exploitative Mais Medicos program. Although PAHO is correct that there is nothing inherently "wrongful" (at least under the TVPA and RICO) about acting as a financial middleman between Cuba and Brazil, it is not true that such conduct became "wrongful" only as a result of <u>Cuba</u>'s separate malfeasance. Under Plaintiffs' theory of the case, PAHO's receipt of a benefit from the Mais Medicos program turned from lawful to unlawful because of <u>PAHO itself</u>'s alleged knowledge that the program it was benefiting from was using forced labor. The conduct at the heart of Plaintiffs' entitlement to relief is thus PAHO's knowing participation, not the actions of others involved, in Mais Medicos.

PAHO rejoins that under <u>Sachs</u> and <u>Nelson</u>, the gravamen must be the conduct that "actually injured" Plaintiffs, and that it was their conscription at the hands of Cuba, not PAHO's alleged financial role in the venture, that directly harmed the four physicians. <u>See</u> <u>Sachs</u>, 136 S. Ct. at 396. Those cases, however, do not establish a "bright-line rule that the conduct that 'actually injured' plaintiffs is <u>always</u> the gravamen." <u>Jam</u>, 2020 WL 4933618, at *2 (calling that view "incorrect"); <u>see also</u> <u>Sachs</u>, 136 S. Ct. at 397 n.2 (expressly disclaiming any categorical rule). Rather, they represent a typical application of the principle that the gravamen of a claim cannot be conduct that "played only a small part" in causing the harms alleged compared to "the much larger and more direct role" of other actions. <u>Jam</u>, 2020 WL 4933618, at *6. Both <u>Sachs</u> and <u>Nelson</u> focused on the conduct that "actually injured" the plaintiffs as opposed to earlier actions, such as the sale of the railway ticket, that merely "led to the conduct that eventually injured" them. <u>Id.</u>; <u>see</u> <u>Jam</u>, 2020 WL 4933618, at *6 (noting that "the failure-to-warn claims in <u>Sachs</u> and <u>Nelson</u> were quite attenuated relative to the other claims plaintiffs asserted"); <u>see also</u> <u>Noboa v. Barceló Corporación Empresarial, SA</u>, 812 F.3d 571, 572–73 (7th Cir. 2016) (reading

<u>Sachs</u> as holding that the ticket sale came too early in a long "chain of causation"). Here, no fair observer could read the operative Complaint and conclude that PAHO's financial-intermediary role in the Mais Medicos program was minor or ancillary. <u>See, e.g.</u>, SAC, ¶ 48 ("PAHO's role was <u>necessary</u> to find a way for Brazil to compensate Cuba . . . .") (emphasis added).

Congress, moreover, expressed in the TVPA its judgment that, as a matter of law, a knowing beneficiary of and participant in a forced-labor scheme injures the victim of that scheme just as much as any other participant in that venture. <u>See</u> 18 U.S.C. § 1595(a) (providing that "victims" "may recover damages" against "the perpetrator (<u>or</u> whoever knowingly benefits . . . from participation in a venture . . . .)") (emphasis added). Under PAHO's theory, despite that legislative determination of equal culpability, only the conduct of the "perpetrator" may form the gravamen of a victim of forced labor's claim against a knowing beneficiary. <u>See</u> PAHO Reply at 18. <u>Sachs</u> and <u>Nelson</u> do not mandate that odd result.

To sum up, Plaintiffs' second claim against PAHO under section 1589(b) of the TVPA, which centers on Defendant's alleged role as financial intermediary between Cuba and Brazil, is "based upon a commercial activity carried on in the United States by" PAHO. <u>See</u> 28 U.S.C. § 1605(a)(2). It is therefore exempt from the immunity conferred by the IOIA.

*ii. TVPA Claim 1*

Clearly demarcating Plaintiffs' three separate TVPA claims in Count I pays dividends here, since their other two do <u>not</u> fall within the commercial-activity exception. Their first alleges that PAHO violated section 1589(a) of the Act, which makes it unlawful to "knowingly provide[] or obtain[] the labor or services of a person" by "means of force," "physical restraint," "serious harm," "abuse of law or legal process," or any threats thereof, or by "means of any

scheme, plan, or pattern intended to cause the person to believe that" he would face such reprisals.  See 18 U.S.C §§ 1589(a), 1595(a).

The operative Complaint does not make clear exactly how PAHO ran afoul of this provision; for the most part, it simply repeats the statutory text.  See SAC, ¶ 132 ("PAHO[] . . . knowingly provided and obtained the labor or services of Plaintiffs by threats of force, physical restraint, [etc.].").  The basic idea seems to be that, as the SAC repeatedly states in general terms, PAHO helped "organize[], administer[], and enforce[]" the Mais Medicos program.  Id., ¶ 3; see also id., ¶¶ 15, 18, 57, 86.  In terms of specifics, there are three main allegations that could support Plaintiffs' claim (to be clear, the Court offers no opinion as to whether these allegations do state a claim for relief): (1) PAHO signed an agreement between Brazil and a Cuban front firm promising "to enforce the obligations of Cuban doctors to" those entities, id., ¶ 18; (2) PAHO contracted with or employed Cuban intelligence officers to "continuously surveil" and threaten Cuban doctors in Brazil, id., ¶¶ 5, 86, 100, 113; and (3) PAHO officials threatened and pressured Brazilian officials to shut down court cases brought by Cuban doctors in Brazil, id., ¶ 19(e).  See Opp. at 16–17.

Because the fit between Plaintiffs' specific allegations and their claim that PAHO "provided or obtained" forced labor is not exactly snug, the Court finds it somewhat difficult to ascertain the gravamen of their claim under section 1589(a).  Ultimately, though, it need not get hung up on that step.  Any way the gravamen of this claim is conceived of, it is not based upon commercial activity.

Begin by focusing only on the core allegation, regardless of the specific predicate facts: that PAHO participated in forcing Plaintiffs to work as part of the Mais Medicos program. Although one might initially think that such conduct could qualify as commercial activity, the

caselaw is unanimous the other way.  See Lubian v. Republic of Cuba, 440 F. App'x 866, 868 (11th Cir. 2011) ("Plaintiffs' underlying claims [against Cuba for medical mission in Venezuela] for false imprisonment and forced labor . . . are not commercial in nature."); Hwang Geum Joo v. Japan, 172 F. Supp. 2d 52, 64 (D.D.C. 2001) ("Japan's operation of 'comfort stations' [during World War II] was not a commercial activity within the meaning of the FSIA."), aff'd, 332 F.3d 679 (D.C. Cir. 2003), cert. granted, judgment vacated, 542 U.S. 901 (2004), and aff'd, 413 F.3d 45 (D.C. Cir. 2005); Bao Ge v. Li Peng, 201 F. Supp. 2d 14, 18, 24 (D.D.C. 2000) (claim that plaintiffs "were compelled by the physical force of their jailers to [work] as forced laborers" was not based on commercial activity), aff'd sub nom. Bao v. Li, 35 F. App'x 1 (D.C. Cir. 2002); Doe I v. Unocal Corp., 395 F.3d 932, 940, 956–58 (9th Cir. 2002) (suggesting that "forced labor program" was not "itself . . . a commercial activity").  There is a straightforward logic to these decisions: as discussed above, courts must separate an activity's purpose from its objective nature, and even though forced labor often has a commercial motivation, the act of forcing another person to work against their will is not "the type of action[] by which a private party engages in trade and traffic or commerce."  Weltover, 504 U.S. at 614; cf. Nelson, 507 U.S. at 362–63 (rejecting argument that wrongful arrest and torture should be considered commercial activity on ground that "Saudi Government often uses detention and torture to resolve commercial disputes").  Indeed, in a certain respect, using force is the polar opposite of how labor is typically obtained or provided in a marketplace: through a voluntary transaction.

Looking to Plaintiffs' specific allegations, moreover, does not change this result, as none of the relevant conduct PAHO is accused of amounts to commercial activity evaluated on its own.  First, Plaintiffs assert that the organization committed by contract to "enforce the obligations of Cuban doctors to [a Cuban front firm] and to Brazil."  SAC, ¶ 18.  It is not clear

what those obligations were, although presumably they must have included working under certain conditions that amount to force, physical restraint, threats thereof, or the like; if they did not, Plaintiffs' 1589(a) claim could not be based upon this alleged agreement between PAHO and the two countries.  The allegation is thus that PAHO entered a contract in which it promised to, essentially, help coerce Cuban physicians into working against their will.

