UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAMONA MATOS RODRIGUEZ, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PAN AMERICAN HEALTH ORGANIZATION, *et al.*,<br><br>Defendants. | Civil Action No. 20-928 (JEB) |

**ORDER**

The parties in this Racketeer Influenced and Corrupt Organizations Act suit have reached a standstill in their exchange of jurisdictional discovery. Jurisdiction in this case is no simple matter of domicile or amount in controversy. It instead turns on whether Plaintiffs — four Cuban physicians who claim that they were victims of human trafficking — can establish the applicability of an exception to Defendant Pan American Health Organization's immunity from suit under the International Organizations Immunity Act (as determined by reference to the Foreign Sovereign Immunities Act).

The Court has already found that such an exception applies based on the facts alleged in Plaintiffs' Second Amended Complaint. Rodriguez v. Pan Am. Health Org., 502 F. Supp. 3d 200, 211–15 (D.D.C. 2020). PAHO now seeks to test that conclusion using real evidence. See ECF No. 80 (Mot. to Dismiss for Lack of Jurisdiction). Before that effort goes forward, however, Plaintiffs have asserted an entitlement to certain discovery that they believe will support their claim to jurisdiction. See ECF No. 91 (Mot. to Compel). The Court held a hearing last fall in which it denied Plaintiffs' Motion to Compel without prejudice and sent the parties back to the

1

negotiating table because they had not adequately teed up the issue for resolution. See Minute Order of September 14, 2023; ECF No. 112 (Hearing Tr.) at 3, 6–7. Now, having followed the Court's instructions, the parties are back for further assistance in resolving their disagreement. See ECF No. 111 (Joint Status) (setting out each side's position on ten requests for discovery, two interrogatories, and a 30(b)(6) deposition).

A brief overview of the legal background is the first order of business. The Court previously ruled that Plaintiffs had adequately pled an FSIA exception to immunity based on PAHO's "commercial activity" — i.e., its "moving of money, for a fee, between Cuba and Brazil" in facilitation of the Mais Medicos program (through which Plaintiffs allege they were trafficked). Rodriguez, 502 F. Supp. 3d at 214; see also id. at 211 (citing FSIA exception codified at 28 U.S.C. § 1605(a)(2)). It also ruled that such activity bore the required nexus to the United States because it was allegedly "carried on in the United States" inasmuch as the full sum of money (the money to be moved along with PAHO's fee) was placed in a U.S. Citibank account as a layover on its journey to its final destination — Cuba. Id. at 215. Call it the "carried-on" theory. The Court also noted that the fact that PAHO's Director-General operated out of the organization's Washington, D.C., headquarters and had negotiated the deal supported this conclusion. Id.

Since the original motion-to-dismiss proceedings, Plaintiffs have dreamt up several new theories of nexus. First, even if the full pot of money never flowed through PAHO's U.S. bank account, its 5% cut ultimately came to rest and was invested there. See JSR at 9, 43. This, they say, means that the commercial activity in question had a "direct effect" in the United States, which is another way to establish the requisite nexus. Id. at 36–37. In addition, they believe that the 5% fee was ultimately absorbed into PAHO's general budget, which went to supporting its

operations managed in the D.C. headquarters.  Id. at 10–12.  It is not entirely clear, however, whether they think that this supports a direct-effect theory as well or whether it goes to their original "carried-on" theory or both.  In any event, Plaintiffs' discovery requests largely seek to corroborate that the 5% fee ended up in the United States.

PAHO, for its part, has a slew of objections to providing information about the money's movements.  For one, it thinks that Plaintiffs should be limited to the theory of nexus that the Court already ruled was valid.  See JSR at 17–21.  It also believes that the doctors have not offered enough reason to think that any of the evidence they seek exists; it points to its own declarations and documents it has produced voluntarily as proof to the contrary.  Id. at 17 (citing standard for IOIA jurisdictional discovery set out in Nyambal v. IMF, 772 F.3d 277, 281 (D.C. Cir. 2014), that a plaintiff must offer a "specific, well-founded allegation" to underwrite any discovery request); see also id. at 24–25 (citing PAHO declarations).  Finally, it disputes the validity of Plaintiffs' new theory of nexus, believing that the mere "domesticat[ion]" of PAHO's purportedly "ill-gotten gains" is insufficient to vitiate its immunity.  Id. at 29–34.