Entering into such a contract is not a commercial activity for the same reasons that coercing a person into labor is not a commercial activity.  Merely making a contract is not necessarily commercial activity under the FSIA.  See, e.g., Millen Indus., 855 F.2d at 884–85; Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1549 (D.C. Cir. 1987) ("[A] contract between a foreign state and a private party for the purchase of goods or services . . . is not inevitably . . . 'commercial activity.'").  As the Circuit has put it, "[A] murder by itself [is not] a commercial activity merely because the killer is paid," nor does kidnapping become commercial if done in exchange for a ransom.  See Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 168 (D.C. Cir. 1994).  Accordingly, "although the hiring of . . . thugs necessarily partakes of contractual elements," hiring such thugs "with the intention of harassing and battering the plaintiffs" is not commercial activity.  Jin v. Ministry of State Sec., 557 F. Supp. 2d 131, 140–41 (D.D.C. 2008).

The two other categories of PAHO's relevant conduct are similarly not commercial activity under the caselaw.  For the reasons just provided, its alleged hiring of Cuban intelligence officials to spy on and intimidate Cuban doctors in Brazil does not fit the bill.  See id. at 141. And, as for threats directed at public officials, Plaintiffs make no argument that they qualify as commercial activity either.  All told, then, Plaintiffs' claim under section 1589(a) — that PAHO

provided or obtained their labor by a prohibited means — does not come within clause one of section 1605(a)(2), as it is not "based upon a commercial activity."

### iii.   TVPA Claim 3

Little more need be added about Plaintiffs' third TVPA claim, which alleges that PAHO violated section 1590's proscription on human trafficking.  Specifically, section 1590(a) covers persons who "knowingly recruit[], harbor[], transport,[] provide[], or obtain[] by any means, any person for [forced labor]" and persons who "obstruct[], attempt[] to obstruct, or in any way interfere[] with or prevent[] the enforcement of th[at] section."  18 U.S.C. § 1590(a)–(b), 1595(a).  The operative Complaint gives no indication as to what specific alleged conduct by PAHO ran afoul of this section, see SAC, ¶ 134, except for the statement that PAHO "obstructed . . . and interfered with . . . [physicians'] attempt[s] through legal means to escape or obtain relief in the Brazilian legal system," which must refer to PAHO's alleged threats against Brazilian officials in an attempt to shut down those legal challenges.  Id., ¶ 19(e).  As just discussed, however, those alleged threats are not commercial activity, nor do Plaintiffs contend otherwise.

### b.  Expropriation Exception

Given its above conclusions, the Court need not further examine Plaintiffs' second claim under the IOIA, as falling within any exception suffices.  But it must still assess whether Plaintiffs can overcome PAHO's presumptive immunity as to their first and third TVPA claims by invoking the FSIA's so-called "expropriation exception."  Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co., 137 S. Ct. 1312, 1316 (2017).  That exception covers claims "in which rights in property taken in violation of international law are in issue and that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the [international organization]."  28 U.S.C. § 1605(a)(3).

Plaintiffs argue in their brief that PAHO "took" their property — and is thus subject to suit under section 1605(a)(3) — by keeping "compensation rightfully belonging to Plaintiffs . . . for itself or transfer[ring] it to accounts in Cuba where it was, directly or indirectly, confiscated by the Cuban government." Opp. at 29 (citing SAC, ¶¶ 1, 16, 18, 27(f), 43, 81, 90, 96, 111, 143). Specifically, Plaintiffs allege that while PAHO received up to $10,000 per month per doctor from Brazil as compensation for Cuban physicians in the Mais Medicos program, the physicians themselves were each paid only $1,000, with the rest (less PAHO's 5% fee) sent to the Cuban government. See SAC, ¶¶ 1, 18, 81, 96. Plaintiffs further claim that they directly received only $400 a month of the $1,000, as PAHO deposited the other $600 per month into Cuban bank accounts. Id., ¶¶ 81, 90. Those accounts were to be forfeited if the physicians did not return to Cuba because, for instance, they defected to the United States (as Plaintiffs eventually did). Id., ¶ 27(f). According to the Complaint, these arrangements were spelled out in the contracts Plaintiffs signed with the Cuban firm that "employed" them. Id., ¶¶ 27(f), 81, 90.

Plaintiffs' first and third TVPA claims fall outside the expropriation exception for two reasons. First, neither of the two claims — which allege, respectively, that PAHO provided or obtained their labor by means or threats of force and that PAHO trafficked them — puts "rights in property . . . in issue." 28 U.S.C. § 1605(a)(3). The Circuit has never laid out the exact metes and bounds of that requirement (although it is clear that no commercial-activity-like gravamen analysis is necessary, as section 1605(a)(3) does not contain the same "based upon" language as 1605(a)(2)). The Circuit has, however, stated that to put "rights in property in issue," a claim must "directly implicat[e] property interests or rights to possession." Simon, 812 F.3d at 142

(quoting Asociacion de Reclamantes v. United Mexican States, 735 F.2d 1517, 1522 (D.C. Cir. 1984)).

Plaintiffs' TVPA claims do not appear to meet that test as it has been applied, as they do not sound in "conversion [or] unjust enrichment" or some other direct entitlement to property. Id. at 141; cf. Philipp v. Fed. Republic of Germany, 894 F.3d 406, 410, 414 (D.C. Cir. 2018) (allowing "replevin, conversion, unjust enrichment, and bailment" claims to proceed under expropriation exception), cert. granted, No. 19-351, 2020 WL 3578677 (U.S. July 2, 2020); De Csepel v. Republic of Hungary, 859 F.3d 1094, 1102 (D.C. Cir. 2017) (bailment, conversion, and unjust-enrichment claims).  According to the Complaint itself, Plaintiffs' employment contracts expressly dictated that they would receive only $400 a month with another $600 deposited in a Cuban bank account.  See SAC, ¶ 81.  Plaintiffs' claims thus raise no question as to who rightfully owns any of the other $9,000 per month transferred to Cuba or kept by PAHO as its fee, nor do they provide any basis to conclude that the $9,000 was Plaintiffs' property at any point.  See id., ¶¶ 16, 27(e).  And, as to the $600 per month allegedly confiscated by Cuba upon Plaintiffs' defection, there is no allegation or plausible inference that PAHO misappropriated those funds.  Plaintiffs' claims instead assert an entitlement to fair compensation for the labor that they allege they were forced to provide; in essence, they believe that the property interests that are "in issue" are their interests in control over their labor.  While that theory is perhaps interesting grist for a law-school (or philosophy) seminar, Plaintiffs do not offer, and the Court is not aware of, any precedent holding that such a claim puts "rights in property . . . in issue" within the meaning of the expropriation exception.

Plaintiffs point out that they "seek, among other things, the portion of their compensation that PAHO unlawfully retained and transferred" as damages.  See Opp. at 29 (citing SAC, ¶¶ 7,

136, 144); see also Ross v. Jenkins, 325 F. Supp. 3d 1141, 1171–72 (D. Kan. 2018) (awarding

"prevailing wage rate" as damages for "human trafficking and forced labor" claims under

TVPA).  It may be true that one measure of Plaintiffs' damages would be the wages they would

have voluntarily worked for.  But they point to no authority holding that a litigant puts "rights in

property . . . in issue" under the FSIA simply by claiming an entitlement to compensation or

monetary relief.  The closest they come is this Circuit's decision in Nemariam v. Fed.

Democratic Republic of Ethiopia, 491 F.3d 470, 476, 479–80 (D.C. Cir. 2007), but that case held

only that ownership of a bank account amounted to a right in property under section 1605(a)(3).

That does not remotely establish that any claim for money puts "a certain kind of 'right' . . . 'at

issue,' namely, a property right."  Bolivarian Republic of Venezuela, 137 S. Ct. at 1319.  Such a

broad conception of the expropriation exception would seem to swallow the presumptive rule of

foreign sovereign immunity.  To the extent that cases applying the Takings Clause of the Fifth

Amendment are instructive, see Devengoechea, 889 F.3d at 1228 (arguing that they are), they

suggest that mere claims for monetary relief do not put property rights at issue.  Cf., e.g., Adams

v. United States, 391 F.3d 1212, 1220 (Fed. Cir. 2004) ("We disagree that Appellants own any

Fifth Amendment property interest [in] . . . . overtime compensation."); Scott v. Phila. Hous.

Auth., No. 10-4723, 2011 WL 1791095, at *5 (E.D. Pa. May 11, 2011) ("Those [courts] that

have considered the issue . . . have found that withheld wages do not give rise to a Takings

Clause claim.").

      Second, even assuming Plaintiffs' TVPA claims do put rights in property in issue, the

Court agrees with PAHO that such property has not been "taken in violation of international

law" here.  Those familiar with constitutional or international law should have a strong sense of

the meaning of that phrase: improperly confiscated by a government.  See Taking, Black's Law

Dictionary (11th ed. 2019) (defining "taking," in the public-law context, to mean "[t]he government's actual or effective acquisition of private property"). Indeed, that is the interpretation of section 1605(a)(3) propounded by at least two federal circuit courts. See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 251 (2d Cir. 2000) ("The term 'taken' thus clearly refers to acts of a sovereign, not a private [instrumentality of a foreign sovereign], that deprive a plaintiff of property without adequate compensation."); Devengoechea, 889 F.3d at 1229 ("[F]or purposes of construing the FSIA, [section 1605(a)(3)] refers to only the state's use of its sovereign power to take property."). PAHO, of course, is not a government entity, and it therefore cannot "take" property in the sense contemplated by section 1605(a)(3).