Whether or not Plaintiffs are limited to the theory already approved by this Court and the D.C. Circuit on appeal, PAHO is correct that the Court cannot compel discovery on a fact that, if proven, would be legally irrelevant to whether a U.S. nexus exists.  See JSR at 20; Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela, 185 F. Supp. 3d 233, 248 (D.D.C. 2016) ("Jurisdictional discovery should be permitted only if it is possible that the plaintiff could demonstrate the requisite jurisdictional facts sufficient to constitute a basis for jurisdiction and it should not be allowed when discovery would be futile.") (cleaned up).  In the prior hearing on this issue, the Court indicated that Plaintiffs had "a tough row to hoe . . . on the direct effect theory."  Hearing Tr. at 4:25–5:1.  As it continues to believe that Plaintiffs' direct-effects version

of U.S. nexus is not legally colorable, the Court need not get into PAHO's other problems with the discovery requests based solely upon that theory.

This Circuit's caselaw is clear that for transfer of funds into a U.S. bank account to have a <u>direct</u> effect, it must be called for or contemplated in the terms of the agreement forming the basis of the suit, such that the transfer into the U.S. was "immediate and unavoidable." See, e.g., <u>I.T. Consultants, Inc. v. Republic of Pakistan</u>, 351 F.3d 1184, 1188–90 (D.C. Cir. 2003) (explaining that no direct effect exists when "the transaction at issue . . . could have occurred without the involvement of a United States bank at any stage") (citing <u>Goodman Holdings v. Rafidain Bank</u>, 26 F.3d 1143, 1147 (D.C. Cir. 1994)). As Plaintiffs do not suggest that there was a requirement in the Mais Medicos agreement that the whole sum move through PAHO's U.S. Citibank account, there is no well-founded allegation that the agreement separately called for the 5% fee to be stored there. The Court will thus generally decline to order discovery on the direct-effects theory as Plaintiffs currently conceive of it.

Of course, the Court also indicated at the prior hearing that because Plaintiffs had "made out something regarding [the] carried on [theory]," they must have "some opportunity to get some discovery" on that topic. See Hearing Tr. at 5:2–3. Specifically, it noted that "discovery about transactions <u>from</u> PAHO's U.S. account" would "certainly [be] relevant." Id. at 5:6–7 (emphasis added). That remains true regardless of the above analysis. Plaintiffs have provided enough for a well-founded allegation that the commercial activity in question was carried on in the United States. They have alleged that PAHO's representative in Brazil suggested that the full sum of money go "through Washington." See ECF No. 50 (Second Am. Compl.), ¶ 50. They have alleged that the PAHO Director-General initiated the program from there. Id., ¶¶ 51, 54. They have also now provided evidence that the 5% fee was absorbed into PAHO's general

budget, from which point it could have been used to support the administration of the program in the United States. See JSR at 10–11. For that reason, discovery requests aimed at uncovering whether the full sum indeed traveled through the U.S. and how the 5% fee (if it indeed ended up in the United States) was used are relevant to a valid theory of U.S. nexus.

No doubt, Defendant has its responses to this evidence. See, e.g., JSR at 24–26 (refuting foregoing allegations). Still, the question at this stage is not whether PAHO's version of events is more plausible than the doctors' version. All Nyambal requires is a "specific, well-founded allegation" — as opposed to mere "conjecture and surmise" — that has not been "conclusively" disproven. See 772 F.3d at 281–82 (finding possibility of waiver of immunity clearly refuted by contract showing no waiver) (cleaned up). Defendants' evidence does not meet that high bar and thus cannot close the doors to discovery.