The FSIA House Report, oft used as an interpretive aid, see Weltover, 504 U.S. at 617–18; Nemariam, 491 F.3d at 479–80, confirms that the word "taken" should be read as a term of art limited to government action. The portion of the Report that covers the so-called "expropriation exception" is titled, unsurprisingly, "Expropriation claims." H.R. Rep. No. 94-1487, at 19 (1976). It explains that "[t]he term 'taken in violation of international law' would include the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law." Id. at 19–20. Only a sovereign, of course, has the capacity to nationalize or expropriate property. See Nemariam, 491 F.3d at 481 ("[T]o 'nationalize' is to 'invest in the central government of a nation the control or ownership of' property.") (quoting Webster's Third New International Dictionary 1505 (3d ed. 1993)); De Csepel v. Republic of Hungary, 714 F.3d 591, 600 (D.C. Cir. 2013) ("Expropriation constitutes a quintessentially sovereign act.") (cleaned up); Expropriation, Black's Law Dictionary (11th ed. 2019) ("A governmental taking or modification of an individual's property rights, esp. by eminent domain").

Plaintiffs point out that the House Report, after explaining that the phrase "taken in violation of international law" includes nationalization and expropriation, adds that it "would also include takings which are arbitrary or discriminatory in nature."  H.R. Rep. No. 94-1487, at 20.  They contend that this additional sentence confirms that "other forms of 'taking'" beyond those by a government actor are covered by section 1605(a)(3).  They are wrong.  In context, it is evident that the Report's drafters used the noun "taking" as equivalent to, and interchangeable with, the nouns "nationalization or expropriation" they had just used in the previous sentence — *i.e.*, the drafters meant that a taking/nationalization/expropriation (all the same thing) may come within section 1605(a)(3) when done without prompt and fair compensation <u>or</u> when arbitrary or discriminatory in some other way.  <u>See</u> <u>Cassirer v. Kingdom of Spain</u>, 616 F.3d 1019, 1027 & n.9 (9th Cir. 2010) (reading Report this way); <u>Zappia</u>, 215 F.3d at 251 (same).  This additional language of the Report therefore confirms, rather than undermines, this Court's reading of the text of 1605(a)(3): the words "taking" or "taken" do not mean something different from expropriating or nationalizing.  All refer to actions that only state actors themselves can take.

Finally, although no party directly raises this argument, the Court does not believe that <u>Jam</u> requires it to interpret the expropriation exception as covering "takings" by international organizations.  It essentially reads the statutory phrase "taken in violation of international law" as equivalent to "taken <u>by a foreign state acting under color of official authority</u> in violation of international law," and if section 1605(a)(3) said that, it would seem open and shut that it does not apply to international organizations.  <u>Jam</u> simply held that international organizations enjoy "the 'same immunity' from suit that foreign governments enjoy today," 139 S. Ct. at 767; it did not hold that courts must mechanically replace the words "by a foreign state" with "by an international organization" everywhere those words appear in the FSIA.  This Opinion's earlier

treatment of the commercial-activity exception is not to the contrary and is indeed illustrative. That statutory exception states that "[a] foreign state shall not be immune . . . in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). In that statutory text, the phrase "foreign state" is used interchangeably with "the defendant"; hence the unavoidable post-Jam need for courts to consider whether an action is "based upon a commercial activity . . . by the [international organization]." That is not so with regard to our hypothetical version of the expropriation exception ("taken by a foreign state acting under color of official authority"), in which the very act giving rise to jurisdiction is one that only a nation state can undertake. Consistent with that reasoning, courts have construed the phrase "taken in violation of international law" to exclude the acts of an instrumentality of a foreign sovereign, despite the fact that foreign instrumentalities are also presumptively immune under the FSIA. Zappia, 215 F.3d at 250–51. There is nothing new or strange, therefore, about reading the expropriation exception not to cover an entity that otherwise generally enjoys the same immunity as foreign sovereigns. Id.

* * *

To summarize: Plaintiffs' claim under section 1589(b) of the TVPA, which alleges that PAHO knowingly benefited financially from participating in the Mais Medicos venture, fits within the commercial-activity exception to the IOIA's presumptive grant of immunity. PAHO is therefore not immune from suit as to that claim. Plaintiffs' two other TVPA claims, conversely — which allege forced labor and human trafficking under sections 1589(a) and 1590 of the Act, respectively — are not covered by either the commercial-activity or the expropriation exceptions.

A brief word is also required on Plaintiffs' RICO claim.  It alleges that PAHO's "violations of 18 U.S.C. § 1589 and § 1590 . . . constitute a 'pattern' of RICO predicates" — in other words, there is no new conduct relevant to the claim other than what has already been discussed.  See SAC, ¶ 140.  To the extent, therefore, that Plaintiffs' RICO claim rests on PAHO's alleged provision of essentially financial services to an enterprise it knew was relying on forced labor (i.e., the conduct underlying their 1589(b) claim), it is also based on commercial activity and thus amenable to suit under the IOIA.  To the extent the RICO claim rests on the other conduct alleged in the Complaint, however, it is not based on commercial activity and does not put rights in property taken in violation of international law at issue.

### 2.  *Treaty Immunity*

As the Court has found PAHO immune from two of Plaintiffs' TVPA (and related RICO) claims, it need consider them no further.  Because any source of immunity protects Defendant, the Court next considers whether PAHO is immune from Plaintiffs' section 1589(b) claim under a separate legal source of immunity.  PAHO offers two possible candidates, both of which are international agreements: (1) article 105 of the U.N. Charter, and (2) article 67 of the WHO Constitution.  As the Court now explains, neither precludes suit here.

### a.  U.N. Charter

Article 105 of the U.N. Charter states that "[t]he Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes."  U.N. Charter art. 105, ¶ 1.  PAHO maintains that it is part of "the Organization" and further insists that the "necessary" immunities it "shall enjoy" include absolute immunity from suit, which would obviously apply to bar Plaintiffs' claims here.  The Court need not address either of those issues, however, for PAHO's argument fails at an antecedent step: this part of the

U.N. Charter is not a self-executing treaty and thus does not create domestic federal law that this Court is bound, or indeed able, to enforce.  As this issue is one of first impression — recall that until <u>Jam</u>, PAHO was thought to be absolutely immune under the IOIA, obviating the need for any court to interpret article 105 — the Court will explain its reasoning in some depth.

The Supreme Court has long recognized and applied the "distinction between treaties that automatically have effect as domestic law, and those that — while they constitute international law commitments — do not by themselves function as binding federal law."  <u>Medellin v. Texas</u>, 552 U.S. 491, 504 (2008).  The former are known as "self-executing" treaties, the latter as "non-self-executing."  A non-self-executing treaty amounts to no more than an international-law commitment that "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it."  <u>Head Money Cases</u>, 112 U.S. 580, 598 (1884).  When such a compact is breached, "its infraction becomes the subject of international negotiations and reclamations," but not the subject of judicial or legal redress.  <u>Id.</u>  As the terminology suggests, Congress and the President must take additional action — namely, enacting a statute — if they wish to "execute" or "implement" a non-self-executing treaty, thereby converting it into domestic federal law.  <u>Medellin</u>, 552 U.S. at 505.  By contrast, a self-executing treaty is already "equivalent to an act of the legislature" and is therefore, of its own force, binding and enforceable by courts.  <u>Id.</u> (quoting <u>Foster v. Neilson</u>, 27 U.S. (2 Pet.) 253, 314 (1829)) (internal quotation marks omitted).

Into which category a treaty falls is a question of treaty interpretation.  <u>Id.</u> at 514 (court has "obligation to interpret treaty provisions to determine whether they are self-executing").  That inquiry proceeds on a provision-by-provision basis, as "[a] treaty need not be wholly self-executing" or wholly non-self-executing.  <u>United States v. Postal</u>, 589 F.2d 862, 884 n.35 (5th

Cir. 1979); Restatement (Fourth) of Foreign Relations Law § 310 cmt. b ("inquiry" is "an assessment of whether the particular treaty provision at issue is self-executing").  The key question is whether the relevant treaty "terms reflect a determination by the President who negotiated it and the Senate that confirmed it that the treaty has domestic effect."  Medellin, 552 U.S. at 521; see also id. at 505 (whether "the treaty itself conveys an intention that it be 'self-executing' and is ratified on those terms").  That inquiry "begins with [the treaty's] text" but also should account for "the negotiation and drafting history of the treaty," "the understanding of the Executive Branch when the President agreed to the [treaty]," and "'the postratification understanding' of signatory nations."  Id. at 506–07, 510 (quoting Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226 (1996)).