With these general conclusions in mind, the Court can now turn to the specifics of the discovery requested by Plaintiffs.

| Request | Content | Ruling |
|---|---|---|
| Request for Production 1 | Records of all transactions relating to or arising from the Mais Medicos program from 2013 to 2018 for any PAHO accounts at Banco Citibank S.A. For the avoidance of doubt, this request includes the complete and unredacted records of all transactions involving "accrued program support costs" from Mais Medicos. | As the information sought in RFPs 1-3 is relevant to Plaintiffs' theory that the administration of the program was carried on in D.C., these RFPs are appropriate. |
| Request for Production 2 | Records of all transactions relating to or arising from the Mais Medicos program from 2013 to 2018 for any PAHO accounts at any other Citibank bank (including Citibank, N.A., any other Citigroup entities, and any other branch or office in the U.S.). For the avoidance of doubt, this request includes the complete and unredacted records of all transactions involving "accrued program support costs." | See RFP 1. |

5

| Request for Production 3 | Records of all transactions from 2013 to 2018 relating to the Mais Medicos program, to or from any bank physically located in the United States. | See RFP 1. |
|---|---|---|
| Request for Production 4 | PAHO's internal correspondence concerning the decision of which banks to use for Mais Medicos, including any records of decision-making such as memos, emails, meeting minutes. For the avoidance of doubt, this request includes correspondence and records relating to the auditors' statement that "Mais Medicos funds could be invested with Citibank," as reported in the 2015 external audit report, ECF No. 91-9, at 119–20. This request also includes correspondence and records concerning whether PAHO invested funds derived from Mais Medicos with or in any U.S. entity (e.g. bank, fund, or other investment service or institution) in order to manage currency rate fluctuations. | The Court approves a narrowed RFP for internal correspondence touching on the use of a U.S. bank to facilitate Mais Medicos. |
| Request for Production 5 | Correspondence from 2013 to 2018 between PAHO and Brazil and/or between PAHO and Cuba concerning which banks would be used for the Mais Medicos program. For the avoidance of doubt, this request includes correspondence relating to the reason PAHO and Brazil changed their agreements from using Citibank to using Banco do Brasil. | See RFP 4. |
| Request for Production 6 | Documents defining, or illustrating, the meaning of "contracts- individual," "contracts – legal entity," "third party services – legal entity," and "third-party services – individual," as used in PAHO's records. | These documents are relevant to the extent that they use these terms in relation to payments or the movement of money. They are otherwise not relevant. |
| Request for Production 7 | Banco do Brasil records of all transactions related to or arising from the Mais Medicos program from 2013 to 2018. | See RFP 1. |
| Request for Production 8 | Correspondence and records concerning the independent administrative review referenced in a June 15, 2020, State Department announcement, and, if different, the review conducted by the Venable law firm, including all appendices and supporting documentation, and related | These documents are relevant to the question of how the 5% fee was ultimately used (and specifically whether it was used to administer the program in any way). |

6

|  | correspondence between PAHO and U.S. officials. |  |
|---|---|---|
| Request for Production 9 | All of PAHO's Technical and Financial Reports for Mais Medicos, as required by Clause 8 of TC-80. See Doc. 80-4, page 18. | This request is relevant as targeted at showing the commercial nature of PAHO's activity. |
| Request for Production 10 | Correspondence concerning, and minutes or reports relating to, meetings on December 3, 2012, in Brasilia and Havana referenced in the Brazilian Embassy cables. | See RFP 4. |
| Interrogatory 1 | Identify all people employed by or affiliated with PAHO who participated from the United States in the planning, implementation, management, and oversight of MMP operations and finances between 2012 and 2018, and describe their role in the Program. This interrogatory includes, but is not limited to, information about the Office of the Director General and the PAHO governing board, as well as non-privileged actions of the Office of the General Counsel. | This is relevant to the carried-on theory. |
| Interrogatory 2 | Provide the total amount of money, in Reais and U.S. Dollars, that PAHO paid the Cuban government for the services of Cuban doctor [sic] between 2013-2018, and, of the total sum, how much was paid to (or earmarked for) the government, and how much was paid to (or earmarked to pay) for the Doctors' compensation. | See RFP 9. |
| 30(b)(6) Deposition | Plaintiffs request the deposition of a designated witness with knowledge of all of PAHO's bank accounts and payments related to the Mais Medicos program, including the destination of the 5% "accrued PSC" and all transfers out of the Banco Citibank, S.A. account(s) that collected the 5% "accrued PSC."<br><br>Specifically, Plaintiffs request to depose Gerald Anderson, Director of Administration for PAHO | See RFP 1. |

The Court, accordingly, ORDERS that:

1. Plaintiffs may obtain the jurisdictional discovery listed above; and

2. The parties shall file a further Joint Status Report by September 27, 2024.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 12, 2024