PAHO argues, as it must, that article 105 of the U.N. Charter is self-executing.  Focusing almost exclusively on the text of the article, PAHO contends that Medellin, the touchstone case in this area, compels that conclusion.  In that case, the argument goes, the Supreme Court found a treaty non-self-executing because it did "not provide that the United States 'shall' or 'must' comply" with the relevant obligation, but rather stated that the signatory nations "undertake[] to comply."  Medellin, 552 U.S. at 508.  The treaty was not, accordingly, a "directive to domestic courts" to enforce the obligation immediately, but rather a "call upon governments" to do so in the future.  Id. (citation omitted).  PAHO argues that under Medellin, article 105 falls on the self-executing side of the line because it states, directly and in "mandatory language," PAHO Reply at 3, that PAHO "shall enjoy in the territory of [the United States] such privileges and immunities as are necessary for the fulfilment of its purposes."  U.N. Charter art. 105, ¶ 1 (emphasis added).

32

While the bare text does cut in PAHO's favor, it cannot bear the weight Defendant places

on it.  For one thing, PAHO treats the word "shall" as a <u>sufficient</u> condition for a treaty to be

self-executing, whereas courts usually suggest that such mandatory language is a <u>necessary</u>, but

not sufficient, condition.  Put another way, it is difficult for a treaty to be regarded as self-

executing without language like "shall" or "must," but the presence of those terms does not

automatically make a provision self-executing.  <u>See</u> <u>Doe v. Holder</u>, 763 F.3d 251, 255–56 (2d

Cir. 2014) ("[E]ven mandatory language may not be conclusive evidence that a provision is self-

executing if the context and treaty objectives indicate otherwise.") (finding non-self-executing

treaty stating "each State party shall take appropriate measures . . . "); <u>United States v. Bahel</u>,

662 F.3d 610, 629–30 (2d Cir. 2011) ("[T]he absence of mandatory language . . . indicates that a

particular provision is not a self-executing directive.").  Indeed, one of the Supreme Court's very

first cases on this subject held that a treaty that provided that "all . . . grants of land . . . shall be

ratified and confirmed" was non-self-executing.  <u>Foster</u>, 27 U.S. (2 Pet.) at 314.

Under PAHO's strict "shall is enough" approach, furthermore, there would be no need to

look at the other interpretive tools that courts, including the <u>Medellín</u> Court, have consistently

relied upon in the self-executing analysis.  <u>See</u> 552 U.S. at 507, 510; <u>Brzak v. United Nations</u>,

597 F.3d 107, 111 (2d Cir. 2010) ("In determining whether a treaty is self-executing, we look to

the text, the negotiation and drafting history, and the postratification understanding of the

signatory nations.").  As it happens, each of those sources indicates that article 105 was <u>not</u>

intended to have "immediate legal effect in domestic courts."  <u>Medellín</u>, 552 U.S. at 508.

To begin, paragraph one of article 105 must be read in conjunction with paragraph three,

which provides that "[t]he General Assembly may make recommendations" or "propose

conventions to the Members of the United Nations" "with a view to determining the details of

the application of paragraph[] 1."  U.N. Charter art. 105, ¶ 3.  In context, then, paragraph one

"anticipates future action . . . . to implement or honor the treaty obligation," a hallmark of a non-

self-executing provision.  Republic of Marshall Islands v. United States, 865 F.3d 1187, 1194

(9th Cir. 2017).  The open-ended language of paragraph one — which refers to immunity

"necessary for the fulfilment of [PAHO's] purposes" — supports that reading.  Where a treaty

"le[aves] to the signatory's discretion to determine what measures are 'appropriate,'" or here,

"necessary," that is usually an indication that the "provision has no immediate legal effect," Doe,

763 F.3d at 256, as it is "addresse[d] . . . to the political, not the judicial department."  Foster, 27

U.S. (2 Pet.) at 314; see also Republic of Marshall Islands, 865 F.3d at 1194 (treaty unlikely to

be self-executing where it "fails to provide a rule of decision for courts because it contains

indeterminate, vague, or aspirational language").  Article 105's text, moreover, confirms that this

usual rule is soundly applied here, as paragraph three establishes "an express diplomatic"

mechanism for fleshing out the details so conspicuously absent from paragraph one.  See

Medellin, 552 U.S. at 509.  Such a mechanism is "itself evidence that" the provision was "not

meant to be enforceable in domestic courts."  Id.; see also Bahel, 662 F.3d at 629 ("[T]he fact

that the U.N. Charter provides for a diplomatic remedy in the event of a nation's non-compliance

with [the relevant] Charter obligation[] strongly suggests that the . . . provision . . . was not

meant to be self-executing.").

　　　Both the "negotiation and drafting history of" article 105 and "the understanding of [our]

Executive Branch [and Senate] when [both] agreed to the U.N. Charter" corroborate this reading

of paragraph one.  Medellin, 552 U.S. at 507, 510.  The U.N. Committee that drafted article 105

explained that while it wished to "provid[e] in general terms for the privileges and immunities of

the Organization," it "recognized that the necessary privileges and immunities may vary in

varying circumstances," and therefore "concluded that the details of application should be implemented through recommendations or conventions initiated by the General Assembly."  13 Documents of the United Nations Conference on International Organization 662 (1945) (U.N. Documents); see also id. at 704–05.  Those intentions, of course, map cleanly onto paragraphs one and three.  The drafters set out the basic "principle" of immunity in paragraph one — "that no member state may hinder in any way the working of the Organization" — but declined to "establish a list [of immunities] valid for all the member states" because doing so "would . . . have been impossible."  Id. at 705.  They left it to later, more specific international agreements, to be negotiated using the paragraph-three process, to "determin[e] the details of application of the provisions in paragraph [one]."  Id. at 704.

Article 105 was understood the same way by the "President who negotiated it and the Senate that confirmed it."  Medellin, 552 U.S. at 521.  The Secretary of State's Report to President Truman summarizing the Charter's negotiation and drafting, known as the San Francisco Conference Report, made clear the Secretary's view that "[s]o far as the United States [was] concerned, legislation w[ould] be needed to enable the officials of the United States to afford all of the appropriate privileges and immunities due the Organization . . . under" article 105.  See Charter of the United Nations, Report to the President on the Results of the San Francisco Conference by the Chairman of the United States Delegation, the Secretary of State 160 (June 26, 1945) (San Francisco Conference Report), https://bit.ly/3frM1xC.  That Report was also considered by the Senate, to whom State Department officials offered the same analysis.  See Charter of the United Nations: Hearings Before the S. Comm. on Foreign Relations, 79th Cong. 34 (1945); id. at 319 (statement of Leo Pasvolsky, Special Assistant to the Secretary of State for International Organization and Security Affairs) ("[Article 105] provides

for the extension of privileges and immunities to the Organization by the Members in their

territories. . . .   [B]ut just what kind of privileges and immunities would be extended would be a

matter for future determination.").

In the face of this advice, Congress moved quickly to implement its international-law

obligation to provide the U.N. with immunity by enacting further domestic legislation, passing

the IOIA four months after ratifying the Charter.  See Letter from Joseph C. Grew, Acting

Secretary of State, to Tom C. Clark, Attorney General (July 2, 1945), available at

https://bit.ly/3i5LLWJ (noting "increasing urgency" of enacting such a law).  The President then

designated the United Nations as the first covered organization under the Act.  See Exec. Order

No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946).  (He later designated the WHO and PAHO.  See

Exec Order No. 10025, 13 Fed. Reg. 9361 (Dec. 30, 1948) (WHO); Exec Order No. 10864, 25

Fed. Reg. 1507 (Feb. 18, 1960) (PAHO).)  None of this would seemingly have been "urgen[t]"

had article 105 been self-executing and thus already providing at least some level of immunity as

operative domestic law.  The relevant "postratification understanding" of article 105 thus tells

the same story as the text, drafting history, and pre-ratification understanding.  See Medellin, 552

U.S. at 507.

On a related note, consider how the political branches of our federal government

responded to related and contemporaneous international-law developments.  Not long after the

Charter came into effect, the General Assembly exercised its power under paragraph three of

article 105 and proposed a specific convention defining the United Nation's privileges and

immunities.  See Convention on Privileges and Immunities of the United Nations, Feb. 13, 1946,

21 U.S.T. 1418 (CPIUN).  (That Convention was later held self-executing.  See Brzak, 597 F.3d

at 112.)  The Assembly then promulgated another, separate convention covering the broader

universe of U.N.-affiliated agencies like PAHO.  See Convention on the Privileges and

Immunities of the Specialized Agencies, Nov. 21, 1947, 33 U.N.T.S. 261 (CPISA).  For many

years, however, the United States did not ratify the CPIUN, instead apparently "content to

operate under the provisions of the [recently enacted] Immunities Act [IOIA]."  Jam, 139 S. Ct.

at 777 (Breyer, J., dissenting).  And while it did eventually ratify the CPIUN in 1970, see 21

U.S.T. 1418, our nation has still yet to ratify the CPISA.  If the President and Senate had

intended article 105 to grant immediate and effective immunity from suit to organizations like

the U.N. and PAHO, all of the foregoing actions — enacting the IOIA, designating the U.N. and

PAHO as covered thereunder, delaying ratification of the CPIUN for decades, and rejecting the

CPISA to this day — would be essentially superfluous.  That is an additional reason, among the

many discussed above, to conclude that article 105 is not self-executing.

      Even if article 105 is a self-executing provision of federal law, the Court cannot resist

wondering (though neither party raises this argument) whether the IOIA would supersede it.

Because a self-executing treaty is equivalent to domestic law, it follows that a "statute can repeal

a self-executing treaty (or the domestic force of a self-executing treaty), just as a statute can

repeal a prior statute."  Al-Bihani v. Obama, 619 F.3d 1, 22 (D.C. Cir. 2010) (Kavanaugh, J.,

concurring in denial of rehearing en banc); accord Breard v. Greene, 523 U.S. 371, 376 (1998)

("[W]hen a statute which is subsequent in time is inconsistent with a treaty, the statute to the

extent of conflict renders the treaty null.") (quoting Reid v. Covert, 354 U.S. 1, 18 (1957)

(plurality opinion)).  To the extent that article 105, paragraph one would provide PAHO

immunity from a claim, such as Plaintiffs' under 1589(b), for which the IOIA does not provide

immunity, the two provisions would directly conflict.  The Court does not see why the IOIA, as

the "the one last in date," would not "control the other."  Whitney v. Robertson, 124 U.S. 190,

194 (1888).

          b.  WHO Constitution

       PAHO also believes that article 67 of the WHO Constitution provides it immunity from

this action, but that position yields no more success — and for the same reason.  Article 67 has

strikingly similar language to article 105 of the U.N. Charter, stating that "[t]he Organization

shall enjoy in the territory of each Member such privileges and immunities as may be necessary

for the fulfillment of its objective and for the exercise of its functions."  WHO Constitution art.

67(a).  Indeed, as PAHO itself argues, the WHO Constitution's "technical preparatory

committee" "modeled" article 67 after article 105, paragraph 1 of the U.N. Charter.  See PAHO

MTD at 16; see also PAHO Reply at 9 (calling the language "virtually identical").  That alone is

enough to conclude that article 67, like article 105, is not self-executing.

       The other relevant evidence all supports that conclusion.  As Plaintiffs point out, there is

direct evidence that the United States did not intend to convert the WHO Constitution into

domestic law by joining the organization.  The joint resolution "authoriz[ing]" the President to

"accept membership for the United States in the World Health Organization" expressly stated

that "[i]n adopting th[e] joint resolution, the Congress [did] so with the understanding that

nothing in the Constitution of the World Health Organization in any manner commits the United

States to enact any specific legislative program regarding any matters referred to in said

Constitution."  Pub. L. No. 80-643, 62 Stat. 441, 442 (1948).  If Congress was reticent about

committing even to later enacting additional "specific legislati[on]," it is hard to see how it could

have intended the WHO Constitution itself to be operative domestic law.

Like the U.N. Charter, moreover, the WHO Constitution has a separate provision confirming that paragraph 67, read in full context, is not intended to have immediate and direct legal effect.  Article 68 of the WHO Constitution, referring directly to paragraph 67, clarifies that "[s]uch . . . privileges and immunities shall be defined in a separate agreement to be prepared by the Organization in consultation with the Secretary-General of the United Nations and concluded between the Members."  WHO Constitution art. 68.  Article 67, therefore, must be read as a precatory statement of general principle, the actual metes and bounds of which will be worked out in a "separate agreement."  And, as with the U.N. Charter, many signatory nations have taken the contemplated further step by ratifying the separate CPISA, which covers the WHO.  See CPISA art. 1 § 1(ii)(g).  Again, the United States chose not to do so.

In short, neither article 105, paragraph one of the U.N. Charter nor article 67 of the WHO Constitution is cognizable domestic law that this Court may enforce.  Neither provision, therefore, renders PAHO immune from this action.

B.  International Comity

Having won some battles while nonetheless losing the immunity war, PAHO next contends that the Court should dismiss this entire suit on abstention grounds under the doctrine of international comity.  That doctrine is one "of deference based on respect for the decisions of foreign sovereigns" and "provides that a U.S. court should give full effect to a foreign judgment that has been rendered with impartiality and due process."  United States v. One Gulfstream G-V Jet Aircraft, 941 F. Supp. 2d 1, 8 (D.D.C. 2013).

PAHO argues that adjudicating this case would "flout[] comity principles" as to both nations whose conduct is relevant to the merits: Brazil and Cuba.  See PAHO MTD at 36.  As to Cuba, Defendant suggests that an examination and adjudication of whether "official acts of the

Cuban government" violated federal laws against forced labor would "necessarily tread on Cuban sovereignty and cause offense to a foreign state."  Id.  As to Brazil, PAHO makes similar points but argues in addition that the Brazilian courts have already issued a number of rulings "rejecting arguments that . . . Cuban physicians were coerced into participating" in Mais Medicos or that they "received unequal treatment in relation to others participating in the program."  Id. at 37.  PAHO contends that this Court must respect the sovereignty and decisions of those foreign tribunals.

PAHO has no leg to stand on when it comes to Cuba, as "[a] defendant invoking the doctrine of comity must . . . point to a valid legal proceeding to which [this] [C]ourt must defer." One Gulfstream G-V, 941 F. Supp. 2d at 9 ("[T]he doctrine . . . will not impede a judicial proceeding when no foreign judgment exists."); Doe v. Exxon Mobil Corp., 654 F.3d 11, 64 (D.C. Cir. 2011) ("In order to invoke this doctrine, [a defendant] must either point to a legal proceeding [in a foreign country] involving these particular plaintiffs to which the court must defer or at least the availability of effective and non-futile local remedies."), vacated on other grounds, 527 F. App'x 7 (D.C. Cir. 2013).  It is not enough to fret that the Court will have to scrutinize "official acts of the Cuban government," PAHO MTD at 36 — if federal courts could not do so, there would be no point to the FSIA, which covers claims based on the acts of foreign sovereigns.  Here, PAHO has identified no legal proceeding or "decision[] of [a] foreign tribunal[]" in Cuba that "should be given effect in domestic courts."  Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984).

Perhaps recognizing this defect, PAHO's reply brief focuses on Brazil, pointing to what it claims is a qualifying judgment of the highest Brazilian court, the Supremo Tribunal Federal. See PAHO MTD at 37; PAHO Reply at 22–23.  PAHO asserts that this decision "rejected

challenges to the legality of the Mais Medicos program that concerned the same issues and subject matter presented here" by "finding that the participating Cuban doctors 'were aware of [the program's] conditions' and were 'not coerced into accepting' positions."  PAHO Reply at 22 (quoting ECF No. 54-5 (Summary Article) at ECF p.5).  Plaintiffs disagree with that characterization, contending that the decision was focused on whether the operation of the Mais Medicos program violated a number of Brazilian laws and did not adjudicate whether Cuban physicians were forced into the program.  See Opp. at 36.

The Court cannot, at least at this juncture, dismiss on comity grounds.  As PAHO recognizes, "[C]omity is an affirmative defense," and thus the party seeking its application "bears the burden of proof."  De Csepel v. Republic of Hungary, 714 F.3d 591, 607 (D.C. Cir. 2013) (quoting Taveras v. Taverez, 477 F.3d 767, 783 (6th Cir. 2007)) (internal quotation marks omitted).  A corollary of that principle is that in general, "dismissal at the [motion-to-dismiss] stage is improper."  Id. at 608; see also United States v. Sum of $70,990,605, 4 F. Supp. 3d 189, 204 (D.D.C. 2014) ("[A]s an affirmative defense, dismissing on the basis of international comity . . . is appropriate only if the facts that give rise to the defense are clear from the face of the complaint.") (quotation omitted).  Where there are "factual disputes . . . about issues such as the character, scope, and findings of" judicial opinions of other nations, therefore, it is appropriate to "defer[] resolution of an international comity . . . defense at the motion to dismiss stage."  Sum of $70,990,605, 4 F. Supp. 3d at 205.  There is such a dispute here, and the Court finds it difficult to resolve on the basis of the exhibits before it, which appear to be articles summarizing the Brazilian court's decision and which are often fairly ambiguous on the matter at hand, perhaps due to translation from Portuguese to English.  See, e.g., Summary Article at ECF p.5 ("With regard to the Cuba case, it is possible to agree or disagree."); id. ("In this case, the Cuban

41

state supervisory entity controls [the process] and withholds a portion [of payment]. . . .  What

happens is that within this treaty, within the pact, each country structures itself in a certain

manner.").  The Court will therefore reserve decision.

That said, it is worth noting several other reasons for the Court's present belief that

abstention is not warranted here.  First, even if the case in Brazil did involve the same subject

matter and factual issues presented here, neither the Plaintiffs in this action nor Defendant PAHO

was a party to this Brazilian case.  Nor is there any arguable privity on either side, as the

petitioner before the Supremo Tribunal Federal appears to have been the Brazilian Medical

Association, and the defendant was presumably the Brazilian government.  Id.  The usual rule is

that a foreign matter must "involv[e] the same parties, issues, and subject matter" to qualify for

comity.  Usoyan v. Republic of Turkey, 438 F. Supp. 3d 1, 25 (D.D.C. 2020); see United States

v. Sum of $70,990,605, 234 F. Supp. 3d 212, 246 (D.D.C. 2017) ("[A] comity defense requires

that the opposing party have had a fair opportunity to be heard in the foreign proceeding."); De

Csepel v. Republic of Hungary, 808 F. Supp. 2d 113, 144–45 (D.D.C. 2011) (declining to accept

foreign judgment as matter of international comity because "[t]he instant matter involve[d] two

additional plaintiffs[,] . . . two additional defendants[,] . . . and [other subject matter] not at issue

in the [foreign] litigation"), aff'd in part, rev'd in part, 714 F.3d at 591; see also Hilton v. Guyot,

159 U.S. 113, 202 (1895) (comity applies if, among other things, the foreign proceeding

provided for "due citation or voluntary appearance of the defendant").

Second, the Court takes heed that "the obligation of comity expires when the strong

public policies of the forum are vitiated by the foreign act."  Laker Airways, 731 F.2d at 937; see

One Gulfstream G-V, 941 F. Supp. 2d. at 10 ("[D]ismissal would not be appropriate [under

international comity] when doing so 'would be contrary to the policies or prejudicial to the

interests of the United States.'") (quoting <u>Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru</u>, 109 F.3d 850, 854 (2d Cir. 1997)).  The United States has undertaken international-law obligations to prevent and punish human trafficking.  <u>See, e.g.</u>, United Nations Convention Against Transnational Organized Crime, Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children art. 3, Dec. 15, 2000, 2225 U.N.T.S. 209.  Those obligations are reflected in the TVPA, an act of Congress with significant criminal and civil penalties.  And a significant part of PAHO's alleged conduct in violation of that federal law was undertaken on American soil, indeed in its capital.  <u>See Usoyan</u>, 438 F. Supp. 3d at 24 (no comity where "[c]ourt is applying United States law to actions which occurred in the United States"); <u>United States v. Portrait of Wally, A Painting by Egon Schiele</u>, No. 99-9940, 2002 WL 553532, at *10 (S.D.N.Y. Apr. 12, 2002) ("Dismissal on international comity grounds [was] not warranted" where violation of U.S. law was alleged because "[t]he United States . . . has a strong interest in enforcing its own laws as applied to conduct on its own soil.").  In numerous respects, then, abstaining from adjudicating Plaintiffs' case on the ground of comity would seem contrary to public policy.

To be clear, the Court reaches no final decision at this stage, and PAHO remains free to reassert the defense of international comity as the litigation continues.  Perhaps it can adduce more evidence and greater detail regarding the decisions of the Brazilian court(s).  For example, PAHO's brief suggests, without providing citation, that other "[l]ower courts in Brazil have adjudicated and dismissed multiple challenges to [Mais Medicos]."  PAHO MTD at 37.  Regardless, if PAHO is to renew this defense, it must grapple with the points made above, which find little airing in PAHO's briefing to date.

C.  Service of Process

PAHO last argues that this entire action should be dismissed under Federal Rule of Civil Procedure 12(b)(5) because it was never properly served.  When evaluating a motion to dismiss for insufficient service under Rule 12(b)(5), the plaintiff bears the burden of showing that he properly served the defendant.  See Light v. Wolf, 816 F.2d 746, 751 (D.C. Cir. 1987).  The court has discretion to dismiss the claim or to allow the plaintiff to correct service of process. See Wilson v. Prudential Fin., 332 F. Supp. 2d 83, 89 (D.D.C. 2004).

PAHO contends first that it is absolutely immune from service of process under the U.N. Charter and WHO Constitution, a position that, as just explained, holds no water because neither international agreement is self-executing domestic law.  PAHO also argues, however, that in light of Jam, service on international organizations is governed by the specific rules for serving foreign nations set out in the FSIA.  See 28 U.S.C. § 1608(a).  Plaintiffs here served PAHO using a private process server, who delivered the summons and Complaint to a mail clerk at PAHO's Washington, D.C., headquarters.  See ECF No. 5.  All agree that such process, which is proper under Federal Rule of Civil Procedure 4(h)(1), does not satisfy any of the four permissible methods of service under the FSIA.  See Opp. at 39–40; PAHO Reply at 24.  The question is therefore another of first impression regarding the IOIA, which confers on PAHO "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." 22 U.S.C. § 288a(b).  Does that provision mean that PAHO may only be served in the ways that foreign nations must be served under the FSIA?  If so, then service has not been effective.

As it happens, the Court believes that PAHO waived its service objection by failing to raise it in its motion to transfer this case from the Southern District of Florida.  This terminates the inquiry.  Even were the Court to address the merits, it would nevertheless conclude that

PAHO reads the IOIA incorrectly: international organizations covered by the IOIA may be served under Rule 4, as PAHO was here.

1. *Waiver*

The Federal Rules state that "[a] party waives any defense listed in Rule 12(b)(2)–(5) by . . . omitting it from a motion in the circumstances described in Rule 12(g)(2)."  Fed. R. Civ. P. 12(h)(1).  Rule 12(g)(2), in turn, covers a "party that makes a motion under [Rule 12] . . . [and then] make[s] another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion."  Simply put, a party waives a defense listed in Rule 12(b)(2)–(5) if it makes an earlier Rule 12 motion without raising that defense.  See Nichols v. Vilsack, 183 F. Supp. 3d 39, 41–42 (D.D.C. 2016); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1391 (3d ed. 2020) ("[A]ny time a defendant makes a pre-answer Rule 12 motion, he or she must include — on penalty of waiver — the defenses set forth in subdivisions (2) through (5) of Rule 12(b).  If one or more of these defenses are omitted from the initial motion but were available to the movant at that time, they are permanently lost.").

PAHO's pending request that this Court dismiss for "insufficient service of process" is a Rule 12(b)(5) defense.  Plaintiffs argue that such defense is therefore waived because PAHO's earlier motion to transfer the case to this district (1) did not raise this argument and (2) qualifies as a previous "motion under this rule [Rule 12]."  Fed. R. Civ. P. 12(g)(2).  PAHO insists that its earlier motion did not trigger the waiver rule.

Plaintiffs have the better of this dispute.  PAHO's motion to transfer primarily argued that "[t]ransfer [was] required under 28 U.S.C. § 1406(a) because there [was] no basis for venue in [the Southern District of Florida] and the only district where venue [was] even arguably

proper is the District of Columbia."  Mot. to Transfer at 6; <u>see also</u> <u>id.</u> ("[V]enue in this district is

wrong.") (cleaned up).  PAHO thus moved to transfer on the ground of "improper venue," which

is a defense listed under Rule 12.  <u>See</u> Fed R. Civ. P. 12(b)(3).  Its motion also briefly requested

dismissal as an alternative remedy.  <u>See</u> Mot. to Transfer at 10; <u>see also</u> ECF No. 42 (Obj. to

Magistrate Judge's Denial of Mot. to Transfer) at 2 (requesting "transfer to the District of

Columbia (or, alternatively, outright dismissal) . . . under 28 U.S.C. § 1406(a)").

Of course, as PAHO points out, it technically did not file a motion to dismiss under Rule

12(b)(3), but rather moved under section 1406, which addresses improper venue.  <u>See</u> PAHO

Reply at 23.  That distinction, though, is entirely one of form and not substance, and the Court

cannot believe that Rule 12(g)'s consolidation requirement admits of such a trivial loophole.  <u>See</u>

<u>Perrigo Co. v. Merial Ltd.</u>, 215 F. Supp. 3d 1329, 1335 (N.D. Ga. 2016) (arguing that

"[s]ubstance, not labels, matter" in this analysis and looking to what "Defendants' first motion in

th[e] case" "argued for" "in substance").  No less an authority than the Supreme Court has

lumped "[s]ection 1406(a) and Rule 12(b)(3)" together, describing both as "allow[ing] dismissal

. . . when venue is 'wrong' or 'improper,'" <u>Atlantic Marine Constr. Co., Inc. v. U.S. Dist. Court</u>

<u>for Western Dist. of Texas</u>, 571 U.S. 49, 55 (2013), and that is exactly what Defendants argued

in their motion.  Lower courts, moreover, have consistently stated that "motion[s] to transfer for

improper venue under § 1406" "must be raised in a responsive pleading or before that pleading is

filed," thereby necessarily holding that a 1406 motion is a "motion under this rule" — <i>i.e.</i>, Rule

12 — for purposes of Rule 12(g).  <u>See</u> <u>Intrepid Potash-New Mexico, LLC v. U.S. Dep't of</u>

<u>Interior</u>, 669 F. Supp. 2d 88, 92 (D.D.C. 2009); <u>Gardner v. Mylan, Inc.</u>, No. 09-1289, 2010 WL

2595114, at *2 (S.D.W. Va. June 24, 2010) ("[A] § 1406(a) transfer is based on improper venue.

Rule 12(b)(3) of the Federal Rules of Civil Procedure, however, provides that objection to

improper venue is an affirmative defense that is waived if it is not made before or with a responsive pleading."); Daily Exp., Inc. v. N. Neck Transfer Corp., 483 F. Supp. 916, 917–18 (M.D. Pa. 1979) ("Under Rule 12(h)(1), if a Defendant fails to object to venue in either of these two ways [section 1406 or Rule 12(b)], he has waived the objection to venue.").  It therefore does not matter whether PAHO captioned its prior motion under Rule 12 or section 1406 — it could have done either or even both — it argued that venue was improper in its "first defensive move" and hence should have raised its service-of-process defense in that same motion.  Nichols, 183 F. Supp. 3d at 41 (quoting George Washington Univ. v. DIAD, Inc., No. 96-301, 1996 WL 470363, at *1 (D.D.C. Aug. 9, 1996)).

        In response, PAHO cites authorities stating that "a motion to transfer venue is not a Rule 12 motion."  PAHO Reply at 23 (cleaned up) (citing Means v. U.S. Conference of Catholic Bishops, 836 F.3d 643, 648–49 (6th Cir. 2016)).  Yet each of the cited authorities discusses only motions to transfer under 28 U.S.C. § 1404, not 1406.  See, e.g., Means v. U.S. Conference of Catholic Bishops, No. 15-353, 2015 WL 3970046, at *4 (W.D. Mich. June 30, 2015); Nichols, 183 F. Supp. 3d at 42 ("Unlike a motion to dismiss for improper venue under Rule 12(b)(3), a motion to transfer venue under Section 1404(a) is not a 'defense' that must be raised by pre-answer motion or responsive pleading.") (quoting Wright & Miller § 3829) (emphasis added).  In what can only be called a disingenuous use of ellipses, PAHO's Reply brief omits the underlined passage in the previous quotation from Nichols and Wright & Miller.  Perhaps PAHO felt the need to make that elision because a substantial amount of authority draws a distinction between 1404 transfers and 1406 transfers, with the former not triggering Rule 12's waiver rule and the latter triggering it.  See, e.g., Perrigo, 215 F. Supp. 3d at 1335 (rejecting argument that 1404 motion waived other Rule 12(b) defenses because "Rule 12(b)(3)'s 'improper venue' defense . . .

captures § 1406, not the venue changes § 1404 permits"); Intrepid, 669 F. Supp. 2d at 92

(explaining that 1404 motions do not come within Rule 12, whereas 1406 motions do); Daily

Exp., 483 F. Supp. at 918 (same).  The reasoning in these decisions is simple: a section 1404

motion does not call into question whether venue is proper in the transferor court; instead, it

allows transfer from a district where venue is proper to another district "[f]or the convenience of

parties and witnesses" or "in the interest of justice."  28 U.S.C. § 1404(a).  A section 1406

motion, by crucial contrast, is premised on the "defense" of "improper venue" under Rule

12(b)(3).  See Fed. R. Civ. P. Rule 12(g)(2).

PAHO briefly suggests that even if it was required to preserve its 12(b)(5) argument in its

motion to transfer, it "expressly reserve[d] its ineffective-service defense."  PAHO Reply at 23.

In full, PAHO said the following in that motion:

> PAHO intends to move to dismiss this action in light of those
> immunities [including immunity from service of process]. That
> motion, however, should be resolved by the U.S. District Court for
> the District of Columbia, because that is the only forum for this case
> that is even arguably appropriate. Subject to and without waiving
> any of its immunities, privileges, rights, or defenses, PAHO
> therefore moves to transfer this action there.

Mot. to Transfer at 1.  Unfortunately for PAHO, "[t]he Federal Rules of Civil Procedure do not

recognize any such 'preservation of rights.'"  Davis v. Shawnee Mission Med. Ctr., Inc., No. 07-

2323, 2008 WL 4758591, at *8 (D. Kan. Oct. 27, 2008), aff'd sub nom. Davis v. Liese, 353 F.

App'x 95 (10th Cir. 2009).  "The language of the[] two rules, 12(g)(2) and 12(h)(1) . . . suggests

that to preserve its 12(b)(2)-(5) defenses prior to answering, a party cannot simply 'assert' or

'reserve' the defense, but must actually argue that defense in a motion that prays the Court to

enter a ruling or order."  Hunter v. Serv-Tech, Inc., No. 07-9009, 2009 WL 2858089, at *2 (E.D.

La. Aug. 28, 2009).  PAHO has offered no authority to the contrary.

2. *Merits*

Although this ruling puts PAHO's service defense to bed, the Court believes that, given the new world <u>Jam</u> has ushered in, some guidance on service under the IOIA will prove beneficial.  Recall that the IOIA guarantees to PAHO "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."  22 U.S.C. § 288a(b).  PAHO argues that service of process is a "form of judicial process," and that it thus may only be served in the means prescribed by the FSIA for foreign governments.  The FSIA provides four such means: (1) service in accordance with a "special arrangement" between the plaintiff and foreign state; (2) service in accordance with an "applicable international convention on service of judicial documents"; (3) service by sending a copy of the complaint and summons, dispatched through the clerk of court, to the head of the  ministry of foreign affairs of the state; and (4) service by mail through the clerk of court to the attention of the Director of Special Consular Services in the U.S. State Department, to be transmitted "through diplomatic channels to the foreign state."  28 U.S.C. § 1608.  It is conceded that PAHO was not served in any of these ways, but instead through simple personal delivery to a mail clerk at its headquarters.

Defendant's argument is superficially appealing.  On closer inspection, though, it relies on a false premise: that the FSIA makes foreign sovereigns <u>immune</u> from being served in any way other than the four it specifies.  That need not be the case; it could simply be that the Act sets out the exclusive means of serving foreign nations, thereby displacing Rule 4, without conferring any sort of jurisdictional "immunity from . . . judicial process" in the sense used by the IOIA.  That distinction may appear more linguistic than substantive, but it makes all the difference for purposes of deciding the question at hand, which depends on interpreting the language of the IOIA.

As it happens, the text of the FSIA clearly indicates that the non-immunity reading is correct. Section 1604 establishes the core immunity rule of the Act, stating that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." Id. § 1604. The Act's service-of-process provisions, though, are conspicuously located in section 1608. Section 1608's text, moreover, does not speak in terms of immunity in the way that sections 1605 through 1607 do. Compare id. ("Service in the courts of the United States and of the States shall be made upon a foreign state [in the following ways] . . . ."), with, e.g., id. § 1605 ("A foreign state shall not be immune from the jurisdiction of courts . . . in any case [in which the following conditions are met] . . . ."). By its plain terms, then, the FSIA is best read to mandate simply that service may only be achieved on foreign states in a particular way. There is no indication that the Act's framers conceived of section 1608 as laying out exceptions to an otherwise-applicable immunity from being served; all evidence is to the contrary.

This reading of the IOIA and FSIA comports with the usual way in which concepts such as immunity, service of process, and jurisdiction are typically understood in our federal system. Put simply, immunity is typically a question of subject-matter jurisdiction, whereas service of process typically falls under the umbrella of personal jurisdiction. See Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 494 n. 20 (1983) ("Under the [FSIA], . . . subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity."); Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 444–445 (1946) ("[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served."); Lemma v. Hispanic Nat'l Bar Ass'n, 318 F. Supp. 3d 21, 24 (D.D.C. 2018) (citing Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd., 484

U.S. 97, 104 (1987)) (service-of-process requirement "must be satisfied . . . before a federal

court may exercise personal jurisdiction over a defendant").  The FSIA fully embraces this

dichotomy in section 1330, which reads as follows:

> (a) The district courts shall have original jurisdiction . . . of any
> nonjury civil action against a foreign state as defined in section
> 1603(a) of this title as to any claim for relief in personam with
> respect to which the foreign state is not entitled to immunity either
> under sections 1605-1607 of this title or under any applicable
> international agreement.
>
> (b) Personal jurisdiction over a foreign state shall exist as to every
> claim for relief over which the district courts have jurisdiction under
> subsection (a) where service has been made under section 1608 of
> this title.

28 U.S.C. § 1330; see also Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1054–55 (2019).

The FSIA's prescribed means of serving process are thus means of obtaining personal

jurisdiction over a foreign state. They are not exceptions to any sort of grant of "immunity" from

service of process.  There is thus no reason to read the IOIA, even as interpreted by the Supreme

Court in Jam, as requiring international organizations to be served under the rules set out in

section 1608.

What is more, requiring plaintiffs to serve international organizations using the FSIA's

specific methods would be both absurd and pointless.  It is apparent on first blush that several, if

not all four, of the FSIA's methods make no sense as applied to international organizations.

There is no "international convention on service of judicial documents" that is "applicable" to an

international organization like PAHO.  See 28 U.S.C. § 1608(a)(2); Opp. at 42 (three service-of-

process treaties to which United States is party do not apply).  Nor can a plaintiff be expected to

send a copy of her complaint against, say, the International Monetary Fund by mail to "the head

of the ministry of foreign affairs" or "to the attention of the Director of Special Consular

Services" at the State Department, to be transmitted "through diplomatic channels."  Id. §

1608(a)(3)–(4).  Perhaps more fundamentally, there is no apparent reason why Congress would

have thought the FSIA's special service rules necessary for international organizations.  The

premises of such organizations are not inviolable, unlike the premises of a nation's embassy.  Cf.

22 U.S.C. § 288a(c) (making only the "archives of international organizations . . . inviolable"

and "[p]roperty . . . immune from search").  The typical means of serving a corporation, such as

by personal service or by certified mail, see Fed. R. Civ. P. 4(h), are thus not a problem in the

way that they are for foreign sovereigns.  See Harrison, 139 S. Ct. at 1060–61 (interpreting FSIA

in light of international-law rules preventing service at embassies in person and even by mail).

PAHO does not provide any other conceivable goal Congress might have sought to achieve by

subjecting international organizations to the FSIA's very particular service-of-process rules.

Out of luck on the merits, PAHO contends that its reading of the IOIA is compelled by

the law of the case.  See PAHO Reply at 24.  It argues that Judge Darrin Gayles of the Southern

District of Florida already concluded, in his opinion granting the motion to transfer, that PAHO

was subject to service only under section 1608(a).  It is true that Judge Gayles wrote in a

somewhat cryptic footnote that the "FSIA's specific provisions for service of foreign states"

were among the items "to which the IOIA's immunity from judicial process refers."  ECF No. 46

(Transfer Op.) at 10–11 n.6.  But that brief, unreasoned aside was not necessary to the holding,

which was that the "IOIA's textual guarantee of the 'same immunity from suit as enjoyed by

foreign governments' . . . incorporates the FSIA's venue restrictions."  Id. at 9; see Ferring

Pharm., Inc. v. Azar, 296 F. Supp. 3d 166, 176 (D.D.C. 2018) ("Dicta is not part of the law of the

case.") (cleaned up) (quoting United States v. Singleton, 759 F.2d 176, 185 (D.C. Cir. 1985)).

Nor does Judge Gayles's holding logically compel the conclusion PAHO advances here. His opinion relied heavily on a comparison between foreign sovereign immunity and the sovereign immunity of U.S. states, and he read the law of state sovereign immunity to give states control over both "whether" and "where" they are sued. See Transfer Op. at 13–15 (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984)).  In Judge Gayles's view, the FSIA thus essentially confers immunity from suit in any venue not specifically provided for in the FSIA.  Id.  Applying that same logic does not help PAHO on the service-of-process question, though, because state-sovereign-immunity principles do not confer any particular privileges on states as to how they may be served.  See Fed. R. Civ. P. 4(j) (allowing a "[s]tate or [l]ocal government" to be served by delivery of summons and complaint to chief executive or by following state law).  Neither, for that matter, do federal-sovereign-immunity principles seem to have anything to say about whether and how the United States may be served.  See Fed. R. Civ. P. 4(i) (providing means of serving United States).  At any rate, even if Judge Gayles had clearly held (or decided by necessary implication) that PAHO could only be served under the FSIA's service rules, Defendant points to no way in which it relied upon that decision or would be prejudiced by its reconsideration here.  See First Nat'l Bank of Hollywood v. Am. Foam Rubber Corp., 530 F.2d 450, 454 (2d Cir. 1976) ("[T]he law of the case is a discretionary doctrine that need not be applied when no prejudice results from its omission."); Dist. No. 1 v. Liberty Mar. Corp., 70 F. Supp. 3d 327, 350 (D.D.C. 2014) (declining to apply doctrine where "a potentially contrary decision . . . w[ould] not prejudice the parties"), aff'd, 815 F.3d 834 (D.C. Cir. 2016).

In brief, then, even had PAHO preserved its argument that it has not been served properly, the Court concludes that such argument gets the law wrong and must be rejected.

D.  Jurisdictional Discovery

One word is needed in order to tie up a final loose end.  In addition to their commercial-activity and expropriation arguments, Plaintiffs also maintain in their Opposition that "PAHO may have waived its immunity [under the IOIA] either expressly or by implication by entering into agreements in which it voluntarily assumed obligations under U.S. law."  Opp. at 33 (citing 28 U.S.C. § 1605(a)(1)).  Plaintiffs "acknowledge," however, "that they have not alleged facts sufficient to invoke this exception because they do not have access to all of the agreements they have alleged PAHO executed" that are relevant to this case.  Id.  Aiming to get their hands on any such agreements, Plaintiffs have separately moved for leave to take jurisdictional discovery, conditioned on the Court's believing that it lacks jurisdiction over their claims under other FSIA exceptions.  See ECF No. 59.  As the Court has concluded that it does indeed lack jurisdiction over Plaintiffs' section 1589(a) and 1590 claims, the jurisdictional-discovery Motion, which PAHO opposes, see ECF No. 63, is live and potentially consequential because PAHO has moved to dismiss all of Plaintiffs' claims.  While Plaintiffs' 1589(b) "knowing benefit" claim is safe regardless of any potential waiver, their 1589(a) and 1590 claims do not survive this Opinion unless they can make out the waiver exception.

Rather than consider the Jurisdictional Discovery Motion now, however, the Court will hold it in abeyance along with PAHO's Motion to Dismiss Plaintiffs' 1589(a) and 1590 claims.  The Court invites Plaintiffs to inform it at the forthcoming status conference as to their preferred course of action going forward.  They might well be content to proceed solely on their 1589(b) claim inasmuch as any damages under the 1589(a) and 1590 claims would likely be duplicative.

If that is Plaintiffs' preference, the Court will at that time grant PAHO's Motion to Dismiss those latter TVPA claims. If, conversely, Plaintiffs desire that the Court consider whether to grant jurisdictional discovery on the waiver issue prior to dismissing those two claims, it will do so.

## III.   Conclusion

Given the number of complex issues addressed in this Opinion and the related procedural nuances, the Court once more summarizes its decision below.

PAHO is not immune from suit in federal court under the U.N. Charter or the WHO Constitution, as both are not self-executing and thus are not cognizable domestic law. Subject-matter jurisdiction therefore turns on the IOIA, which incorporates the FSIA's exceptions to immunity. Applying those exceptions, the Court has jurisdiction per the commercial-activity exception of the FSIA/IOIA over Plaintiffs' claim under section 1589(b) of the TVPA, which alleges that PAHO "knowingly benefit[ed] . . . from participation in a venture which has engaged in the providing or obtaining of" forced labor. See 18 U.S.C. § 1589(b). The Court does not yet have jurisdiction over Plaintiffs' other two TVPA claims, which satisfy neither the commercial-activity exception nor the expropriation exception; it offers no decision as to whether it has jurisdiction over those two claims under the FSIA's waiver exception. As for Plaintiffs' RICO claim, which is skeletally pled at best, it comes within the commercial-activity exception only to the extent that it relies on the same conduct underlying Plaintiffs' 1589(b) claim. Finally, neither of Plaintiffs' arguments regarding international comity or service of process leads to dismissal.

The Court will, accordingly, deny PAHO's Motion to Dismiss Plaintiffs' 1589(b) and RICO claims, and it will hold in abeyance the same Motion as to Plaintiffs' 1589(a) and 1590 claims pending the receipt of further information from Plaintiffs at the next status conference.  A contemporaneous Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 9, 2020